

2023 OCT -2 PM 1:28

# UNITED STATES DISTRICT COURT for the DISTRICT OF MASSACHUSSETS

STEVEN P. ENDRES, derivatively

on behalf of EXHAUSTLESS INC.

      Plaintiff,

v.

Case No. 1:23-cv-12051-AK

ASHLEY MOODY, in her official capacity
of Attorney General of Florida, *et al*

      Defendants.

# AMENDED PETITION FOR PERMANENT INJUNCTION, ISSUANCE OF PATENT, MONETARY DAMAGES, AND PUNITIVE DAMAGES

## <u>CERTIFICATE AS TO PARTIES, CORPORATE DISCLOSURE, AND RELATED CASES</u>

**A.**    **Parties**

Petitioner/Plaintiff: Steven P. Endres, derivatively on behalf of Exhaustless Inc.

Respondents/Defendants:

<u>Law Enforcement:</u>
Ashley Moody, in her official capacity as Attorney General of Florida,
Ken Paxton, in his official capacity as Attorney General of Texas,

<u>Airport Owners:</u>
City of New York, New York,
City of Newark, New Jersey,
The United States (Owner of Reagan National Airport),

<u>Airport Operators:</u>
Metropolitan Washington Airports Authority,
Port Authority of New York and New Jersey,

<u>Air Carriers and Foreign Air Carriers:</u>
Air Canada*,
Air France-KLM S.A. *,
Alaska Air Group, Inc.*,
American Airlines Group Inc.*,
International Consolidated Airlines Group S.A.*,
Delta Air Lines, Inc.*,
FedEx Corp.,
Frontier Group Holdings, Inc. *,
Hawaiian Holdings, Inc. *,
JetBlue Airways Corp.*,
Kalitta Air, L.L.C.
LATAM Airlines Group S.A.*,
Deutsche Lufthansa AG*,
Southwest Airlines, Co.*,
Spirit Airlines, Inc.*,
United Airlines Holdings, Inc.*,
United Parcel Service, Inc.,
There are no other parties, intervenors, or amici.

**\* indicates Passenger Carrier.**

**B.    Corporate Disclosure Statement**

Pursuant to FRCP Rule 7.1, Petitioner states that Exhaustless Inc. is not a subsidiary or affiliate of a parent corporation and no publicly-held corporation owns 10% or more of its stock.

**C.    Related Cases**

U.S. *et al* v. American Airlines Group, Inc. and JetBlue Airways Corp., Case 1:21-cv-11558-LTS (D. Mass.) (final judgment and permanent injunction issued July 28, 2023; an order regarding termination of slot lease agreements and airport infrastructure sharing agreements, related to the NEA, is pending);

U.S. *et al* v. JetBlue Airways Corp. and Spirit Airlines, Inc., Case 1:23-cv-10511-WGY, D. Mass.;

Steven Endres, derivatively on behalf of Exhaustless Inc., v. the United States, Fed. Cl., Case No. 1:23-cv-01536 (complaint filed Sep. 5, 2023, answer due Nov. 10, 2023).

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF JURISDICTION .................................................................... 1

STATEMENT OF THE CASE ............................................................................. 6

    A.  Basic Overview ............................................................................... 6

    B.  Exhaustless' Market-Clearing Service ....................................... 10

    C.  The Conspiracy of Carriers to Restrain Trade in Reservations ............... 12

        1.  The IATA and the WSG Agreement ..................................... 12

            a.  The IATA Governance Structure ........................... 12

            b.  The IATA Annual General Meeting.............................. 18

            c.  The IATA WSG ........................................................ 19

        2.  The Reservation Allocation Process in the U.S.................................. 20

            a.  Each carrier stakes its claim to a grandfathered entitlement..... 20

            b.  The 'Slot Coordinator' sets the season's reservation limit at each airport.................................................................... 21

            c.  Each carrier submits its requested schedule................................ 22

            d.  The Slot Coordinator then 'grants' the carrier its schedule......... 22

            e.  The Slot Conference. ................................................... 22

            f.  A domestic trade association manages the domestic slot conference................................................................... 23

            g.  Carriers hold on to grandfathered claim when reservation not used as agreed.................................................... 24

    D.  Exhaustless v. FAA ..................................................................... 24

E.  COVID Pandemic ........................................................................... 26

F.  Delta/WestJet Alliance Agreement ............................................... 28

G.  Airport Operators Join the IATA WSG Agreement ...................... 29

H.  Winter 2019 and Summer 2020 Seasonal Reservations ............... 31

    1.  Administrative Allocation with the IATA WSG ................... 31

    2.  Slot Usage Waiver – Reduced Passenger Demand .............. 32

I.  The Public's Access to the Public's Airspace at a NJ Airport .................. 34

J.  Winter 2020 Seasonal Reservations .............................................. 35

    1.  Competitive Market Allocation Boycott ............................. 35

    2.  Administrative Allocation with the IATA WSG ................... 35

    3.  Slot Usage Waiver – Reduced Passenger Demand .............. 36

K.  American/JetBlue Northeast Alliance (NEA) ............................... 37

    1.  The making of the NEA agreement ..................................... 37

    2.  The complaint against the NEA ........................................... 39

    3.  The trial of the NEA ............................................................. 41

    4.  Permanent injunction of the NEA ....................................... 45

L.  Summer 2021 Seasonal Reservations ............................................ 45

    1.  Administrative Allocation with the IATA WSG ................... 45

    2.  Slot Usage Waiver – Reduced Passenger Demand .............. 46

M.  American/oneworld Alliance Amendment ................................... 48

N.  Delta/LATAM Alliance Agreement ............................................... 49

O.  Winter 2021 Seasonal Reservations .............................................. 50

    1.  Competitive Market Allocation Boycott ............................. 50

    2.  Administrative Allocation with the IATA WSG ................... 51

3.   Slot Usage Waiver – Reduced Passenger Demand ............................... 51

P.   **Summer 2022 Seasonal Reservations** ........................................... 52

1.   Competitive Market Allocation Boycott ................................. 52

2.   Administrative Allocation with the IATA WSG ................................. 53

3.   Slot Usage Waiver – Reduced Passenger Demand ............................... 53

Q.   Winter 2022 Seasonal Reservations ........................................... 54

1.   Competitive Market Allocation Boycott ................................. 54

2.   Administrative Allocation with the IATA WSG ................................. 55

3.   Slot Usage Waiver – Reduced Passenger Demand ............................... 56

R.   United/Air Canada Alliance Agreement ................................... 56

S.   Access to South Africa's Airspace ........................................... 56

T.   Access to Cuba's Airspace ........................................... 57

U.   The Public's Access to the Public's Airspace at DCA and LGA ............... 59

1.   Access to Airspace at a Washington, D.C. Airport ........................... 59

2.   Access to Airspace at a New York Airport ........................... 61

V.   JetBlue/Spirit Merger Agreement ................................... 62

W.   **Summer 2023 Seasonal Reservations** ........................................... 64

1.   Competitive Market Allocation Boycott ................................. 64

2.   Administrative Allocation with the IATA WSG ................................. 65

3.   Slot Usage Waiver – Reduced Airport Runway Capacity .................. 65

4.   Slot Usage Waiver – Reduced Airspace Capacity ............................. 67

X.   JetBlue Complaint Against The Netherlands ........................... 69

Y.   Winter 2023 Seasonal Reservations ........................................... 71

1.   Competitive Market Allocation Boycott ................................. 71

2. Administrative Allocation with the IATA WSG ................................. 72

Z. JetBlue/Frontier LaGuardia "Divestiture" Agreement............................ 73

AA. ATPCO ................................................................................................ 74

BB. Monetization of Grandfathered Allocation to use the Public's
Airspace............................................................................................... 75

1. Carrier Sells Reservations to Consumers ........................................... 75

2. Carrier Allocates Future Capacity to Certain Employers................. 76

3. Carrier Coins its Own Currency......................................................... 77

4. Allocate Future Service to Consumers with Grandfathering ............ 79

5. Other Claims of Ownership of Public Assets ..................................... 79

ARGUMENT ...................................................................................................... 82

A. Respondent Carriers Violated Antitrust Laws..................................... 82

B. Respondents American Airlines and JetBlue Airways Committed
Fraud.................................................................................................... 86

C. Racketeering Activity ......................................................................... 91

1. Respondent Air Carriers and Foreign Air Carriers........................... 91

2. Respondent Passenger Air Carriers and Foreign Air Carriers.......... 92

3. Respondent Airport Operators ........................................................... 94

D. Pattern of Racketeering Activity ....................................................... 94

E. Respondent the United States Violated the Constitution ....................... 96

F. Respondent Airport Operators Violated Exhaustless' First
Amendment Rights and Other Laws ........................................................ 98

G. Respondent Attorneys General Violated the U.S. Constitution ............. 101

H. Four-factor Test to Establish Standing for a Permanent Injunction ..... 102

1. Petitioner suffered an irreparable injury........................................... 102

2. Remedies available at law are inadequate......................................... 103

      3.   The balance of hardships warrants an injunction. ............................ 103

      4.   Permanent injunction serves the public interest............................ 104

   I.   Future Injury Is Certainly Impending ..................................................... 105

   J.   The Public's Right to the Patent ............................................................. 109

REQUEST FOR RELIEF ............................................................................................ 114

   A.   Request for Relief ..................................................................................... 114

OATH .......................................................................................................................... 126

# TABLE OF AUTHORITIES

## Cases

*A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935) .................... 97

*Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206 (Fed. Cir. 2005) ....................... 40, 44

*American Airlines v. Civil Aeronautics Board*, 192 F.2d 417 (D.C. Cir. 1951) . 89, 113

*Butchers' Union Co. v. Crescent City Co.*, 111 U.S. 746 (1884) .................................. 91

*Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990) ............................... 85

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................. 105

*Crandall v. Nevada*, 73 U.S. 35 (1867) ..................................................................... 113

*Crutcher v. Kentucky*, 141 U.S. 47 (1891) ......................................................... 90, 110

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) .......................................... 102

*Exhaustless Inc. v. FAA*, 931 F. 3d. 1209 (D.C. Cir. 2019), Doc. 27, PA-G
     Court 207 ............................................................................................................. 5, 25

*Exhaustless Inc. v. FAA*, Case No. 19-1158, Judgment, ECF 1835740 (D.C.
     Cir. 2020), Doc. 225, PA-G Court 236 ................................................................ 27

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 433 (1990) .................... 84

*H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949) ........................................ 98

*Ling Su Fan v. United States*, 218 U.S. 302, 310 (1910) ........................................... 92

*Morales v. Trans World Airlines*, 504 U.S. 374 (1992) ................................ 26, 61, 101

*National Soc'y of Prof. Engineers v. U.S.*, 435 U.S. 679 (1978) .................... 47, 83, 98

*Ohio v. AMEX*, 585 U.S. ___ (2018) .......................................................................... 112

*Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. ___
     (2018) .................................................................................................................. 112

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ............................... 109

*Spirit Airlines, Inc. v. DOT*, No. 19-1248 (D.C. Cir. 2021), Doc. 82, PA-G
    Court 218 ................................................................................................ 34, 90

*U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558,
    Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023),
    Doc. 224, PA-I Antitrust 749 ............................................ 39, 45, 86, 123

*U.S. v. Airline Tariff Publishing Company, et al*, Civil Action No.: 92 2854,
    Final Judgment (D.D.C. Nov. 1, 1993) ................................................ 75

*U.S. v. Causby*, 328 U.S. 256 (1946) ............................................ 6, 40, 110

*U.S. v. Topco Assocs., Inc.,* 405 U.S. 596 (1972) ................................ 83, 103

*Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748 (1976)...................... 26, 99

*Zobel v. Williams*, 457 U.S. 55 (1982) ................................................ 112

## Statutes

5 U.S.C. § 5702 note, Retention of Travel Promotional Items............................ 44, 78

15 U.S.C. § 1 .................................... 82, 99, 100, 114, 118, 120, 121, 125

15 U.S.C. § 15(a) ................................................ 1, 2, 5, 85, 115

15 U.S.C. § 15b ............................................................ 1, 85

15 U.S.C. § 21(e) ............................................................ 85

15 U.S.C. § 22 .............................................................. 2

15 U.S.C. § 26 .............................................................. 1

18 U.S.C. § 1001 ................................................ 86, 120, 122

18 U.S.C. § 1503 ................................................ 94, 120

18 U.S.C. § 1952 ................................................ 92, 94, 116, 117

18 U.S.C. § 1956(a) ................................................ 93, 119

18 U.S.C. § 1956(b)(2) ................................................ 2

18 U.S.C. § 1957 ................................................ 92, 116

18 U.S.C. § 1961(1)(B) ............................................................ 91, 94, 116, 119, 120

18 U.S.C. § 1961(1)(D) ............................................................................... 93, 119

18 U.S.C. § 1961(5) ...................................................................................... 94, 117

18 U.S.C. § 1962 ........................................................................................... 95, 118

18 U.S.C. § 1963(a) ............................................................................................... 95

18 U.S.C. § 1963(c) ............................................................................................... 95

18 U.S.C. § 1964(a) .......................................................................................... 2, 120

18 U.S.C. § 1964(c) .......................................................................................... 1, 117

18 U.S.C. § 1965 ..................................................................................................... 2

28 U.S.C. § 1331 ..................................................................................................... 1

28 U.S.C. § 1337 ..................................................................................................... 1

28 U.S.C. § 1338(b) ............................................................................................... 1

28 U.S.C. § 1346(a)(2) ........................................................................................... 2

28 U.S.C. § 1651 ..................................................................................................... 5

33 U.S.C. § 1251 et seq. ......................................................................................... 4

42 U.S.C. § 7401 et seq. ......................................................................................... 4

49 U.S.C. §    101(a) .......................................................................................... 110

49 U.S.C. §   5501 .................................................................................................. 4

49 U.S.C. § 40101 ................................................................................................. 89

49 U.S.C. § 40101(a) ............................................... 2, 11, 104, 105, 115, 121, 122

49 U.S.C. § 40102 .......................................................................................... 19, 110

49 U.S.C. § 40103(a)(1) ..................................................................................... 2, 25

49 U.S.C. § 40103(a)(2) ......................................................................................... 6

49 U.S.C. § 40103(b) ............................................................................................ 90

49 U.S.C. § 41101(c) .............................................................................. 2

49 U.S.C. § 41109 ......................................................................... 104, 110

49 U.S.C. § 41110(a) ......................................................................... 104

49 U.S.C. § 41304(a) ......................................................................... 104

49 U.S.C. § 41713 ................................................. 61, 100, 101, 125

49 U.S.C. § 41714(h)(4) ........................................................................ 7

49 U.S.C. § 41718 ................................................................................ 66

49 U.S.C. § 41722 ....................................................................... 34, 66

49 U.S.C. § 47101(b) ......................................................................... 105

49 U.S.C. § 49101 *et seq.* ................................................................... 59

49 U.S.C. § 49104(a)(4) ................................... 59, 60, 97, 98, 125

49 U.S.C. § 49109 .................................................................. 59, 96, 125

49 U.S.C. § 49111 ......................................................................... 96, 125

51 U.S.C. § 20102(e) ............................................................................. 4

Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-
      136, Title IV, Subtitle A, 134 Stat. 281, 469 (Mar. 27, 2020) ........................... 27

Patent Number 9,156,564 (2015) ....................................................... 4, 115

Patent Number 9,920,695 (2018) ....................................................... 4, 115

Port of New York Authority, Pub. Res., No. 17 (Aug. 3, 1921), Doc. 310, PA-A
      InfoCongress 847 ................................................................................ 100

## Other Authorities

Adam Smith, Wealth of Nations, Bk. I, c. 10 ........................................ 91

Agreement with the U.S. Department of Transportation Regarding Northeast
      Alliance Between American Airlines, Inc. and JetBlue Airways
      Corporation, dated January 10, 2021, Doc. 75, PA-D Agreement 204 ... 38, 121

Airline associations statement on benefit of global alignment of airport slot regulations (Jun. 15, 2023), Doc. 314, PA-D Agreement 1092 ....................... 73

Airlineinfo.com, OST Docket Filings for December 26, 2019, Doc. 39, PA-E Auction 54 ............................................................................................................. 35

Airlines for America Letter to FAA re Slot Usage Waiver (Aug. 7, 2023), Doc. 342, PA-J Other 172 ........................................................................................... 107

Airlines for America, Job Posting for Airline Traffic Management Coordinator (Oct. 5, 2022), Doc. 195, PA-D Agreement 427 ............................................... 43

Airlines for America, Job Posting for Director, Air Traffic Management (Mar. 22, 2023), Doc. 196, PA-D Agreement 429 ....................................................... 43

Airports Council International-North America Members (printed Aug. 8, 2023), Doc. 343, PA-J Other 174 ........................................................................ 30

Alfred Kahn, "Federal Trade Commission Act Amendments of 1987" *Congressional Record* – Senate, 8169 (Apr. 7, 1987), Doc. 317, PA-A InfoCongress 854 ..................................................................................................... 82

American Airlines *et al* Motion for Antitrust Immunity for Amended Joint Business Agreement, Dkt. DOT-OST-2008-0252 (Dec. 21, 2018), Doc. 325, PA-D Agreement 1244 .............................................................................. 48

American Airlines Group, Inc. SEC Form 10-K (Feb. 28, 2014) ................................ 81

American Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 384, PA-J Other 237 ........................................................................................... 68

American Airlines, Request for Cuba Waiver, Dkt. DOT-OST-2022-0073 (Jul. 21, 2023), Doc. 388, PA-B Rulemaking 806 .................................................. 107

AMR Corporation SEC Form 10-K (Feb. 15, 2012) ..................................................... 81

Answer of the Dutch Government, Ministry of Infrastructure and Water Management, Dkt. DOT-OST-2023-0028 (Mar. 7, 2023), Doc. 345, PA-J Other 203 ........................................................................................................... 70

Black's Law Dictionary, Free 2nd ed. ........................................................................... 87

Bureau of Transportation Statistics of the Department of Transportation, Transportation Statistics Annual Report 2022, 1-18, Doc. 302, PA-A InfoCongress 542 ..................................................................................................... 3

Charles E. Schumer, et al., Your Flight Has Been Delayed Again, Report by
    the Joint Economic Committee Majority Staff (May 2008), Doc. 1, PA-A
    InfoCongress 1 .................................................................................................. 10

Civil Aeronautics Board Fiscal Year 1981/1982 Reports to Congress, page 1
    (1983) ............................................................................................................. 110

Clarification of Departmental Position on American Airlines - JetBlue
    Airways Northeast Alliance Joint Venture, Dkt. DOT-OST-2021-0001-
    0023 (Sep. 21, 2021), Doc. 108, PA-D Agreement 229 ...................................... 39

Delta Air Lines letter to FAA re system constraints (Mar. 21, 2023), Doc. 383,
    PA-J Other 235 ................................................................................................. 68

Delta Air Lines, Inc. and LATAM Airlines Group, S.A., Joint Application for
    Approval of and Antitrust Immunity for Alliance Agreements, Dkt.
    DOT-OST-2020-0105-0001 (Jul. 8, 2020), Doc. 151, PA-D Agreement
    243 .................................................................................................................. 50

Delta Air Lines, Inc. SEC Form 10-K (Feb. 10, 2023) .......................................... 78, 79

Delta Air Lines, Inc. SEC Form 10-K (Feb. 15, 2008) ............................................. 80

Delta Air Lines, Inc. SEC Form 10-K (Mar. 27, 2006) ............................................ 80

Delta-WestJet Application for Antitrust Immunity for Alliance Agreements,
    Dkt. DOT-OST-2018-0154 (Oct. 10, 2018), Doc. 326, PA-D Agreement
    1353 ................................................................................................................. 28

DOJ Email, Notice of Production to Defendants in US v JetBlue and Spirit
    (Mar. 13, 2023), Doc. 380, PA-I Antitrust 1255 .............................................. 64

DOJ Email, Notice of Protective Order (Jan. 14, 2022), Doc. 125, PA-I
    Antitrust 43 ..................................................................................................... 40

DOJ Email, Notice of Stipulated Protective Order (Apr. 20, 2022), Doc. 379,
    PA-I Antitrust 1253 ......................................................................................... 41

DOJ Email, Notice of Stipulated Protective Order (Mar. 22, 2023), Doc. 381,
    PA-I Antitrust 1257 ......................................................................................... 64

DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287,
    PA-D Agreement 806 ....................................................................................... 124

Excerpts from CAB Reports Economic Cases Dec 1969 to Apr 1970, OMB
    Control 2120-0524, ICR 202108-2120-002 (Sep. 20, 2021), Doc. 98, PA-
    H CarrierInfo 121 ............................................................................................. 22

Exhaustless Airport Slot Auction Notice for Summer 2023, Dkt. DOT-OST-
2001-9849-0193 (Jul. 29, 2022), Doc. 177, PA-E Auction 158 .......................... 64

Exhaustless Airport Slot Auction Notice for Winter 2023, Dkt. DOT-OST-
2001-9849-0195 (Feb. 17, 2023), Doc. 203, PA-E Auction 171 ....................... 71

Exhaustless Announcement of Slot Auction for Summer 2022, Dkt. DOT-
OST-2001-9849-0187 attachment 1/6 (Aug. 19, 2021), Doc. 94, PA-E
Auction 101 ..................................................................................................... 52

Exhaustless Announces Auction of Frequencies for Scheduled Services to
Havana, Dkt. DOT-OST-2016-0021-1427 (May 5, 2022), Doc. 160, PA-E
Auction 153 ..................................................................................................... 58

Exhaustless Announces Auction of Frequencies to Cuba, Dkt. DOT-OST-
2001-9849-0190 (Apr. 19, 2022), Doc. 148, PA-E Auction 151 ....................... 57

Exhaustless Attached Auction Documents, Dkt. DOT-OST-2001-9849-0187
(Aug. 19, 2021) ............................................................................................... 53

Exhaustless Auction of Airspace Reservations to South Africa, Dkt. DOT-
OST-2001-9849-0188 (Mar. 30, 2022), Doc. 141, PA-E Auction 144 .............. 57

Exhaustless Aviation 2.0 Explained, Dkt. DOT-OST-2019-0144-0019
attachment 4/5 (Dec. 24, 2019), Doc. 37, PA-E Auction 4 .............................. 35

Exhaustless Aviation 2.0 Licensing Agreement – Carrier (v8.1) Dkt. DOT-
OST-2001-9849-0195 (Feb. 17, 2023), Doc. 204, PA-E Auction 178 ............... 71

Exhaustless Comment, Dkt. FAA-2001-9854-0127 (Jan. 7, 2022), Doc. 124,
PA-E Auction 103 ............................................................................................ 55

Exhaustless Comment, Dkt. FAA-2020-0862-0354/0351 (Mar. 7, 2022), Doc.
136, PA-B Rulemaking 327 .............................................................................. 54

Exhaustless Documentation of IATA WSG Calendar of Coordination History,
Doc. 14, PA-D Agreement 1 ........... 12, 21, 31, 36, 42, 46, 51, 53, 55, 65, 72, 117

Exhaustless Email "DOJ should amend complaint in U.S. v. American and
JetBlue" (Jan. 21, 2022), Doc. 129, PA-I Antitrust 207 ................................... 40

Exhaustless Email to DOJ (May 10, 2022), Doc. 149, PA-I Antitrust 214 ............... 40

Exhaustless FOIA Request for Information from Schedule Reduction
Meetings Held in Private, Dkt. DOT-OST-2021-0103-0049 (Jul. 14,
2022), Doc. 147, PA-B Rulemaking 366 .......................................................... 35

Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc.
    21, PA-B Rulemaking 95................................................. 12, 32, 46, 51, 53, 55, 65

Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0018 (Sep. 16, 2020), Doc.
    54, PA-B Rulemaking 160.................................................................................. 36

Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0321 (Sep. 27, 2021), Doc.
    104, PA-B Rulemaking 259................................................................................ 52

Exhaustless Inc. Petition for Rulemaking, Dkt. FAA-2018-0481-0001 (May
    21, 2018), Doc. 12, PA-B Rulemaking 71 ........................................................ 11

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Brief for Respondent, ECF
    1778181 (Mar. 18, 2019), Doc. 26, PA-G Court 87........................................... 25

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Joint Appendix, ECF
    1771626 (Feb. 1, 2019), Doc. 243, PA-G Court 1643........................................ 24

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Amended
    Opening Brief, ECF 1773615 (Feb. 15, 2019), Doc. 25, PA-G Court 1............ 24

Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Reply Brief,
    ECF 1780513 (Apr. 1, 2019), Doc. 242, PA-G Court 1592 ............................... 24

Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Brief for Respondent, ECF
    1821592 (Dec. 26, 2019), Doc. 251, PA-G Court 2245....................................... 90

Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Joint Appendix, ECF
    1815348 (Nov. 12, 2019), Doc. 227, PA-G Court 239 ....................................... 11

Exhaustless Inc. Workpaper IATA BOGs, Doc. 402, PA-L Cartel 26........................ 13

Exhaustless Internal Transcript of Oral Argument, D.C. Cir. Case 18-1303,
    Doc. 255, PA-G Court 2372 .............................................................................. 25

Exhaustless Notice of Claim (May 8, 2020), Doc. 350, PA-J Other 220 ................... 30

Exhaustless Notice of Results of Auction of Airport Schedules for Summer
    2023, Dkt. DOT-OST-2001-9849-0194 (Aug. 24, 2022), Doc. 178, PA-E
    Auction 165........................................................................................................ 64

Exhaustless Notice of Results of Auction of Airport Schedules for Winter
    2023, Dkt. DOT-OST-2001-9849-0196 (Mar. 17, 2023), Doc. 209, PA-E
    Auction 219........................................................................................................ 72

Exhaustless Objection to the Delta-LATAM Alliance, Dkt. DOT-OST-2020-
    0105-0045 (Feb. 7, 2022), Doc. 152, PA-D Agreement 366.............................. 50

Exhaustless Objection, Dkt. DOT-OST-2008-0252 (Nov. 30, 2020), Doc. 65, PA-D Agreement 110 ............................................................................. 49

Exhaustless Objection, Dkt. DOT-OST-2018-0154-0053 (Nov. 9, 2020), Doc. 60, PA-D Agreement 52 .......................................................... 29, 51

Exhaustless Objection, Dkt. DOT-OST-2020-0037 (Apr. 2, 2020), Doc. 340, PA-B Rulemaking 733 ........................................................................ 28

Exhaustless Objection, Dkt. DOT-OST-2021-0001 (Oct. 7, 2021), Doc. 106, PA-D Agreement 218 ........................................................................... 40

Exhaustless Objection, Dkt. FAA-2013-0259-2815 (Mar. 28, 2020), Doc. 42, PA-B Rulemaking 142 ........................................................................ 33

Exhaustless Objection, Dkt. FAA-2020-0862-0255 (Dec. 28, 2020), Doc. 71, PA-B Rulemaking 192 ........................................................................ 47

Exhaustless Request to Amend Complaint of NEA (Jan. 21, 2022), Doc. 128, PA-I Antitrust 205 ............................................................................. 40

Exhaustless Response, Dkt. DOT-OST-2023-0028 (Mar. 13, 2023), Doc. 346, PA-J Other 207 ................................................................................... 70

Exhaustless SCOTUS Appendix to v35, Doc. 127, PA-I Antitrust 174 ..................... 40

Exhaustless SCOTUS Permanent Injunction v35 (Jan. 21, 2022), Doc. 126, PA-I Antitrust 45 ............................................................................... 40

Exhaustless Slot Auction Design Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 205, PA-E Auction 193 .......................................... 71

Exhaustless Slot Auction Rules and Procedures Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 206, PA-E Auction 201 ....................... 71

Exhaustless Update to DOJ (May 10, 2022), Doc. 148, PA-I Antitrust 210 ............. 40

Exhaustless Winter 2023 Airport Slot Auction Prepayment Form, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 208, PA-E Auction 218 ............... 72

Exhaustless Winter 2023 Auction Registration doc ver. 1.1, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 207, PA-E Auction 215 ...................... 72

FAA Construction Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 87 Fed. Reg. 79245 (Dec. 27, 2022), Doc. 201, PA-B Rulemaking 402 .......................................................................................... 66

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 11805 (proposed Mar. 2, 2022), Doc. 135, PA-B Rulemaking 321 ................................................................................................... 54

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 18057 (Mar. 29, 2022), Doc. 137, PA-B Rulemaking 332 ............... 54

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Summer 2021 Scheduling Season, 85 Fed. Reg. 83672 (proposed Dec. 22, 2020), Doc. 70, PA-B Rulemaking 188 ................................................................................................... 47

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 57288 (proposed Sep. 15, 2020), Doc. 53, PA-B Rulemaking 155 .................................................................................... 36

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 63335 (Oct. 7, 2020), Doc. 55, PA-B Rulemaking 162 ............... 37

FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 52114 (proposed Sep. 20, 2021), Doc. 103, PA-B Rulemaking 252 .................................................................................... 52

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 58134 (Oct. 20, 2021), Doc. 121, PA-B Rulemaking 269 ........... 52

FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2022/2023 Scheduling Season, 87 Fed. Reg. 65282 (Oct. 28, 2022), Doc. 180, PA-B Rulemaking 385 ........... 56

FAA High Density Traffic Airports; Slot Allocation and Transfer Methods, 50 Fed. Reg. 52180 (Dec. 20, 1985), Doc. 232, PA-B Rulemaking 455 ................. 67

FAA Information Collection Request, OMB Control No: 2120-0524, ICR Reference No: 202108-2120-002, Supporting Statement A (Aug. 26, 2021), Doc. 261, PA-H CarrierInfo 283 ........................................... 21

FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 15018 (Mar. 16, 2020), Doc. 40, PA-B Rulemaking 137 ........... 26, 32

FAA Notice of limited waiver of the minimum slot usage requirement, 85
    Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PA-B Rulemaking
    140 .................................................................................. 23, 26, 33, 86

FAA Notice of limited waiver of the minimum slot usage requirement., 85
    Fed. Reg. 21500 (Apr. 17, 2020), Doc. 43, PA-B Rulemaking 147 ................... 33

FAA Notice of Limited Waiver of the Slot Usage Requirement, Doc. 387, PA-J
    Other 243 .............................................................................................. 68

FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK,
    LAX, EWR, SFO] for the Winter 2023/2024 Scheduling Season, 88 Fed.
    Reg. 22514 (Apr. 13, 2023), Doc. 218, PA-B Rulemaking 435 ......................... 21

FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK,
    LAX, SFO] for the Summer 2020 Scheduling Season, 84 Fed. Reg.
    51222 (Sep. 27, 2019), Doc. 34, PA-B Rulemaking 116 .................................. 23

FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK,
    LAX, SFO] for the Summer 2024 Scheduling Season, 88 Fed. Reg.
    64964 (Sep. 20, 2023) ............................................................................. 21

FAA NYC_Waiver_Extension_FAA_8-8-23, Doc. 353, PA-J Other 224 ................. 108

FAA Policy Statement: COVID-19 Related Relief at [ORD, JFK, LAX, EWR,
    LGA, DCA, SFO] for the Summer 2021 Scheduling Season, Dkt. FAA-
    2020-0862-0302 (Jan. 14, 2021), Doc. 72, PA-B Rulemaking 194 ................... 47

FAA PR, Fed. Reg. Notice of Limited Waiver of Slot Usage Requirement for
    Summer 2023 (Mar. 22, 2023), Doc. 386, PA-J Other 241 .............................. 68

FAA Press Release, FAA Aviation Safety Summit Breakout Panels (Mar. 15,
    2023), Doc. 382, PA-J Other 232 ............................................................... 68

FAA Press Release, FAA Extends Flexibility for Airlines (Aug. 9, 2023), Doc.
    352, PA-J Other 223 ............................................................................... 108

FAA Slot Administration Email (Jan. 29, 2021), Doc. 20, PA-B Rulemaking
    91 ........................................................................................................ 22

FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA,
    EWR], 88 Fed. Reg. 18032 (Mar. 27, 2023), Doc. 210, PA-B Rulemaking
    417 ...................................................................................................... 68

FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA,
    EWR], 88 Fed. Reg. 64793 (Sep. 20, 2023) ................................................ 108

Frontier Press Release, JetBlue and Frontier Announce Divestiture
    Agreement in Connection with JetBlue's Combination with Spirit (Jun.
    1, 2023), Doc. 324, PA-D Agreement 1242 ................................................. 74, 121

GSA City Pair Program (CPP) FY24 Contract Awards (Jul. 2023), Doc. 354,
    PA-H CarrierInfo 315 ............................................................................ 107, 124

GSA Federal Travel Regulation; Using Promotional Materials and Frequent
    Traveler Programs, 67 Fed. Reg. 17946 (Apr. 12, 2002), Doc. 197, PA-B
    Rulemaking 394 ...................................................................................... 44

GSA Federal Travel Regulation; Using Promotional Materials; Conference
    Planning, 68 Fed. Reg. 27936 (May 22, 2003), Doc. 198, PA-B
    Rulemaking 396 ...................................................................................... 44

GSA FY23 CPP Request for Proposal (Feb. 17, 2022), Doc. 185, PA-H
    CarrierInfo 153............................................................................................ 42, 77

GSA Press Release, FY23 City Pair Contracts Awarded for Official
    Government Travel (Jul. 12, 2022), Doc. 186, PA-H CarrierInfo 273 ............ 76

IATA 150th Slot Conference – Organizations attending (Jun. 13, 2022), Doc.
    231, PA-D Agreement 436 ......................................................................... 23

IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc.
    254, PA-D Agreement 444 ............................................................. 23, 30, 45, 73

IATA Act of Incorporation, Doc. 400, PA-L Cartel 11 ................................. 12

IATA Articles of Association (undated, unsigned), Doc. 399, PA-L Cartel 1 ............ 12

IATA Business Registration Quebec (July 2023), Doc. 403, PA-L Cartel XX ........... 15

IATA Industry restart: Forming new interline partnerships within the
    multilateral interline framework (May 19, 2020), Doc. 312, PA-J Other
    4 ............................................................................................................ 37

IATA Managing Scarce Airport Capacity: Airport Slots & Worldwide Slot
    Guidelines (WSG) Fact Sheet (Dec. 2019), Doc. 305, PA-D Agreement
    1084 ....................................................................................................... 20

IATA Press Release, Airline Associations Join Together to Call for Global
    Alignment of Slot Regulations (Jun. 15, 2023), Doc. 313, PA-D
    Agreement 1091 ................................................................... 73, 84, 106

IATA Press Release, Aviation Leaders Assemble in Istanbul for IATA's 79th
    AGM (Jun. 2, 2023), Doc. 316, PA-J Other 12 ................................. 18

IATA press release, Industry Collaboration Brings New Era for Airport Slot Allocation (June 3, 2019), Doc. 32, PA-D Agreement 12 ........................... 29, 99

IATA Resolution on Slot Policy, 75th Annual General Meeting (Jun. 2, 2019), Doc. 304, PA-D Agreement 1082 ........................................................ 18, 83, 116

IATA Rules and Regulations of the Board of Governors (undated), Doc. 401, PA-L Cartel 14 ................................................................................................. 12

IATA Slot Conference, Form 1 - Accreditation of Head Delegate, Doc. 404, PA-L Cartel 53 ................................................................................................ 23

IATA Website, Annual General Meeting (printed Aug. 1, 2023), Doc. 329, PA-J Other 13 ................................................................................................... 18

IATA Worldwide Airport Slots Fact Sheet (Apr. 2023), Doc. 306, PA-D Agreement 1086 .................................................................................................. 20

IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136 ..................................19, 20, 22, 23, 24, 29, 46, 66, 69, 114

IATA, How to get the most out of attending the Slot Conference (March 2022), Doc. 338, PA-J Other 168 .......................................................... 21, 66, 67

JetBlue Airways Complaint, Dkt. DOT-OST-2023-0028 (Feb. 14, 2023), Doc. 344, PA-J Other 182 ............................................................................................. 69

JetBlue Airways Corporation SEC Form 10-K (Feb. 27, 2023) ...................... 62, 77, 78

JetBlue Airways Corporation SEC Form 10-Q (Aug. 1, 2023).................................... 63

JetBlue Airways Corporation SEC Form 10-Q, Exhibit 10.3, Northeast Alliance Agreement between American Airlines, Inc. and JetBlue Airways Corp. (Nov. 9, 2020), Doc. 322, PA-D Agreement at 1093 ........ 37, 120

JetBlue Airways Corporation SEC Form 8-K (Oct. 24, 2022).................................... 71

JetBlue Comment, Dkt. FAA-2020-0862 (Sep. 23, 2020), Doc. 334, PA-J Other 144 ................................................................................................................. 106

JetBlue request to withdraw complaint, Dkt. DOT-OST-2023-0028 (Jun. 5, 2023), Doc. 347, PA-J Other 216 ...................................................................... 71

JPMorgan Chase & Co., 2022 SEC Form 10-K (Feb. 21, 2023).................................. 78

Lease of the Metropolitan Washington Airports between the U.S.A. acting by
    and through the Secretary of Transportation and the Metropolitan
    Washington Airports Authority (Mar. 2, 1987), amend. 1 (1991),
    amend. 2 (1998), amend. 3 (2003), and amend. 4 (2013), Doc. 308, PA-A
    InfoCongress 782............................................................... 59, 96, 99, 125

Letter from PANYNJ Claims Division (Jul. 17, 2020), Doc. 351, PA-J Other
    222 ............................................................................................... 30

Michael Ball, et al., Total Delay Impact Study, National Center of Excellence
    for Aviation Operations Research ("NEXTOR") (Nov. 3, 2010), Doc. 2,
    PA-A InfoCongress 35 ................................................................. 3, 115

New York Senate Bill S311A........................................................................ 61

Notice of Action Taken re: American Airlines, Inc. and JetBlue Airways
    Corp., Dkt. DOT-OST-2016-0021-1436 (Sep. 19, 2022), Doc. 162, PA-F
    MarketFail 94.............................................................................. 58

Notice of Action Taken re: Delta Air Lines, Dkt. DOT-OST-2016-0021-1442
    (Oct. 18, 2022), Doc. 164, PA-F MarketFail 100 ................................. 58

Notice of Action Taken re: JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-
    1447 (Mar. 17, 2023), Doc. 165, PA-F MarketFail 104..................................... 58

Notice of Action Taken re: Mesa Airlines, Inc., Dkt. DOT-OST-2016-0021-
    1435 (Sep. 19, 2022), Doc. 163, PA-F MarketFail 97......................................... 58

Notice of Market-based Actions to Relieve Airport Congestion and Delay, 66
    Fed. Reg. 43947 (proposed Aug. 21, 2001), Doc. 337, PA-B Rulemaking
    553 ............................................................................................... 7

Notice Suspending US-Cuba Scheduled Services via Non-Havana Points,
    Dkt. DOT-OST-2016-0021-1410 (Oct. 25, 2019), Doc. 156, PA-F
    MarketFail 75.............................................................................. 57

Open Skies Partners, Bureau of Economic and Business Affairs (Sep. 1,
    2020), Doc. 303, PA-A InfoCongress 776............................................ 3

Order 2017-4-6 (Apr. 10, 2017), Doc. 9, PA-B Rulemaking 43..................................... 8

Order 2020-10-13 (proposed Oct. 23, 2020), Doc. 59, PA-D Agreement 14 ............... 28

Order 2020-11-14 (Nov. 17, 2020), Doc. 157, PA-F MarketFail 78............................ 57

Order 2020-11-9 (proposed Nov. 16, 2020), Doc. 64, PA-D Agreement 92 .......... 48, 75

Order 2020-12-17 (Dec. 21, 2020), Doc. 63, PA-D Agreement 90 ............................. 29

Order 2020-3-10 (proposed Mar. 27, 2020), Doc. 339, PA-B Rulemaking 557 .... 27, 38

Order 2020-4-2 (Apr. 7, 2020), Doc. 341, PA-B Rulemaking 735............................... 28

Order 2022-5-17 (May 19, 2022), Doc. 159, PA-F MarketFail 81 ............................. 58

Order 2022-6-1 (Jun. 1, 2022), Doc. 161, PA-F MarketFail 89 ................................. 58

Order 2022-7-1, (Jul. 5, 2022), Doc. 134, PA-F MarketFail 58 ................................. 34

Order 2022-7-18 (Jul. 26, 2022), Doc. 174, PA-F MarketFail 115 ............................ 57

Order 2022-9-20 (Sep. 30, 2022), Doc. 155, PA-D Agreement 413............................. 50

Order 2023-6-21 (Jun. 27, 2023), Doc. 348, PA-J Other 218..................................... 71

Order Extending Order Limiting Operations at John F. Kennedy
    International Airport, 83 Fed. Reg. 46865 (Sep. 17, 2018), Doc. 22, PA-
    B Rulemaking 100 .............................................................................................. 24

Patent Application US15/789,585 (Aug. 19, 2016) .................................................... 11

San Francisco Board of Supervisors, Notification of Contract Approval (Aug.
    3, 2012), Doc. 392, PA-J Other 261 .......................................................... 30, 120

San Francisco International Airport, Competition Plan Update (Aug. 2001),
    Doc. 391, PA-J Other 250 .................................................................................. 30

Settlement Agreement among Spirit Airlines, Inc., JetBlue Airways Corp.,
    and the Attorney General of Florida (Mar. 6, 2023), Doc. 214, PA-I
    Antitrust 695 ............................................................................................... 63, 122

Southwest Airlines Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 332,
    PA-J Other 129.................................................................................................. 105

Spirit Airlines Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 333, PA-J
    Other 134........................................................................................................... 106

Spirit Airlines Complaint, Attachment 1/2, Dkt. DOT-OST-2021-0001 (Jan. 7,
    2021), Doc. 328, PA-D Agreement 1595 ............................................................ 37

Spirit Airlines Supplement to Complaint, Dkt. DOT-OST-2021-0001 (May 12,
    2021), Doc. 327, PA-D Agreement 1458 ............................................................ 62

Spirit Airlines, Inc. SEC Form 10-K (Feb. 6, 2023)............................................ 74, 81

Spirit Airlines, Inc. SEC Form 8-K/A, Agreement and Plan of Merger, Exhibit 2.1 (filed Aug. 16, 2022), Doc. 323, PA-D Agreement 1131 ...................... 62, 120

Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Joint Appendix, ECF 1846976 (Jun. 12, 2020), Doc. 238, PA-G Court 1021 ..................................... 46

Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petition for Review, ECF 1818212 (Nov. 25, 2019), Doc. 234, PA-G Court 824 ....................................... 34

Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petitioner's Final Opening Brief, ECF 1849058 (Jun. 26, 2020), Doc. 235, G Court 832 ........................... 34

Steve Endres, Congestion-free Flights for NYC Now, LinkedIn (May 28, 2018), https://www.linkedin.com/pulse/congestion-free-flights-nyc-now-steve-endres/, Doc. 13, PA-E Auction 1 ............................................. 11

Testimony of JetBlue CEO, D. Mass. Case 1:21-cv-11558, ECF 299 (Sep. 28, 2022) ...................................................................................................... 41

Testimony of JetBlue Corporate Sales Manager, D. Mass. Case 1:21-cv-11558, ECF 299 (Sep. 28, 2022), Doc. 184, PA-I Antitrust 219 ................................... 43

Testimony of JetBlue Pricing Manager, D. Mass. Case 1:21-cv-11558, ECF 300 (Sep. 29, 2022) ....................................................................................... 75, 79

Testimony of Spirit Airlines VP Network Planning, D. Mass. Case 1:21-cv-11558, ECF 300 (Sep. 29, 2022), Doc. 291, PA-I Antitrust 1132...................... 87

Testimony of Spirit Airlines VP Network Planning, D. Mass. Case 1:21-cv-11558, ECF 301 (Sep. 30, 2022)......................................................................... 41

The Port Authority of New York and New Jersey, Airport Rules and Regulations, Chapter VIII Aircraft Operations (Jul. 27, 2022), Doc. 335, PA-J Other 146.................................................................................... 61, 125

TRN Agreement regarding Merger Between US Airways Group, Inc. and AMR Corp. (Nov. 12, 2013), Doc. 191, PA-I Antitrust 463 ............................. 122

TRN Letter to United Airlines, Dkt. DOT-OST-2008-0234-0336 (posted Jul. 21, 2022), Doc. 176, PA-D Agreement 424 ........................................................ 56

U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, American Airlines and JetBlue Response to Plaintiff's Motion for Entry of Final Judgment and Permanent Injunction, Exhibit A, ECF 359-1 (Jun. 14, 2023), Doc. 315, PA-I Antitrust 1243 ........................ 45, 87

U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Complaint, ECF 1 (Sep. 21, 2021), Doc. 105, PA-I Antitrust 1 ........... 39

U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Plaintiff's Proposed Findings of Fact, ECF 332 (Dec. 2, 2022), Doc. 200, PA-I Antitrust 517 ............................................................... 44

U.S. et al v. JetBlue Airways and Spirit Airlines, Inc., D. Mass. Case 1:23-cv-10511, Complaint, ECF 1 (Mar. 7, 2023), Doc. 215, PA-I Antitrust 708 ........ 63

U.S. General Accounting Office Report to Congress, GAO-02-36 Metropolitan Washington Airports Authority (March 2002).................................. 60

UAL Corporation SEC Form 10-K (Mar. 16, 2007) ...................................... 80

UAL Corporation SEC Form 10-K (Mar. 28, 2003) ...................................... 80

United Airlines Comment, Dkt. DOT-OST-2021-0103 (Sep. 27, 2021) Doc. 330, PA-J Other 15 ............................................................ 105

United Airlines Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 331, PA-J Other 122 ............................................................ 105

United Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 385, PA-J Other 238 ................................................................ 68

US Airways and AMR Settlement Agreement Texas (Sep. 30, 2013), Doc. 192, PA-I Antitrust 484 ............................................................ 123

US Airways Group, Inc. SEC Form 10-K (Mar. 12, 2004) ........................... 80

US Airways Group, Inc. SEC Form 10-K (Mar. 27, 2003) ........................... 79

USTRANSCOM Award - Alaska Airlines, Doc. 357, PA-H CarrierInfo 320 ............. 76

USTRANSCOM Award - American Airlines, Doc. 358, PA-H CarrierInfo 322 ........ 76

USTRANSCOM Award - Delta Air Lines, Doc. 361, PA-H CarrierInfo 328 ............. 76

USTRANSCOM Award - Hawaiian Airlines, Doc. 364, PA-H CarrierInfo 334 ........ 76

USTRANSCOM Award - JetBlue Airways, Doc. 365, PA-H CarrierInfo 336 ........... 76

USTRANSCOM Award - United Airlines, Doc. 374, PA-H CarrierInfo 354 ............. 76

USTRANSCOM Award - UPS, Doc. 375, PA-H CarrierInfo 356 ............................. 76

Wikipedia – ATPCO (printed Jul. 15, 2023), Doc. 309, PA-J Other 1 ...................... 74

# Regulations

14 C.F.R. § 212.2 ................................................................................................ 42

14 C.F.R. § 303.03 .............................................................................................. 56

14 C.F.R. § 399.84(a) .................................................................................... 96, 118

14 C.F.R. Part 93, Subpart S, § 93.215(a), Doc. 202, PA-B Rulemaking 405 ............ 67

# Constitutional Provisions

U.S. Const. amend. I ..................................................................................... 98, 121

U.S. Const. amend. X .................................................................................... 90, 109

U.S. Const. art. I, § 8, cl. 3 ................................ 2, 96, 100, 101, 109, 111, 122, 123, 125

U.S. Const. art. I, § 8, cl. 5 ........................................................................... 92, 118

U.S. Const. art. I, § 8, cl. 8 ............................................................................ 2, 115

U.S. Const. art. I, § 9, cl. 6 ........................................................................... 96, 125

U.S. Const. art. I, § 10, cl. 1 .................................................................. 102, 122, 123

U.S. Const. art. I, § 9, cl. 8 .................................................................. 96, 100, 111, 125

U.S. Const. art. IV, § 3, cl. 2 .......................................... 2, 101, 102, 110, 122, 123, 125

U.S. Const. art. VI, cl. 2 ..................................................................................... 109

# Treaties

U.S. – E.U. (Iceland, Norway) Air Transport Agreement of June 21, 2011,
    Doc. 321, A InfoCongress 976 ................................................................... 4

U.S. – E.U. Air Transport Agreement of April 30, 2007, Doc. 319, PA-A
    InfoCongress 860 ............................................................................... 4, 7

U.S. – E.U. Air Transport Agreement of June 24, 2010, Doc. 320, A
    InfoCongress 948 .................................................................................. 4

# GLOSSARY OF ACRONYMS

| | |
|---|---|
| A4A | Air Transport Association of America, Inc. d/b/a Airlines for America, a domestic airline trade association |
| CAB | Civil Aeronautics Board |
| CPP | City Pair Program of the GSA |
| DCA | Reagan National Airport in Washington, D.C. |
| DOJ | Department of Justice |
| DOT | Department of Transportation (abbreviation used by D. Mass. and the Secretary), a.k.a. TRN |
| EWR | Newark Liberty Airport in New Jersey |
| FAA | Federal Aviation Administration under the Secretary of Transportation |
| FOIA | Freedom of Information Act |
| GSA | General Services Administration, an executive branch agency |
| IATA | International Air Transport Association, an airline trade association incorporated in Canada |
| JFK | John F. Kennedy Airport in New York |
| LAX | Los Angeles Airport in California |
| LGA | LaGuardia Airport in New York |
| NYC | New York City, New York |
| OIRA | Office of Information and Regulatory Affairs of the OMB |
| OMB | Office of Management and Budget, an office in the executive office of the President |
| ORD | Chicago O'Hare Airport in Illinois |
| OST | Office of the Secretary of Transportation |
| SFO | San Francisco Airport in California |
| TRN | Department of Transportation (abbreviation used by Fed. Cl.), a.k.a. DOT |

| USPTO | U.S. Patent and Trademark Office under the Secretary of Commerce |
| WSG, WASG | Worldwide Slot Guidelines, a.k.a. Worldwide Airport Slot Guidelines, an agreement among member-airlines of the IATA |

## TABLE OF PETITIONER'S APPENDICES

| PETITIONER'S APPENDIX | ABBREVIATION |
|---|---|
| A: Communication with Congress | PA-A InfoCongress |
| B: Rulemaking | PA-B Rulemaking |
| C: Unsolicited Proposal | PA-C Offer |
| D: Agreements between Airlines | PA-D Agreement |
| E: Exhaustless Auction Announcement | PA-E Auction |
| F: Administrative Reservation Allocation | PA-F MarketFail |
| G: Court Documents | PA-G Court |
| H: Agency Information Collection | PA-H CarrierInfo |
| I: U.S. Antitrust Cases | PA-I Antitrust |
| J: Other | PA-J Other |
| K: Table of Documents Referenced to Appendices | [None] |
| L: IATA Corporation Documents | PA-L Cartel |

# STATEMENT OF JURISDICTION

Petitioner brings this derivative action, pursuant to Federal Rules of Civil Procedure Rule 23.1, to enforce Exhaustless Inc.'s right to a permanent injunction under section 16 of the Clayton Act, 15 U.S.C. § 26, and seeks structural and monetary remedies under section 901 of the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(c), section 4 of the Clayton Act, 15 U.S.C. § 15(a), and rights to "further necessary or proper relief" based on the D.C. Circuit's declaratory judgment regarding Exhaustless' market, pursuant to 28 U.S.C. § 2202

This petition is timely filed: The constitutional claims and Racketeering Influenced Corrupt Organizations (RICO) claims have no statute of limitation, and the antitrust claims are filed "within four years after the cause of action accrued," section 4 of the Clayton Act, as amended,15 U.S.C. § 15b, which was on March 25, 2020.[1]

This Court has jurisdiction pursuant to Pub. L. 80-773, 62 Stat. 869, 931, 933 (1948), 28 U.S.C. § 1337 because this petition arises under acts of the Congress regulating commerce and protecting trade and commerce against restraints; pursuant to 28 U.S.C. § 1338(b) because the claim of unfair competition is related to a claim under the patent laws; and pursuant to 28 U.S.C. § 1331 for the claims arising under the U.S. Constitution, laws and treaties.  This Court has jurisdiction

---

[1]  *See* E. COVID Pandemic, *infra*.

1

over the foreign respondents pursuant to section 317 of the USA PATRIOT Act of 2001, 18 U.S.C. § 1956(b)(2). This Court also has jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a) and under the civil remedies section 901 of the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(a).

This Court has jurisdiction, concurrent with the U.S. Court of Federal Claims, 28 U.S.C. § 1346(a)(2) because the U.S. is a respondent in a claim founded on the constitution. No claim of monetary damages from the U.S. is made in this petition. Petitioner has filed a complaint in the U.S. Court of Federal Claims, Case No. 1:23-cv-01536, regarding the federal government's related actions, which culminated in a regulatory taking of Exhaustless' proprietary right to conduct commerce, requiring compensation under the fifth amendment.

Venue is proper under section 4 of the Clayton Act, 15 U.S.C. § 15(a), section 12 of the Clayton Act, 15 U.S.C. § 22, and section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1965.

This petition will aid the Court's jurisdiction because it involves the Congress' constitutional authority over the regulation of the use of the public's airspace,[2] domestic and foreign commerce,[3] and patent rights.[4]

---

[2]    *See* U.S. Const. art. IV, § 3, cl. 2. *See also*, 49 U.S.C. §§ 40103(a)(1) ("The United States Government has exclusive sovereignty of airspace of the United States") *and* 41101(c) (an air carrier certificate "does not confer a proprietary or exclusive right to use airspace, an airway of the United States, or an air navigation facility").

[3]    *See* U.S. Const. art. I, § 8, cl. 3. *See also*, 49 U.S.C. § 40101(a)(12)(B).

[4]    *See* U.S. Const. art. I, § 8, cl. 8.

Exhaustless' competitive market allocation of reservations to use the public's airspace has been blocked by a carrier cartel's conspiracy to restrain trade by price fixing and market allocating reservations to land and takeoff at airports, and by a group boycott of the reservation market. The restraint of trade has usurped the market competition for price, route, and service required by the Airline Deregulation Act of 1978 and committed to in air transport agreements between the U.S. and over 100 of its trading partners.[5] Exhaustless' right to collect market-clearing premiums for airspace reservations was declared by the U.S. Court of Appeals for the D.C. Circuit; the lost commerce exceeds $30,000,000,000 per year.[6] Exceptional circumstances warrant the exercise of this Court's discretionary powers because the rights claimed by carriers to use scarce public airspace resources contradict long-established property rights regarding the public's title to the navigable airspace, undermining the statutory framework and affecting passengers and shippers in over 800 million annual enplanements across the U.S. on domestic and foreign carriers.[7]

Further, Exhaustless has patented solutions to increase flight capacity at constrained airports, and solutions to allocate reservations across the National

---

[5] *See* Open Skies Partners, Bureau of Economic and Business Affairs (Sep. 1, 2020), Doc. 303, PA-A InfoCongress 776.

[6] *See* Michael Ball, et al., Total Delay Impact Study, National Center of Excellence for Aviation Operations Research ("NEXTOR") at vii, Table 0-1 (Nov. 3, 2010), Doc. 2, PA-A InfoCongress 35.

[7] *See* Bureau of Transportation Statistics of the Department of Transportation, Transportation Statistics Annual Report 2022, 1-18, Doc. 302, PA-A InfoCongress 542.

Intermodal Transportation System — while decreasing noise, pollution, and greenhouse-gas emissions,[8] as sought by Congress (*e.g.*, Clean Air Act,[9] Clean Water Act,[10] air transport agreements,[11] the National Aeronautics and Space Act,[12] and the Intermodal Surface Transportation Efficiency Act of 1991[13]).  But the anticompetitive allocation has interfered with the Congress' promotion of progress in transportation — while squandering Exhaustless' limited time to the exclusive use of its intellectual property.

Petitioner brings many of the parties that have orchestrated and joined this agreement to restrain trade — domestic and foreign air carriers, airport owners, airport operators, and state Attorneys General — before this Court to establish traceability because "when a petitioner's injury arises from an agency's unlawful regulation (or lack of regulation) of someone else, causation often is substantially more difficult to establish because the petitioner must demonstrate that the injury

---

[8]  *See* Patent Numbers 9,156,564 (2015) and 9,920,695 (2018).

[9]  *See* 42 U.S.C. § 7401 et seq.

[10]  *See* 33 U.S.C. § 1251 et seq.

[11]  *See e.g.*, U.S. – E.U. Air Transport Agreement of April 30, 2007, Doc. 319, PA-A InfoCongress 860; U.S. – E.U. Air Transport Agreement of June 24, 2010, Art. 15 § 6(a), as amended by Art. 3, Doc. 320, A InfoCongress 948 at 954; and U.S. – E.U. (Iceland, Norway) Air Transport Agreement of June 21, 2011, Doc. 321, A InfoCongress 976.

[12]  *See* Pub. L. 111–314, §3, 124 Stat. 3328, 3331, *codified at* 51 U.S.C. § 20102(e).

[13]  *See* Pub. L. 102-240, §2, 105 Stat. 1914, *codified at* 49 U.S.C. § 5501.

does not result from the independent action of some third party not before the court."[14]

The All Writs Act provides that the Court "may issue all writs necessary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a).  Petitioner Endres now brings this private right of action to petition his government for grievances and to demand redress pursuant to 15 U.S.C. § 15(a).  Adequate relief cannot be obtained in any other form than (a) a permanent injunction from grandfathering reservations to use the public's airspace, which carriers use to offer routes to the public for scheduled flight service in passenger and cargo air transportation, and (b) the issuance of the patent for Exhaustless' market solution to ensure consistent competition across the nation — free from agreements with states that favor their ports.

In addition, Petitioner seeks monetary damages, punitive damages, and structural changes to the air transportation system to protect competition.

---

[14]   *Exhaustless Inc. v. FAA*, 931 F. 3d. 1209 (D.C. Cir. 2019), Doc. 27, PA-G Court 207 at 210 (internal quotations and reference omitted).

## STATEMENT OF THE CASE

### A.   Basic Overview

In 1938, the Congress *"recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable air space of the United States."* [15]   The Supreme Court upheld this right in 1946:

> The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim. [16]

In 1978, in deregulating air transportation, the Congress delegated decisions related to price, route, or service in air transportation to be determined by market competition.  The remaining economic regulations were structured to ensure that carriers comply with the terms of use of the National Airspace System — embodied in the requirements of the economic certificate — including compliance with antitrust laws.

------

[15]   Civil Aeronautics Act of 1938, Pub. L. 75-706, § 3, 52 Stat 973, 980, *codified as amended at* 49 U.S.C. § 40103(a)(2).

[16]   *U.S. v. Causby*, 328 U.S. 256 (1946).

The Congress searched for a competitive method to allocate to carriers the scarce seasonal reservations required for the use of the public's airspace at those airports with excess market demand.  When a competitive method did not emerge, the Secretary of Transportation accepted the Title of *"Slot Coordinator,"* an arbiter of carrier disputes over the rights of access to the airspace reservations,[17] pursuant to an agreement among carriers to allocate the reservation market with grandfathering, called the International Air Transport Association's (IATA) Worldwide Slot Guidelines[18] (WSG).  The Congress has acted several times to correct the market failure in airspace reservations; yet, forty-five years into the deregulated era, domestic and foreign carriers still allocate the slot market according to the IATA WSG agreement.

During this deregulated era, the Executive branch has negotiated and signed treaties with foreign nations agreeing to allow a fair and equal opportunity for the airlines of each country to compete to provide service;[19] it has issued notices seeking a permanent solution to the allocation of airspace reservations;[20] and it has justified

---

[17]   The reservation to enter and exit the navigable airspace is also known as a "slot"; *see* 49 U.S.C. § 41714(h)(4).

[18]   Also known as Worldwide Scheduling Guidelines and Worldwide Airport Slot Guidelines (WASG).

[19]   *See e.g.,* U.S. – E.U. Air Transport Agreement of April 30, 2007, Doc. 319, PA-A InfoCongress 860, Article 2 at 868.

[20]   *See* Notice of Market-based Actions to Relieve Airport Congestion and Delay, 66 Fed. Reg. 43947 (proposed Aug. 21, 2001), Doc. 337, PA-B Rulemaking 553.

its administrative allocation of market access because of a market failure.[21]  This market failure is sustained by the IATA WSG, which both declares exclusive rights to grandfathered carriers and recruits regulators to confer those exclusive rights through enforcement of the agreement.

Relying on the statutory framework, Exhaustless developed its competitive multi-sided market allocation — which upgrades both the carrier and passenger reservation systems to allocate the congestion-free capacity of airspace reservations with a demand-calibrated premium that is designed to ensure prices meet market clearing levels.

Exhaustless offered the service to carriers, but every carrier continued to obtain its grandfathered reservations for free rather than bid.  Exhaustless challenged the orders for an administrative allocation by the Federal Aviation Administration (FAA) of the Department of Transportation in court.  The court ruled that the FAA could withdraw its orders at will, and found no hurdles that would preclude carriers from adopting the competitive allocation.  But the court needed either more information to determine traceability to regulators, or it needed carriers present before the court before taking further action.  So, Exhaustless again offered the service to carriers.  The carrier-members of the IATA instead

---

[21]  *See* Order 2017-4-6 (Apr. 10, 2017), Doc. 9, PA-B Rulemaking 43 at 47 ("[N]on-incumbent carriers have had a difficult time acquiring viable slot times at both airports, and that it is unlikely that a market solution will present itself. . . Our decision to condition the grant of ATI with a slot divestiture remedy was not novel, but was instead consistent with our prior rulings in other cases, in which we employed this mechanism as a means of ensuring that the benefits of the transaction are realized by providing the means for sufficient competition[.]")

unanimously voted to continue to grandfather reservations — worldwide — for free rather than bid in the reservation market.

Exhaustless offered its service in multiple proceedings in Department of Transportation (DOT or TRN) public dockets, notifying carriers that they are risking antitrust exposure by boycotting the market.

Instead of licensing the market agreement to bid for reservations, two domestic carriers — whose CEOs were both directors on the board of the IATA — crafted an agreement called the Northeast Alliance (NEA), in which they claimed title to, and therefore a right to lease to each other, certain reservations to use certain runways to enter the airspace.  In their court challenge of the NEA agreement, the Department of Justice (DOJ) and plaintiff states proposed that this Court find that carriers own slots — based on evidence under seal — seventy-seven years after the Supreme Court held that the navigable airspace was owned by the public.  This Court found that the NEA was a naked agreement to not compete, in violation of antitrust laws, and enjoined the agreement. But the Court ruling was silent on the matter of ownership of reservations to takeoff or land (slots) — even though the NEA agreement leased property rights in airspace reservations to a horizontal competitor.

Carriers have continued to claim exclusive and proprietary rights to airspace and have *de facto* received that privilege with the aid of an illegal subsidy from the DOT, which granted grandfathered reservations to the airspace for free.

This breakdown in the separation of powers has substituted the carriers' self-declared grandfathered rights in airspace reservations over long-established public property rights, and usurped Congress' clear intent for market competition to determine price, route, and service quality — without interference in the commerce by federal or state regulation.

Petitioner now files this motion for permanent injunction of the carrier agreement to grandfather reservations, the issuance of the patent for the market-clearing service, structural remedies, and monetary damages.

## B.   Exhaustless' Market-Clearing Service

Relying on a Joint Economic Committee study that estimated the size of the market, Exhaustless developed a market-clearing service for reservations to use the public's airspace to meet the Congressional policy to place maximum reliance on competitive market forces.[22]  This service calculates the capacity that would support the highest volume of flights and passengers while minimizing the queue, and upgrades both the carrier and passenger reservation systems to discover and collect the premium needed to clear excess demand and supply.  Because there can only be one market-clearing service in a market, this creates a natural monopoly; but because it discovers and broadcasts the market price of exclusivity from bidding participants, it has no monopoly pricing power.

---

[22]   Charles E. Schumer, et al., *Your Flight Has Been Delayed Again*, Report by the Joint Economic Committee Majority Staff (May 2008), Doc. 1, PA-A InfoCongress 1.

Exhaustless' intellectual property adds a supporting service to the airway system that is critical to fully deregulate the industry — it creates the profits from competition in the market-clearing process to drive innovations, such as the development of Exhaustless' assisted takeoff system.[23] Consequent to the development of the solution and its new commerce, Exhaustless disclosed its discovery in a patent application in the U.S. and Canada.[24]

On March 8, 2017, Exhaustless sent information regarding the Exhaustless Inc. Aviation 2.0 Operating Standard (A2OS) to the boards of directors of Respondents American Airlines, Delta Air Lines, and United Airlines — including an unsolicited proposal it had sent to the DOT in 2016.  On September 21, 2017, Exhaustless sent an updated unsolicited proposal it had sent to the DOT to the CEOs of American, Delta, Southwest, and United airlines.

On May 21, 2018, Exhaustless petitioned the FAA to withdraw its market-allocating rules that interfere with Exhaustless' market.[25]  On May 28, 2018, Exhaustless announced an auction for airspace reservations for the Winter 2018 carrier scheduling season.[26]  No carrier joined the competitive market standard.

---

[23]   *See* 49 U.S.C. § 40101(a)(12) and (14).

[24]   *See* Patent Application US15/789,585 (Aug. 19, 2016).

[25]   *See* Exhaustless Inc. Petition for Rulemaking, Dkt. FAA-2018-0481-0001 (May 21, 2018), Doc. 12, PA-B Rulemaking 71.  *Also filed at,* Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Joint Appendix, ECF 1815348 (Nov. 12, 2019), Doc. 227, PA-G Court 239 at 369.

[26]   Steve Endres, Congestion-free Flights for NYC Now, LinkedIn (May 28, 2018), Doc. 13, PA-E Auction 1.  *Also filed at,* Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Joint Appendix, ECF 1815348 (Nov. 12, 2019), Doc. 227, PA-G Court 239 at 376.

On June 7, 2018, carriers completed their Initial Coordination of the Winter 2018 reservations according to the IATA WSG grandfathering rules.[27]  On June 19, 2018, carriers attended the Slot Conference in Vancouver, Canada to complete the market allocation.[28]

## C.   The Conspiracy of Carriers to Restrain Trade in Reservations

### 1.  The IATA and the WSG Agreement

#### a.  The IATA Governance Structure

IATA is governed by a General Meeting and an executive committee, known as the Board of Governors.[29]  The Board of Governors, *inter alia*, approves the agenda for the General Meeting and determines IATA policy.[30]  To serve on the Board of Governors, the individual must be chair of the board, chief executive officer, or president of the member-airline or the entity that is its majority shareholder.[31]  Each Board member agrees to "act as a representative of the

---

[27]  See Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[28]  *See* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 95 at 97.

[29]  *See* IATA Articles of Association (undated, unsigned), Doc. 399, Art. VIII, PA-L Cartel 1 at 5. See also, IATA Act of Incorporation, Doc. 400, PA-L Cartel 11.

[30]  *See id.*, Doc. 399, Art. XIV, 8(d) and (i) at 7.

[31]  See IATA Rules and Regulations of the Board of Governors (undated), Doc. 401, III (7), PA-L Cartel 14 at 15.

interests of the membership as a whole and not as a representative of his or her region or Member airline."[32]

Below, are Respondent Airline members of the IATA Board of Governors from the IATA's Annual Reviews from 2005 to 2022 that are published on its website.[33] Each governor's airline employment history comes from the company's annual reports and proxy statements when disclosed, its website, press releases, articles in the press, and LinkedIn profiles.

### i.   American Airlines

An executive for American Airlines parent corporation has served on the Board of Governors since at least June 2004.

W. Douglas Parker was an executive officer of various airlines from 1995 to 2022, most recently as Chief Executive Officer of American Airlines Group, Inc. from December 2013 to March 2022, and was Chairman of the Board from 2014 to April 2023.  Parker was an IATA Governor from 2015 to November 2022.

Robert Isom has been an executive officer of American Airlines and its predecessors since 2007 and has been Director and Chief Executive Officer of American Airlines Group, Inc. from March 2022, to present.  Isom has been an IATA Governor since June 2023.

---

[32]   *Id.*, III (6).

[33]   *See* Exhaustless Inc. Workpaper IATA BOGs, Doc. 402, PA-L Cartel 26.  *See also*, IATA's Annual Reviews published at https://www.iata.org/en/publications/annual-review/.

### ii.    United Airlines

An executive for United Airlines parent corporation has served periodically on the Board of Governors since at least June 2004.

Jeffrey Smisek, President and Chief Executive Officer of then-named United Continental Holdings, Inc. from October 2010 to September 2015, was an IATA Governor from June 2014 to September 2015.

Oscar Munoz, President and Chief Executive Officer of United Airlines Holdings, Inc. from September 2015 to May 2020, and Executive Chairman of the Board from May 2020 to May 2021, was an IATA Governor from June 2018 to June 2020.

J. Scott Kirby has been an executive of three airlines: President of US Airways from 2006 to 2013, President of American Airlines from 2013-2016, President of United Holdings from August 2016 to May 2020, and Chief Executive Officer of United Airlines Holdings, Inc. from May 2020 to present.  Kirby has been an IATA Governor from June 2020 to present.

### iii.    FedEx Corporation

David Bronczek was an executive officer of FedEx Express from 1998 to 2017 and President and Chief Operating Officer of FedEx Corporation from 2017 through March 1, 2019.  Bronczek was an IATA Governor from at least June 2004 to June 2015 and from June 2016 to June 2019.

John Dietrich, an attorney, was an executive officer at Atlas Air Worldwide from September 2006, culminating in serving as its President and Chief Executive

Officer from January 2020 to June 2023; and has been Executive Vice President and Chief Financial Officer of FedEx Corporation since July 2023.  Dietrich has been an IATA Governor from June 2022 to present.[34]

### iv.  Delta Air Lines

An executive for Delta Air Lines has served on the Board of Governors periodically since at least June 2004.

Richard Anderson, Chief Executive Officer of Delta Air Lines, Inc. from 2007 to 2016 and a former attorney, was an IATA Governor from June 2007 to June 2015.

### v.  JetBlue Airways

David Barger, Chief Executive Officer of JetBlue Airways Corp. from 2007 to 2015, was an IATA Governor from June 2012 to June 2015.

Robing Hayes, Chief Executive Officer of JetBlue Airways Corp. from 2015 to present, was an IATA Governor from June 2015 to June 2023, and was Chair of the Board of Governors from June 2020 to June 2022.

### vi.  Hawaiian Holdings

Mark Dunkerly, Director, President, and Chief Executive Officer of Hawaiian Holdings, Inc. from June 2005 to March 2018, was an IATA Governor from June 2016 to March 2018.

---

[34] *See* IATA Business Registration Quebec (July 2023), Doc. 403, PA-L Cartel 40 at 47.

Peter Ingram, Director, President, and Chief Executive Officer of Hawaiian Holdings, Inc. from March 2018, to present, has been an IATA Governor since June 2023.

### vii.   Air Canada

An executive for Air Canada has served on the Board of Governors since at least June 2004.

Calin Rovinescu, President and Chief Executive Officer of Air Canada from April 2009 to February 2021, was an IATA Governor from June 2011 to November 2020.

Michael Rousseau, President and Chief Executive Officer of Air Canada from February 2021 to present, has been an IATA Governor since June 2020.

### viii.   Air France-KLM

An executive for Air France-KLM has served on the Board of Governors since at least June 2004.

Jean-Cyril Spinetta, President and Chief Executive Officer of Air France-KLM S.A. from 2011 to 2013, was an IATA Governor from June 2004 to June 2007 (for Air France) and from June 2011 to June 2013.

Alexandre de Juniac, President and Chief Executive Officer of Air France-KLM S.A. from 2013 to 2016, was an IATA Governor from June 2013 to June 2014 and from June 2015 to June 2016.  Juniac was then IATA's Director General from August 2016 to April 2021.

Jean-Marc Janaillac, Chairman and Chief Executive Officer Air France-KLM S.A. from July 2016 to June 2018, was an IATA Governor from August 2016 to June 2018.

Benjamin Smith, Chief Executive Officer of Air France-KLM S.A. from August 2018 to present, and Director from December 2018, has been an IATA Governor since June 2018.

### ix.   IAG

Willie Walsh, Chief Executive Officer of British Airways from 2005 until it merged with Iberia Airlines in 2011 and became IAG, was an IATA Governor from June 2005 to June 2007.  Walsh was Chief Executive Officer of International Consolidated Airlines Group (IAG) from 2011 to September 2020, and was an IATA Governor from June 2011 to June 2020.  Walsh has been IATA's Director General since April 2021.

Luis Gallego Martín, Chief Executive Officer IAG from September 2020 to present, has been an IATA Governor since June 2018.

### x.    LATAM Airlines Group

Enrique Cueto, Chief Executive Officer of LATAM Airlines Group S.A. from June 2012 to April 2020, was an IATA Governor from June 2004 to March 2020.

Roberto Alvo, Chief Executive Officer of LATAM Airlines Group S.A. from XX to XX, has been an IATA Governor since June 2019.

xi. **Lufthansa Group**

An executive for Lufthansa has served on the Board of Governors since at least June 2004.

Carsten Spohr, Chairman and Chief Executive Officer of Lufthansa Group from May 2014 to present, has been an IATA Governor since June 2013.

## b. The IATA Annual General Meeting

The process to manage and carry on the IATA WSG occurs at the IATA's Annual General Meeting (AGM) among airline executive officers.[35]  On June 2, 2019, the IATA member-representatives unanimously voted to continue allocating reservations to use the public's airspace according to the IATA WSG instead of competing for reservations using Exhaustless' market-clearing service.[36]

Below are Respondent Airline members of the IATA, except the members whose executive serves the IATA as governor, from the IATA's Annual Reviews from 2005 to 2022 that are published on its website.

xii. **Alaska Air**

Alaska Airlines has been a member of the IATA since at least 2004.  Ben Minicucci was Executive VP and Chief Operating Officer of Alaska Airlines from

---

[35]   *See, e.g.*, IATA Press Release, Aviation Leaders Assemble in Istanbul for IATA's 79th AGM (Jun. 2, 2023), Doc. 316, PA-J Other 12. *See also*, IATA Website, Annual General Meeting (printed Aug. 1, 2023), Doc. 329, PA-J Other 13.

[36]   *See* IATA Resolution on Slot Policy, 75th Annual General Meeting (Jun. 2, 2019), Doc. 304, PA-D Agreement 1082.

2009 to 2016; President of Alaska Airlines from 2016 to March 2021; Chief

Executive Officer of Virgin America from its acquisition in December 2016 until it

merged with Alaska in 2018; and has been President and Chief Executive Officer of

Alaska Air Group from March 2021 to present.

### xiii.  UPS

UPS Airlines has been a member of the IATA since at least 2004.  Nando

Cesarone has been with UPS for 33 years, his titles have included: President-

Europe Region from 2016 to 2018; President International from 2018 to 2020;

President USA from 2020 to 2022; and presently Executive Vice President of UPS,

Inc. and President of U.S.

### c.  The IATA WSG

Respondent Air Carriers and Foreign Air Carriers[37] (collectively "Respondent

Carriers") have agreed to allocate the market of seasonal airspace reservations for

scheduled service according to the IATA Worldwide Slot Guidelines, which states:

"An airline is *entitled to retain* a series of slots for the next equivalent season if they

were operated at least 80% of the time during the period for which they were

allocated.  This is referred to as historic precedence."[38]

---

[37]  *See* 49 U.S.C. § 40102(a)(2) and (21) for the definition of air carrier and foreign air carrier.

[38]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, § 8.1.1(f) at 174 (emphasis added).

In addition to horizontally allocating the market for routes and service with grandfathering, Respondent Carriers have agreed to fix the price of the scarce airspace reservations to $0.[39]  The IATA WSG agreement prohibits bidding for the reservations needed to offer scheduled service between city-pair markets and maintains a group boycott of Exhaustless' market among all carriers at all domestic public service airports, which fall into either the IATA WSG 'level 1', 'level 2', or 'level 3' category.[40]

## 2. The Reservation Allocation Process in the U.S.

The twice-a-year process to coordinate the seasonal reservations for scheduled flight service originating and/or terminating at an airport in the U.S. is managed by the IATA and closely follows the process as described in the IATA WSG.[41]

### a. Each carrier stakes its claim to a grandfathered entitlement.

Each carrier maintains a list of its prior season's originally scheduled flights compared to its operated flights; if the carrier operated 80% of its originally scheduled flights, it claims entitlement to the corresponding reservations at each

---

[39]  *See* IATA Managing Scarce Airport Capacity: Airport Slots & Worldwide Slot Guidelines (WSG) Fact Sheet (Dec. 2019), Doc. 305, PA-D Agreement 1084 at 1085 ("The cost must only cover charges for the slot coordination process and not include discriminatory charges such as for the initial or primary allocation of slots.").

[40]  *See* IATA Worldwide Airport Slots Fact Sheet (Apr. 2023), Doc. 306, PA-D Agreement 1086 at 1087 ("Why Not Auction Slots to the Highest Bidder? Auctioning adds costs and uncertainty to the slots process with potentially disastrous outcomes for consumers.").

[41]  *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, Part 3 at 184.

terminal point for the next season.  This list of 'entitled' reservations is referred to as the "SHL" or Slot Historic List.[42]

For airports at which the FAA limits airspace reservations — which the IATA WSG calls "level 2" or "level 3" airports — each carrier sends the Slot Historic List to the DOT/Slot Coordinator; if the carrier operated 80% of its originally scheduled flights, it claims entitlement to the corresponding reservation for the next season.[43]

### b. The 'Slot Coordinator' sets the season's reservation limit at each airport.

The DOT/Slot Coordinator issues a Notice of Schedule Submission Deadline to inform carriers which U.S. airports it will coordinate for the next season;[44] this is referred to as the "coordination parameters."[45]  The IATA WSG requires the DOT/Slot Coordinator to privately provide IATA-carriers public information about the details of the available flight capacity of the U.S. airspace accessed from runways at certain airports.[46]

---

[42]  *Id.*, §9.4 at 185.

[43]  *See* FAA Information Collection Request, OMB Control No: 2120-0524, ICR Reference No: 202108-2120-002, Supporting Statement A (Aug. 26, 2021), Doc. 261, PA-H CarrierInfo 283 at 286 (*note* that the details of this calculation vary slightly at each airport to disguise it as a "local rule").

[44]  *See, e.g.*, FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK LAX, EWR, SFO] for the Winter 2023/2024 Scheduling Season, 88 Fed. Reg. 22514 (Apr. 13, 2023), Doc. 218, PA-B Rulemaking 435.

[45]  Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1. *See also*, FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, SFO] for the Summer 2024 Scheduling Season, 88 Fed. Reg. 64964 (Sep. 20, 2023).

[46]  *See* IATA, How to get the most out of attending the Slot Conference (March 2022), Doc. 338, PA-J Other 168 at 169 ("Coordinators please . . . upload any of the following documents or website links to Swapcard . . . Declared airport capacities . . .").

### c. Each carrier submits its requested schedule.

Each carrier then submits its 'requested' schedule to the DOT/Slot Coordinator, which is basically its same schedule as the last equivalent season; this is called the "initial submission."[47]  No other carrier 'requests' the same reservation for which another IATA carrier has claimed entitlement because the IATA carriers have agreed not to compete for airspace reservations.  In this way, each reservation to use the airspace at each airport has largely stayed in the hands of the carrier that received the reservation in a route certificate from the Civil Aeronautics Board during the regulatory era.[48]

### d. The Slot Coordinator then 'grants' the carrier its schedule.

The DOT/Slot Coordinator then replies to the carrier schedule request with a "K" to 'grant' an exclusive right to that scheduled time, or with a "U" to deny a grant;[49] this is called "initial coordination" and "SAL deadline."[50]

### e. The Slot Conference.

Delegates of every air carrier and foreign air carrier claiming an entitlement to an airspace reservation, delegates of the DOT/Slot Coordinator, and delegates of

---

[47]    IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, §9.6 at 186.

[48]    *See, e.g.,* Excerpts from CAB Reports Economic Cases Dec 1969 to Apr 1970, OMB Control 2120-0524, ICR 202108-2120-002 (Sep. 20, 2021), Doc. 98, PA-H CarrierInfo 121 at 123 (showing an example of a grant of a route certificate, Certificate for Route 54).

[49]    FAA Slot Administration Email (Jan. 29, 2021), Doc. 20, PA-B Rulemaking 91.

[50]    IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, § 9.9 at 187.

many airport operators[51] attend a meeting to negotiate edits to the Initial

Coordination and complete their market allocation of the season's airport schedule;

this is called the "Slot Conference."[52]

To trade slots at the conference and bind the airline, the airline's delegate

must be authorized by the "[p]erson in charge of entire organization."[53]

### f. A domestic trade association manages the domestic slot conference.

Airlines for America hosts the slot conference for U.S. airports for which the

FAA limits airspace reservations and that are not allocated at the IATA slot

conference (including Reagan Washington and LaGuardia airports).[54]  The domestic

slot conference follows the market allocating and price fixing rules of the IATA

WSG.[55]

---

[51] *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PA-D Agreement 444 (showing the airport operators registered to attend the slot conference scheduled to begin June 13, 2023 — Chicago O'Hare; Newark Liberty, JFK, and LaGuardia (Port Authority of New York and New Jersey); Los Angeles; and Seattle-Tacoma (Port of Seattle) registered to attend; and a carrier consortium at San Francisco airport (SFOTEC).) *See also,* IATA 150th Slot Conference – Organizations attending (Jun. 13, 2022), Doc. 231, PA-D Agreement 436 (showing the airport operator of Orlando airport (Greater Orlando Aviation Authority) registered to attend.

[52] IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, §§ 9.11-9.12 at 189.

[53] IATA Slot Conference, Form 1 - Accreditation of Head Delegate, Doc. 404, PA-L Cartel 53.

[54] *See* FAA Notice of Submission Deadline for Schedule Information for [ORD, JFK, LAX, SFO] for the Summer 2020 Scheduling Season, 84 Fed. Reg. 51222 (Sep. 27, 2019), Doc. 34, PA-B Rulemaking 116 at 118 ("The FAA discussed the Level 2 review with airlines and airport operators in meetings at the 144th IATA Slot Conference, the domestic slot conference hosted by Airlines for America, as well as other individual meetings.").

[55] *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PA-B Rulemaking 140 ("[F]AA limits operations . . . via rules at DCA and an Order at LGA that are equivalent to IATA Level 3.")

### g. Carriers hold on to grandfathered claim when reservation not used as agreed

Carriers agree to retain entitled status when the slots are not used 80% of the time when there is, *inter alia,* an "[i]nterruption of the air services of the airline due to unforeseeable and unavoidable causes outside the airline's control, for example a closure of an airport or airspace or severe weather;" this is referred to as "Justified Non Utilization of Slots," or JNUS.[56]  The FAA has agreed to a modified version of this clause, requiring "a highly unusual and unpredictable condition which is beyond the control of the carrier and which affects carrier operations for a period of five consecutive days or more."[57]

## D.   Exhaustless v. FAA

Rather than withdraw its market-allocating rules as Exhaustless had petitioned, the FAA reissued its rules on September 17, 2018.[58]  In November 2018, Exhaustless petitioned the court to review the FAA's rules at LaGuardia (LGA) and John F. Kennedy (JFK) airports over Exhaustless' competitive market allocation.[59]

---

[56]   IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, §8.8 at 178.

[57]   Order Extending Order Limiting Operations at John F. Kennedy International Airport, 83 Fed. Reg. 46865 (Sep. 17, 2018), Doc. 22, PA-B Rulemaking 100, Item 9.a.ii. at 102.

[58]   *See, e.g.,*

[59]   *See* (a) Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Amended Opening Brief, ECF 1773615 (Feb. 15, 2019), Doc. 25, PA-G Court 1; (b) Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Joint Appendix, ECF 1771626 (Feb. 1, 2019), Doc. 243, PA-G Court 1643; (c) and Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Petitioner's Reply Brief, ECF 1780513 (Apr. 1, 2019), Doc. 242, PA-G Court 1592.

In oral arguments, the court declared that it would "address the merits of the remaining legal obstacles in our first decision."[60]  In its ruling, the court declared the Aviation 2.0 market-clearing service:

> Using Aviation 2.0, carriers would compete in semi-annual auctions to purchase slots for a six-month period, with the total number of slots determined by Exhaustless using its proprietary technology.  Passengers would then pay demand-calibrated congestion premiums (on top of their airfare) when purchasing tickets.  Both the congestion premiums and the auction proceeds would go to Exhaustless.[61]

In addition, the court declared that the "interim rule resembled the High Density Rule and generally grandfathered the slots held by airlines under the previous regime," and is "revocable at will."[62]

Although, as cited in the DOT/DOJ's brief, the "United States government has 'exclusive sovereignty' over U.S. airspace"[63] the Court found that without carriers added as defendants, Exhaustless failed to demonstrate traceability and redressability to the DOT and therefore dismissed the petition for lack of standing.[64]  While the court declared Exhaustless' right to compete, the court failed

---

[60]   *See* Exhaustless Internal Transcript of Oral Argument, D.C. Cir. Case 18-1303, Doc. 255, PA-G Court 2372, 00:20:54 at 2377.  *Note that* the court docketed an official transcript at ECF 1787958, but that document is not accessible by Exhaustless.

[61]   *Exhaustless Inc. v. FAA*, 931 F. 3d. 1209 (D.C. Cir. 2019), Doc. 27, PA-G Court 207 at 210.

[62]   *Id.* at 212 and 214.

[63]   *See* Exhaustless Inc. v. FAA, D.C. Cir. Case 18-1303, Brief for Respondent, ECF 1778181 (Mar. 18, 2019), Doc. 26, PA-G Court 87 at 120, *referencing* 49 U.S.C. § 40103(a)(1).

[64]   *See Exhaustless Inc. v. FAA*, 931 F. 3d. 1209 (D.C. Cir. 2019), Doc. 27, PA-G Court 207 at 208.

to link the federal governments' sovereignty over the airspace to the protection of Exhaustless' constitutional right to hear and publish competitive market prices, as upheld in *Virginia Pharmacy,*[65] and to the protection of the market competition required by The Airline Deregulation Act of 1978, as upheld in *Morales.*[66]

## E.    COVID Pandemic

Beginning in March 2020, passenger demand declined suddenly and sharply due to the global spread of the COVID-19 virus.  On March 16, 2020, at the request of carriers, the FAA 'granted' carriers a waiver from their private IATA WSG agreement to minimum reservation usage requirements through May 31, 2020.[67] On March 25, 2020, at the request of carriers, the FAA proposed a waiver of the IATA WSG's minimum usage requirements through October 24, 2020 — a seven month freeze of the pre-pandemic market allocation.[68]  This was the moment when Exhaustless realized how the carriers were orchestrating the conspiracy worldwide, and that it had a private antitrust claim against the IATA-member carriers.

---

[65]     *See Va. Pharmacy Bd. V. Va. Consumer Council*, 425 U.S. 748 (1976).  *See also*, Argument, F. Respondent Airport Operators Violated Exhaustless' First Amendment Rights and Other Laws, *infra.*

[66]     *See Morales v. Trans World Airlines*, 504 U.S. 374 (1992).  *See also*, Argument, G. Respondent Attorneys General Violated the U.S. Constitution, *infra.*

[67]     *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 15018 (Mar. 16, 2020), Doc. 40, PA-B Rulemaking 137.

[68]     *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PA-B Rulemaking 145.

On March 27, 2020, the D.C. Circuit Court denied Exhaustless' petition to review the FAA's denial of Exhaustless petition for rulemaking, the petition which Exhaustless had requested that the FAA withdraw its market allocating orders.[69] At this moment, Exhaustless believed it had a fifth amendment takings claim.

Also on March 27, 2020, the President signed the CARES Act into law, which included provisions for carriers to receive financial assistance from the public's treasury.[70] On March 31, 2020, the Assistant Secretary of Aviation and International Affairs of the DOT issued a show cause order regarding the regulation of the required Service Obligation an air carrier must commit to when receiving financial assistance, pursuant to the CARE Act.[71] The order stated that "These provisions do not authorize any coordination among air carriers that would violate the antitrust laws."[72] But the order did not mention how the antitrust immunity that carriers had been granted by the DOT under their sealed alliance agreements intersects with the provision of financial assistance from the public.

On April 2, 2020, Exhaustless objected to the proposed order, stating: "But the airlines are already coordinating to violate antitrust laws by using the anticompetitive International Air Transport Association's Worldwide Slot

––––––––––––––––––––

[69]   See *Exhaustless Inc. v. FAA*, Case 19-1158, Judgment, ECF 1835740 (D.C. Cir. 2020), Doc. 225, PA-G Court 236.

[70]   *See* Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. 116-136, Title IV, Subtitle A, 134 Stat. 281, 469 (Mar. 27, 2020).

[71]   *See* Order 2020-3-10 (proposed Mar. 27, 2020), Doc. 339, PA-B Rulemaking 557.

[72]   *Id.* at 559.

Guidelines (IATA WSG) to allocate slot and schedule reservations at airports where excess supplier demand and excess passenger demand exist."[73] On April 7, 2020, the DOT issued its final order and did not address Exhaustless comments.[74]

Exhaustless then began delving into public information about the sealed so-called immunized alliance agreements.

## F.    Delta/WestJet Alliance Agreement

Rather than compete for airspace reservations in the market, Delta and Canadian citizen WestJet — both members of the IATA — requested antitrust immunity in a "confidential" agreement to pool the respective U.S. and Canada airspace reservations to which they each claimed entitlement.[75]

On October 23, 2020, the DOT proposed to grant the antitrust immunity on condition that, *inter alia*, the carriers "divest" 16 airspace reservations at LaGuardia airport in New York City (NYC) because "market entry for services involving NYC airports, particularly for new entrants, is not likely, timely, or sufficient to address our concerns due to the persistent inability of carriers to access slots for new and/or additional services."[76] The DOT proposed that Delta/WestJet

---

[73]   Exhaustless Objection, Dkt. DOT-OST-2020-0037 (Apr. 2, 2020), Doc. 340, PA-B Rulemaking 733.

[74]   *See* Order 2020-4-2 (Apr. 7, 2020), Doc. 341, PA-B Rulemaking 735.

[75]   Delta-WestJet Application for Antitrust Immunity for Alliance Agreements, Dkt. DOT-OST-2018-0154 (Oct. 10, 2018), Doc. 326, PA-D Agreement 1353 1357.

[76]   Order 2020-10-13 (proposed Oct. 23, 2020), Doc. 59, PA-D Agreement 14 at 35.

acquire the services of a third party to administer an auction of the reservations, the proceeds of which would be retained by the <u>carriers</u>.[77]

Exhaustless objected to the proposal because, *inter alia*, "[a] competitive alternative is available for airlines to obtain airspace slots without regulatory intervention in the slot market."[78]

Delta/WestJet rejected the conditions, withdrew their application, and requested the administrative proceeding to be closed, which the DOT granted.[79]

## G.    Airport Operators Join the IATA WSG Agreement

In 2018, when the IATA published the WSG 9th Edition, it informally announced that the Airports Council International (ACI), a trade association for airport operators, had joined the IATA WSG agreement.[80]   In June 2019, IATA announced a formal agreement joining the ACI to the IATA WSG agreement.[81]

The Port Authority of New York and New Jersey (PANYNJ), which operates all three large hub airports in the New York City metropolitan area, is a member of

---

[77]  *See id.* at 47.

[78]  Exhaustless Objection, Dkt. DOT-OST-2018-0154-0053 (Nov. 9, 2020), Doc. 60, PA-D Agreement 52.

[79]  *See* Order 2020-12-17 (Dec. 21, 2020), Doc. 63, PA-D Agreement 90.

[80]  *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136 at 139. ("The first changes to the WSG because of the joint work of airports, airlines, and coordinators in the Strategic Review have been accepted and published in this, the 9th edition of the WSG.").

[81]  *See* IATA press release, Industry Collaboration Brings New Era for Airport Slot Allocation (June 3, 2019), Doc. 32, PA-D Agreement 12.

ACI's North American branch.[82]  On May 8, 2020, Exhaustless notified PANYNJ that they were violating antitrust laws and Exhaustless' right to allocate the market by "*allowing flights whose reservations were obtained through an anticompetitive allocation process*" and offered to license its operating standard to the PANYNJ to rectify this violation.[83]  On July 17, 2020, the PANYNJ responded that Exhaustless should elevate this claim.[84]

The San Francisco Terminal Equipment Company, L.L.C. (SFOTEC), a consortium of air carriers and foreign air carriers,[85] operates the San Francisco Airport's International Terminal Complex and has attended the IATA WSG slot conference to allocate the public's terminal resources at San Francisco Airport.[86]

---

[82]   *See* Airports Council International-North America Members (printed Aug. 8, 2023), Doc. 343, PA-J Other 174.

[83]   Exhaustless Notice of Claim (May 8, 2020), Doc. 350, PA-J Other 220.

[84]   *See* Letter from PANYNJ Claims Division (Jul. 17, 2020), Doc. 351, PA-J Other 222.

[85]   *See* San Francisco International Airport, Competition Plan Update (Aug. 2001), Doc. 391, PA-J Other 250 ("SFOTEC, LLC, formed by all 25 airlines operating out of the ITC, operates and maintains the Airport-owned common use equipment related to handling flights and passengers at the ITC."). *See also*, San Francisco Board of Supervisors, Notification of Contract Approval (Aug. 3, 2012), Doc. 392, PA-J Other 261 (showing the owners of SFOTEC to be Aeromexico, Air China, Air France, Air New Zealand, Alaska Airlines, All Nippon Airways, Asiana, British Airways, Cathay Pacific, China Airlines, Delta Air Lines, Emirates, Japan Airlines, KLM, Korean Airlines, LAN Peru, Lufthansa, Mexicana, Philippine Airlines, Singapore Airlines, Swiss International, TACA International, United Airlines, Virgin Atlantic, and Virgin America).

[86]   *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PA-D Agreement 444.

## H.   Winter 2019 and Summer 2020 Seasonal Reservations

### 1.  Administrative Allocation with the IATA WSG

On May 9, 2019, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[87]  On May 16, 2019, carriers submitted their schedule requests for the Winter 2019 scheduling season to the FAA.[88]  No later than June 6, 2019, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[89]  On June 18, 2019, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference in Cape Town, South Africa to finalize the regulatory allocation of the season's airspace reservations to carriers.[90]

On September 26, 2019, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[91]  On October 3, 2019, carriers submitted their schedule requests for the Summer 2020 scheduling season to the

---

[87]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[88]  *See* id.

[89]  *See id.*

[90]  *See id.*

[91]  *See id.*

FAA.[92]  No later than October 31, 2019, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[93]  On November 12, 2019, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference in Brisbane, Australia to finalize the regulatory allocation of the season's airspace reservations to the carriers.[94]

### 2.  Slot Usage Waiver – Reduced Passenger Demand

In the spring of 2020, the level of passenger demand for scheduled service plummeted, and the level of cargo demand spiked, due to the COVID-19 pandemic. Certain carriers requested that the DOT 'grant' a waiver from the usage terms of their private-sector WSG agreement for the seasonal reservations that had previously been allocated by grandfathering for the Winter 2019 and Summer 2020 season in order to retain their grandfathered status for the future season.[95]  The DOT complied and *de facto* waived the required usage of reservations for Winter 2019, and carriers voluntarily violated their private IATA WSG agreement by

---

[92]  *See id.*

[93]  *See id.*

[94]  *See id. See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 100 at 102.

[95]  *See* FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 15018 (Mar. 16, 2020), Doc. 40, PA-B Rulemaking 142 ("Several foreign airlines have petitioned the FAA to grant a waiver of the 80 percent minimum slot usage requirement at JFK through the Winter 2019/2020 scheduling season ending on March 28, 2020 and some petitioners have sought relief for portions, or the entirety, of the Summer 2020 scheduling season. On March 2, 2020, IATA petitioned on behalf of airlines for a slot usage waiver at all constrained airports through the Summer 2020 scheduling season ending on October 24, 2020. On March 6, 2020, Airlines for America petitioned the FAA on behalf of domestic member airlines for "a waiver of the minimum slot usage requirement at all slot-controlled and schedule facilitated airports for at least Summer 2020.").

continuing to claim entitlement.[96]  The FAA issued a notice of proposed rulemaking

for the Summer 2020 reservations.[97]  Exhaustless responded to the proposal,

stating:

> In the deregulated air transportation market, carriers are
> free to adjust their prices, routes, and service in response
> to market conditions. . . No other deregulated industry
> gets to preserve its market share during a crisis—
> especially not through regulation.  For every other
> market, it's a new competition after the crisis. * * * Any
> airline that operates flights in the U.S. whose slot
> reservation was allocated through an anticompetitive
> process risks treble damages for price-fixing and market-
> rigging of airport slots and their perpetual right-of-first-
> refusal — both of which are per se violations of U.S.
> antitrust laws (Clayton Act).  * * * Now is the best time to
> introduce a market clearing service — while the excess
> demand and excess supply are low, the congestion
> premiums will be low and will allow time for airlines to
> prepare to better serve the pent-up demand when it
> returns.[98]

No carrier joined the competitive market standard.  The DOT *de facto*

granted a waiver to the carriers' private IATA WSG agreement, and carriers

voluntarily violated the terms of their agreement by continuing to claim

entitlement.[99]

---

[96]  *See id.*

[97]  See FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PA-B Rulemaking 145.

[98]  Exhaustless Objection, Dkt. FAA-2013-0259-2815 (Mar. 28, 2020), Doc. 42, PA-B Rulemaking 142.

[99]  *See* FAA Notice of limited waiver of the minimum slot usage requirement., 85 Fed. Reg. 21500 (Apr. 17, 2020), Doc. 43, PA-B Rulemaking 147.

## I.     The Public's Access to the Public's Airspace at a NJ Airport

At the request of United Airlines, the DOT reduced the schedule at the Newark Liberty airport by 16 daily reservations purportedly to reduce delays.[100] Rather than compete in the market for all airspace reservations at all airports, Spirit Airlines decided to 'compete' within the confines of the IATA WSG — by petitioning the court for a review of a federal agency action that prevented Spirit from competing for a grant from the DOT of 16 out of 1,200 daily reservations at the Newark, NJ airport.[101]  Spirit eventually received its 'competitive' grant of 16 reservations — after an 18-month court process followed by a 14-month regulatory process, involving dozens of people.[102]

Rather than compete for airspace reservations in the market, or comply with the terms of its IATA WSG agreement, or comply with the statutory process for reducing schedules to reduce delays,[103] United and several other domestic carriers requested and purportedly received a private and unlawful waiver from the DOT of the terms of its private IATA WSG agreement:

---

[100]   *See* Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petition for Review, ECF 1818212 (Nov. 25, 2019), Doc. 234, PA-G Court 824.  *See also*, *Spirit Airlines, Inc. v. DOT*, No. 19-1248 (D.C. Cir. 2021), Doc. 82, PA-G Court 218 at 234 ("[W]e must take with a grain of salt the self-serving views of the regulated entities, such as those offered by United upon which the FAA seems to have relied.") (internal quotations and references omitted).

[101]   *See* Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Petitioner's Final Opening Brief, ECF 1849058 (Jun. 26, 2020), Doc. 235, G Court 832 at 842 ("Petitioner Spirit Airlines promptly asked DOT/FAA to reallocate Southwest's peakhour flight authorizations to Spirit.").

[102]   *See* Order 2022-7-1, (Jul. 5, 2022), Doc. 134, PA-F MarketFail 58.

[103]   *See* 49 U.S.C. § 41722.

> United Airlines will cut about 50 daily flights from
> Newark Liberty International Airport next month in an
> effort to reduce delays. . . [W]e reached out to the FAA
> and received a waiver allowing us to temporarily adjust
> our schedule there for the remainder of the summer. . .
> Delta Air Lines, JetBlue Airways, Spirit Airlines,
> Southwest Airlines and Alaska Airlines are among the
> carriers that have also trimmed their schedules this
> year.[104]

## J.   Winter 2020 Seasonal Reservations

### 1.  Competitive Market Allocation Boycott

In December 2019, Exhaustless announced an auction by its market-clearing service for airspace reservations for the Winter 2020 carrier scheduling season.[105] On December 26, 2019, Airline Information Research L.L.C.'s service "Daily Airline Filings" broadcast this announcement to its customers.[106]  No carrier licensed Exhaustless' Standard to participate in the auction.

### 2.  Administrative Allocation with the IATA WSG

On May 7, 2020, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim

---

[104]   Exhaustless FOIA Request for Information from Schedule Reduction Meetings Held in Private, Dkt. DOT-OST-2021-0103-0049 (Jul. 14, 2022), Doc. 147, PA-B Rulemaking 366 at 370, referencing an article in the press.

[105]   *See* Exhaustless Aviation 2.0 Explained, Dkt. DOT-OST-2019-0144-0019 attachment 4/5 (Dec. 24, 2019), Doc. 37, PA-E Auction 4.

[106]   *See* Airlineinfo.com, OST Docket Filings for December 26, 2019, Doc. 39, PA-E Auction 54 at 57. *Note that* Airline Information Research L.L.C.'s service scrapes the federal docket system and website activity, then curates and broadcasts that activity to its customers.

entitle them to the future season's reservation.[107]  On May 14, 2020, carriers submitted their schedule requests for the Winter 2020 scheduling season to the FAA.  No later than June 4, 2020, the DOT/Slot Coordinator allocated the reservations according to the IATA WSG.  No slot conference was held.

### 3.  Slot Usage Waiver – Reduced Passenger Demand

On September 15, 2020, the DOT again proposed a rulemaking in response to certain carrier requests that the DOT 'grant' a waiver from the usage terms of their private-sector WSG agreement for the Winter 2020 seasonal reservations to retain their grandfathered status for the future season.[108]  Exhaustless responded to the proposal, stating, *inter alia*:

> Air carriers must abandon the unlawful grandfathering scheme.  Airlines may adopt the Aviation 2.0 Operating Standard to compete for access to high demand markets.  Or, airlines may choose to abandon those markets.  Those are the choices under current statute.[109]

No carrier joined the competitive market standard, and no carrier petitioned the DOT to change the airports to 'level 1' pursuant to the IATA WSG agreement.

---

[107]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[108]  *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 57288 (proposed Sep. 15, 2020), Doc. 53, PA-B Rulemaking 155 ("IATA, Airlines for America (A4A), and multiple U.S. carriers, including American Airlines, Inc., Delta Air Lines, Inc., JetBlue Airways Corporation, and United Airlines, Inc., as well as a coalition of airlines worldwide and the African Airlines Association (AFRAA), have urged the FAA to extend relief through the Winter 2020/2021 scheduling season, which ends on March 27, 2021.").

[109]  Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0018 (Sep. 16, 2020), Doc. 54, PA-B Rulemaking 160.

The DOT *de facto* granted a waiver to the carriers' private IATA WSG agreement, and carriers voluntarily violated their agreement.[110]

## K.   American/JetBlue Northeast Alliance (NEA)

### 1.  The making of the NEA agreement

On May 19, 2020, IATA published a guide to its products and services which airlines can use to manage bespoke alliances — including joint ventures that coordinate "capacity, pricing, and schedules."[111]  On July 17, 2020, American Airlines and JetBlue (both of whom had executives on the Board of Governors of the IATA) entered into a domestic Northeast Alliance Agreement (NEA), which claimed that each carrier "owned or otherwise held" a proprietary right to perpetually lease to each other seasonal reservations to use the public's airspace at certain public airports.[112]

On January 7, 2021, Spirit Airlines filed a complaint with the DOT to request an investigation into whether the NEA was an unfair method of competition.[113]

---

[110]   *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2020/2021 Scheduling Season, 85 Fed. Reg. 63335 (Oct. 7, 2020), Doc. 55, PA-B Rulemaking 162.

[111]   IATA Industry restart: Forming new interline partnerships within the multilateral interline framework (May 19, 2020), Doc. 312, PA-J Other 4 at 5.

[112]   JetBlue Airways Corporation SEC Form 10-Q, Exhibit 10.3, Northeast Alliance Agreement between American Airlines, Inc. and JetBlue Airways Corp. (Nov. 9, 2020), Doc. 322, PA-D Agreement at 1093.

[113]   *See* Spirit Airlines Complaint, Attachment 1/2, Dkt. DOT-OST-2021-0001 (Jan. 7, 2021), Doc. 328, PA-D Agreement 1595.

On January 10, 2021, American and JetBlue agreed to unlawful regulations of price, route, and service by the Assistant Secretary of Aviation and International Affairs of the DOT[114] in exchange for the DOT/DOJ not to prosecute the coordination by the carriers that violates antitrust laws.[115]  All parties implicitly asserted that the carriers had a proprietary right to sell a 'permanent' seasonal reservation to use the public's airspace by requiring the alliance carriers to "divest" certain airspace reservations within approximately one year by auctioning the reservations to another certificated carrier and <u>retaining the proceeds</u>.[116] Additionally, all parties implicitly asserted that the carriers had a proprietary right to lease a 'permanent' seasonal reservation to use the public's airspace by requiring the alliance carriers to lease a slot for longer than the term defined by the unspoken IATA WSG agreement.[117]

––––––––––––––––––––––

[114]   *Note that* this was the same person that issued the order in March 2020 that stated carriers may not coordinate under the antitrust laws, *see* Order 2020-3-10 (proposed Mar. 27, 2020), Doc. 339, PA-B Rulemaking 557..

[115]   *See* Agreement with the U.S. Department of Transportation Regarding Northeast Alliance Between American Airlines, Inc. and JetBlue Airways Corporation, dated January 10, 2021, Doc. 75, PA-D Agreement 204.

[116]   *See id.* at 207.

[117]   *See id.* at 205 ("[T]he NEA will be amended so that slots will be leased for a minimum of two IATA seasons[.]").

## 2. The complaint against the NEA

On September 21, 2021, the DOJ Antitrust Division, under a new administration of the Executive branch, and joined by several states,[118] filed a complaint against the American Airlines and JetBlue NEA agreement for violation of the antitrust laws.[119]  As this Court noted:

> On September 21, 2022, [*sic*] the same day this lawsuit was filed, the DOT issued a formal Clarification of Departmental Position, noting its review of the NEA had occurred informally and without establishing a docketed proceeding, and explaining the DOT Agreement was not designed to approve or disapprove the alliance.[120]

On October 7, 2021, Exhaustless objected to the carriers' agreement with the DOT over Exhaustless' market allocation and provided information to the public docket and to the lead DOJ attorney on the NEA case in this Court:

> The entire NEA — and indeed, every so-called immunized alliance — is predicated on the allocation of slots according to the WSG agreement, but the WSG agreement is not included in the NEA Agreement.  While the WSG is mentioned in the DOT-AA-JB Agreement, there is no indication that it was reviewed with the joint

---

[118]   Arizona, California, District of Columbia, Florida, Massachusetts, Pennsylvania, and Virginia.

[119]   *See* U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Complaint, ECF 1 (Sep. 21, 2021), Doc. 105, PA-I Antitrust 1.

[120]   *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PA-I Antitrust 749 at 774 (internal quotations and reference omitted).  *See also*, Clarification of Departmental Position on American Airlines - JetBlue Airways Northeast Alliance Joint Venture, Dkt. DOT-OST-2021-0001-0023 (Sep. 21, 2021), Doc. 108, PA-D Agreement 229.

venture or with any alliance agreement, nor that the DOJ
has any knowledge of it. [121]

On January 14, 2022, the DOJ notified Exhaustless that the DOJ is required

to provide the information from Exhaustless to each carrier-defendant's outside

counsel, which will be categorized as confidential and governed by the court's

default protective order.[122]  On January 21, 2022, Exhaustless emailed the DOJ its

draft of this petition for permanent injunction of the IATA WSG.[123]  Because

Exhaustless did not have the resources to prosecute the motion, Exhaustless

requested that the DOJ amend its complaint to petition the court for permanent

injunction of the IATA WSG.[124]  The DOJ did not amend its complaint.

On May 10, 2022, Exhaustless notified the DOJ of the rulings in *U.S. v.*

*Causby*, 328 U.S. 256 (1946) and *Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206

(Fed. Cir. 2005) that only the public has title to the navigable airspace.[125]

Exhaustless continued to provide information to the DOJ over the course of

the proceedings for the case in the Court.  On April 20, 2022, the DOJ notified

Exhaustless that the Court had issued a stipulated protective order for the case,

---

[121] Exhaustless Objection, Dkt. DOT-OST-2021-0001, 3 (Oct. 7, 2021), Doc. 106, PA-D Agreement 218.

[122] *See* DOJ Email, Notice of Protective Order (Jan. 14, 2022), Doc. 125, PA-I Antitrust 43.

[123] *See* Exhaustless SCOTUS Permanent Injunction v35 (Jan. 21, 2022), Doc. 126, PA-I Antitrust 45. *See also*, Exhaustless SCOTUS Appendix to v35, Doc. 127, PA-I Antitrust 174.

[124] *See* Exhaustless Request to Amend Complaint of NEA (Jan. 21, 2022), Doc. 128, PA-I Antitrust 205. *See also*, Exhaustless Email "DOJ should amend complaint in U.S. v. American and JetBlue" (Jan. 21, 2022), Doc. 129, PA-I Antitrust 207.

[125] *See* Exhaustless Update to DOJ (May 10, 2022), Doc. 148, PA-I Antitrust 210. *See also*, Exhaustless Email to DOJ (May 10, 2022), Doc. 149, PA-I Antitrust 214.

and that the information Exhaustless had provided would be treated as "highly confidential" as described in the order. [126]

### 3. The trial of the NEA

This court held a month-long bench trial for the American Airlines – JetBlue NEA agreement antitrust case in the fall of 2022. Testifying witnesses included executives of both defendant carriers and of Spirit and Southwest airlines, as well as expert economist witnesses for each side.

The Court heard evidence that airlines treat 'slots' as assets and as equity, but no witness was questioned about how a renewable asset — the future airspace schedule — was treated as a permanent asset.[127] No party or witness mentioned the IATA WSG or its allocation of seasonal airspace reservations by grandfathering at the twice-a-year Slot Conference — that every carrier before this Court attended on June 21, 2022, in Seattle, Washington to allocate the global Winter 2022

---

[126]   DOJ Email, Notice of Stipulated Protective Order (Apr. 20, 2022), Doc. 379, PA-I Antitrust 1253.

[127]   See, *e.g.*, Testimony of JetBlue CEO, D. Mass. Case 1:21-cv-11558, ECF 299 (Sep. 28, 2022), line 20 at 13, line 22 at 21, and line 24 at 24 ("Q. What did you see as impeding or hindering JetBlue's growth in New York, in particular[?] A. The number one hindrance to growth we had was just the lack of slots. * * * THE COURT: So the assets you're pooling are the slot. THE WITNESS: Yes." * * * Q. Thank you. Then the next bullet says, "Secures valuable airport access at LaGuardia and gains traction with corporate accounts. What do you mean by airport access at LaGuardia? A. Well, we touched on that earlier. You know, we had always had a very, very small slot holding at LaGuardia. . . And for us, being able to add more slots at LaGuardia would've allowed us to be more successful in trying to get more *corporate business* on JetBlue.") (emphasis added). *See also*, Testimony of Spirit Airlines VP Network Planning, D. Mass. Case 1:21-cv-11558, ECF 301 (Sep. 30, 2022), line 12 at 29 ("THE COURT: Airlines, I take it, are entitled to sell the slots to another airline if they want, or does that have to go through DOT? THE WITNESS: [T]ypically, they have to go through DOT. And the interesting thing about slots, Your Honor, is that technically they're owned by the government. . . Over time, it's evolved into something that's considered a piece of equity for the carrier.").

<u>airspace reservations, nor the upcoming slot conference on November 15-18, 2022,
in Australia to allocate the global Summer 2023 airspace reservations with
grandfathering.</u>[128]  <u>No party or witness mentioned the public's title to the navigable
airspace, which was declared in binding case precedent in 1946.  No party or
witness mentioned the Exhaustless market, which was declared in binding case
precedent in 2019.</u>

In addition, testimony and evidence submitted to the court revealed that the
carriers use Global Distribution Systems to circumvent the air tariff publication
system to allocate part of the market of air transportation to corporate customer
contracts at reduced or fixed prices relative to those offered to the public, including
a federal government "City Pair Program" (CPP) contract negotiated by the General
Services Administration (GSA).[129]

In addition, testimony and evidence submitted to the court revealed that
airline corporate account sales representatives monitor the contract accounts for
flights booked by very important people to the airline (VIP-A); when a VIP-A is
scheduled on a particular flight, the sales representative notifies the airline staff at

---

[128]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[129]  *See* GSA FY23 CPP Request for Proposal (Feb. 17, 2022), Doc. 185, PA-H CarrierInfo 153 at 167 ("The offeror shall propose a fixed-price fare for scheduled air passenger transportation services as specified herein in accordance with the same services the offeror provides commercially to the general public in scheduled service."). *See also,* 14 C.F.R. § 212.2 ("Charter flight means a flight operated *under the terms of a charter contract* between a direct air carrier and its charterer or lessee. It does not include scheduled interstate air transportation, scheduled foreign air transportation, or nonscheduled cargo foreign air transportation, *sold on an individually ticketed or individually waybilled basis.*" (emphasis added)).

the airport to prioritize service for that flight.[130]  What was not said at the trial is that an airline trade association houses one of its employees in the public's air traffic control tower; the member-airlines notify their trade association liaison of any flights to prioritize, who then coordinates with the FAA to ensure that the flight with the VIP-A on board bypasses the queue to the runway.[131]  Corporate and government contract VIP-As are provided this premium service ——to bypass the queue — at no additional charge.  The public currently has no way to pay premiums to Exhaustless' market-clearing service to prevent the queue, nor do they have access to a service to bypass the queue.

In addition, and what was not said in the Court, a corporate or government employee that purchases a flight under a corporate contract and is personally enrolled in an airline loyalty program — such as a member of the Congress, a federal judge, staff of the White House, an executive of a wireless carrier, an oil company, or a bank — is granted a private allocation of future capacity of the air

———————————————

[130]  *See* Testimony of JetBlue Corporate Sales Manager, D. Mass. Case 1:21-cv-11558, ECF 299 (Sep. 28, 2022), Doc. 184, PA-I Antitrust 219 at 250 ("So this is an e-mail you sent to JetBlue's system operations directors; is that right? A. Yes.  Q. And the system operations directors are the people at JetBlue responsible for moving – or for managing airplane activities and movements across JetBlue's network; is that right? A. Yes. That's one of their functions.  Q. Okay. And in this particular e-mail, you were asking them for special attention to a flight between Philadelphia and Boston on which this corporate customer's CEO was then traveling; is that right? A. Yes. I'm highlighting this flight to the system office team. . . But if I can give them some information, highlight a flight is important to us, they will keep their eyes on all the elements that go into getting a flight out on time.").

[131]  *See* Airlines for America, Job Posting for Airline Traffic Management Coordinator (Oct. 5, 2022), Doc. 195, PA-D Agreement 427.  *See also,* Airlines for America, Job Posting for Director, Air Traffic Management (Mar. 22, 2023), Doc. 196, PA-D Agreement 429.

transportation system – for free – from the air carrier or foreign air carrier in the form of 'loyalty rewards' for their benefit.[132]

This Court heard closing arguments on November 18, 2022.

On December 2, 2022, the DOJ submitted its proposed findings of fact that *"American owns many valuable slots at JFK and LGA, both of which are slot-constrained airports."*[133]  The DOJ omitted the IATA WSG, the Exhaustless market-clearing service declared in binding case precedent in *Exhaustless*, and the Supreme Court precedent in *Causby*.  The DOJ did not mention that in *Air Pegasus*, it had relied on *Causby* when it stated that "the navigable airspace has always been subject to the exclusive and complete control of the federal government and is consequently not available for private ownership."[134]  Instead, the DOJ cited sealed evidence to proffer airline ownership of reservations to use the airspace, PX0162, which remains unpublished.  But no evidence — sealed or public —claiming private ownership of the public's assets can overturn U.S. Supreme Court precedent that precludes such claim.

-----

[132]   *See* National Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, div. A, title XI, § 1116, 115 Stat. 1012, 1241 (Dec. 28, 2001), amended by National Defense Authorization Act for Fiscal Year 2020, Pub. L. 116-92, div. A, title VI, § 606(c), 133 Stat. 1198, 1425 (Dec. 20, 2019), *codified at* 5 U.S.C. § 5702 note, Retention of Travel Promotional Items.  *See also*, GSA Federal Travel Regulation; Using Promotional Materials and Frequent Traveler Programs, 67 Fed. Reg. 17946 (Apr. 12, 2002), Doc. 197, PA-B Rulemaking 394.  *See also*, GSA Federal Travel Regulation; Using Promotional Materials; Conference Planning, 68 Fed. Reg. 27936 (May 22, 2003), Doc. 198, PA-B Rulemaking 396.

[133]   U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Plaintiff's Proposed Findings of Fact, ECF 332 (Dec. 2, 2022), Doc. 200, PA-I Antitrust 517, ¶436 at 645.

[134]   *Air Pegasus of D.C., Inc. v. U.S.*, 424 F.3d 1206, 1214 (Fed. Cir. 2005).

### 4. Permanent injunction of the NEA

On May 19, 2023, this Court permanently enjoined the NEA as a "naked agreement to not compete" and "a straightforward example of market allocation."[135]

The Court's order did not declare the owner of the 'slot.'

While American Airlines and JetBlue were in this Court negotiating the terms of the injunction — and claiming that they had engaged "in good faith" with regulators to craft their joint venture agreement[136] — they did not disclose that the carriers and the DOT/Slot Coordinator were attending the 152nd slot conference on June 13-15, 2023, in Ireland to allocate the global Winter 2023 airspace reservations with the entire market allocation secured by the IATA WSG agreement.[137]

## L.   Summer 2021 Seasonal Reservations

### 1. Administrative Allocation with the IATA WSG

On October 1, 2020, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent scheduling season and to

---

[135]  *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PA-I Antitrust 749 at 752, 821.

[136]  U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, American Airlines and JetBlue Response to Plaintiff's Motion for Entry of Final Judgment and Permanent Injunction, Exhibit A, ECF 359-1 (Jun. 14, 2023), Doc. 315, PA-I Antitrust 1243 at 1244.

[137]  *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PA-D Agreement 449.

which they claimed entitlement for the future season.[138]  On October 8, 2020, carriers submitted their schedule requests for the Summer 2021 scheduling season to the FAA.  No later than November 5, 2020, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[139]  On November 17, 2020, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference held online to finalize the regulatory allocation of the season's airspace reservations to carriers[140]

### 2.  Slot Usage Waiver – Reduced Passenger Demand

On December 18, 2020, the DOT/Slot Coordinator posted the carriers IATA WSG agreement to a public docket.[141]

On December 22, 2020, at the request of certain carriers, the FAA proposed a rule to issue carriers a waiver of the airspace reservation minimum usage requirement agreed to by carriers' private IATA WSG agreement, through the end

---

[138]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[139]  *See id.*

[140]  *See id. See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 95 at 97.

[141]  *See* IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862-0244 (Dec. 18, 2020), Doc. 69, PA-D Agreement 136.  *Also filed at* Spirit Airlines, Inc. v. DOT, D.C. Cir. No. 19-1248, Joint Appendix, ECF 1846976 (Jun. 12, 2020), Doc. 238, PA-G Court 1021 at 1186.

of the Summer 2021 scheduling season on October 30, 2021.[142]  On December 28,

2020, Exhaustless objected to the waiver because:

> The FAA cannot protect airlines from the antitrust laws.
> As the Supreme Court stated: 'The assumption that
> competition is the best method of allocating resources in a
> free market recognizes that all elements of a bargain --
> quality, service, safety, and durability -- and not just the
> immediate cost, are favorably affected by the free
> opportunity to select among alternative offers.  Even
> assuming occasional exceptions to the presumed
> consequences of competition, **the statutory policy
> precludes inquiry into the question whether
> competition is good or bad.**'[143]

In addition, Exhaustless announced an auction by its market-clearing service

of airspace reservations for the Winter 2021 carrier scheduling season to carriers

that license the Exhaustless Standard by January 13, 2021."[144]  No carrier joined

the competitive market standard.

On January 14, 2021, the FAA *de facto* granted the waiver and *de facto*

created a second-class of airline reservations with grandfathered rights, at the

request of IATA, relegating new schedule 'requests' to third-class.[145]

-------------------

[142]  *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Summer 2021 Scheduling Season, 85 Fed. Reg. 83672 (proposed Dec. 22, 2020), Doc. 70, PA-B Rulemaking 188.

[143]  Exhaustless Objection, Dkt. FAA-2020-0862-0255 (Dec. 28, 2020), Doc. 71, PA-B Rulemaking 192 (*referencing National Soc'y of Prof. Engineers v. U.S.*, 435 U.S. 679, 695 (1978) (emphasis in original).

[144]  *Id.*

[145]  *See* FAA Policy Statement: COVID-19 Related Relief at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Summer 2021 Scheduling Season, Dkt. FAA-2020-0862-0302 (Jan. 14, 2021), Doc. 72, PA-B Rulemaking 194 at 224 ("[T]he FAA has determined to apply a standard similar to paragraph

## M.   American/oneworld Alliance Amendment

Rather than compete in the market for airspace reservations in the U.S., Aer Lingus, a citizen of Ireland and a subsidiary of International Consolidated Airlines Group, joined the American Airlines *et al* oneworld alliance in a "confidential" agreement to use the public's airspace.[146]  In November 2020, the DOT issued a show cause order for its tentative approval of this non-public agreement and cited "serious competitive concerns in the U.S.-London market *due to access constraints*" to justify requiring certain carriers to lease their 'holdings' of certain reservations.[147]

In response to the proposed amended alliance — rather than compete for airspace reservations in the market or honor its IATA WSG agreement — JetBlue sought for the government to take reservations from the existing 'holders' to give to JetBlue:

> JetBlue argues that only government action will enable JetBlue to enter the market and compete with the existing alliances. JetBlue states that it is the best-positioned carrier to enter the U.S.–LHR market and

---

1.4 of the WASB proposal at all slotcontrolled and designated IATA Level 2 airports in the United States. Slots or schedules operated as approved on a non-historic basis in Summer 2021 will be given priority over new demands for the same timings in the next equivalent season (i.e., Summer 2022) for use on a non-historic basis, subject to capacity availability and consistent with established rules and policies in effect in the United States. . .  This priority does not affect the historic precedence or priority of slot holders and carriers with schedule approvals, respectively, which meet the conditions of the waiver during Summer 2021 and seek to resume operating in Summer 2022.").

[146]   American Airlines *et al* Motion for Antitrust Immunity for Amended Joint Business Agreement, Dkt. DOT-OST-2008-0252 (Dec. 21, 2018), Doc. 325, PA-D Agreement1244, Appendix 1 at 1302.

[147]   Order 2020-11-9 (proposed Nov. 16, 2020), Doc. 64, PA-D Agreement 92 at 103 (emphasis added).

provide vigorous competition. JetBlue argues that the
existing remedy slot holders have more than enough slots
to operate their existing and planned operations.
Therefore, JetBlue argues that the remedy should be
modified to allow for the reallocation of the remedy slots
to JetBlue.[148]

Exhaustless objected to the proposed expansion of antitrust immunity

because:

> 1) A competitive alternative is available for airlines to
> obtain airspace slots without regulatory intervention in
> the slot market; 2) The fundamental assumption of
> illiquid slot markets by the applicants and the DOT is no
> longer valid; 3) The proposed slot divestiture continues
> the prohibited practice of grandfathering slots; . . .
> Exhaustless will blindly auction the Winter 2021/2022
> slot, or schedule, reservations for Heathrow Airport on
> April 7, 2021.[149]

The carriers did not abandon their joint business agreement to join the

competitive market.

## N.    Delta/LATAM Alliance Agreement

In July 2020, rather than compete in the market for airspace reservations,

Delta Air Lines and LATAM Airlines Group, a holding company of eleven foreign

carriers that are citizens of seven countries (Argentina, Brazil, Chile, Columbia,

Ecuador, Paraguay, and Peru) — all of whom are members of the IATA — requested

---

[148]   *Id.* at 99.

[149]   Exhaustless Objection, Dkt. DOT-OST-2008-0252 (Nov. 30, 2020), Doc. 65, PA-D Agreement
110.

that the DOT grant approval and antitrust immunity of a "confidential" joint venture agreement (JVA) among all of the carriers across the two groups.[150]

On February 7, 2022, Exhaustless opposed this agreement because, *inter alia*, the "JVA is not the entire agreement as it is predicated on the anticompetitive IATA Worldwide Slot Guidelines agreement. * * * Delta-LATAM's JVA presents pages of market share 'impact' against rivals — data that is meaningless since they have conspired to allocate that market through the WSG."[151]

None of the carriers abandoned the joint venture agreement, eventually accepting a grant of antitrust immunity based on their fraudulent application.[152]

## O.   Winter 2021 Seasonal Reservations

### 1.  Competitive Market Allocation Boycott

As noted in the discussion of American/Aer Lingus application for antitrust immunity,[153] on November 9, 2020, Exhaustless announced an auction for the Winter 2021 airspace reservations for LaGuardia, JFK, and Newark Liberty airports on April 7, 2021, to eligible carriers that license the Aviation 2.0 Operating

---

[150]   Delta Air Lines, Inc. and LATAM Airlines Group, S.A., Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Dkt. DOT-OST-2020-0105-0001 (Jul. 8, 2020), Doc. 151, PA-D Agreement 243 at 253.

[151]   Exhaustless Objection to the Delta-LATAM Alliance, Dkt. DOT-OST-2020-0105-0045 (Feb. 7, 2022), Doc. 152, PA-D Agreement 366 at 368.

[152]   *See* Order 2022-9-20 (Sep. 30, 2022), Doc. 155, PA-D Agreement 413.

[153]   *See* M. American/oneworld Alliance Amendment, *supra.*

Standard by January 13, 2021.[154] No carrier joined the competitive market standard.

### 2. Administrative Allocation with the IATA WSG

On May 6, 2021, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[155] On May 13, 2021, carriers submitted their schedule requests for the Winter 2021 scheduling season to the FAA.[156] No later than June 3, 2021, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[157] On June 15, 2021, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference held online to finalize the regulatory allocation of the season's airspace reservations to the carriers[158]

### 3. Slot Usage Waiver – Reduced Passenger Demand

On September 20, 2021, at the request of certain carriers, the FAA proposed a rule to issue carriers a waiver of the airspace reservation minimum usage

---

[154] Exhaustless Objection, Dkt. DOT-OST-2018-0154-0053 (Nov. 9, 2020), Doc. 60, PA-D Agreement 52.

[155] *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[156] *See id.*

[157] *See id.*

[158] *See id. See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 100 at 102.

requirement agreed to by carriers' private IATA WSG agreement, through the end

of the Winter 2021 carrier scheduling season on March 26, 2022.[159]  On September

27, 2021, Exhaustless objected to the proposed waiver because, *inter alia*:

> The waiver seeks to protect the market allocated at seven
> high demand airports to members of the carrier cartel
> that provide foreign air transportation, contrary to the air
> transport agreement with the E.U. that requires both
> governments to 'apply their respective competition
> regimes to protect and enhance overall competition and
> not individual competitors.'[160]

On October 20, 2021, the DOT *de facto* granted a waiver to the carriers'

private IATA WSG agreement.[161]

## P.  Summer 2022 Seasonal Reservations

### 1.  Competitive Market Allocation Boycott

On August 19, 2021, Exhaustless announced a competitive market allocation

for the airspace reservations for the Summer 2022 carrier scheduling season at the

seven airports which the FAA requires advance management of airspace demand.[162]

_____

[159]  *See* FAA COVID-19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 52114 (proposed Sep. 20, 2021), Doc. 103, PA-B Rulemaking 252.

[160]  Exhaustless Inc. Objection, Dkt. FAA-2020-0862-0321 (Sep. 27, 2021), Doc. 104, PA-B Rulemaking 259.

[161]  FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2021/2022 Scheduling Season, 86 Fed. Reg. 58134 (Oct. 20, 2021), Doc. 121, PA-B Rulemaking 269.

[162]  *See* Exhaustless Announcement of Slot Auction for Summer 2022, Dkt. DOT-OST-2001-9849-0187 attachment 1/6 (Aug. 19, 2021), Doc. 94, PA-E Auction 101. *See also*, Exhaustless Attached

No carriers licensed Exhaustless' competitive market standard to compete for the reservations.

### 2. Administrative Allocation with the IATA WSG

On September 30, 2021, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[163] On October 7, 2021, carriers submitted their schedule requests for the Summer 2022 scheduling season to the FAA.[164] No later than November 4, 2021, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[165] On November 16, 2021, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference in Rome, Italy to finalize the regulatory allocation of the season's airspace reservations to the carriers.[166]

### 3. Slot Usage Waiver – Reduced Passenger Demand

On March 2, 2022, at the request of certain carriers, the FAA proposed a rule to issue carriers a waiver of certain airspace reservation minimum usage

---

Auction Documents, Dkt. DOT-OST-2001-9849-0187 (Aug. 19, 2021) (Aviation 2.0 Licensing Agreement (attachment 2/6), Slot Auction Rules and Procedures (attachment 3/6), Slot Auction Design (attachment 4/6), Prepayment Form (attachment 5/6), and Registration Form (attachment 6/6)).

[163]   *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[164]   *See id.*

[165]   *See id.*

[166]   *See id. See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 100 at 102.

requirements agreed to by carriers' private IATA WSG agreement, through the Summer 2022 carrier scheduling season ending on October 29, 2022.[167]  On March 7, 2022, Exhaustless objected to the waiver: *"The DOT/FAA's proposal to elevate the self-declared 'historical rights' of air carriers over an available market is repugnant to the policies of the U.S. Government and to the agreement among its people of a free market economy as enshrined in the Constitution."*[168]  Exhaustless also documented the civil penalties that the Congress provides for each flight involving the violation of certain statutes.[169]  On Mar. 29, 2022, the FAA *de facto* granted a waiver to the carriers' private IATA WSG agreement.[170]

## Q.   Winter 2022 Seasonal Reservations

### 1.  Competitive Market Allocation Boycott

On January 7, 2022, Exhaustless announced a competitive market allocation for the airspace reservations for the Winter 2022 carrier scheduling season at the

---

[167]   *See* FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 11805 (proposed Mar. 2, 2022), Doc. 135, PA-B Rulemaking 321.

[168]   Exhaustless Comment, Dkt. FAA-2020-0862-0354/0351 (Mar. 7, 2022), Doc. 136, PA-B Rulemaking 327 at 330 (emphasis added).

[169]   *Id.* at 335.

[170]   *See* FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA SFO] for the Summer 2022 Scheduling Season, 87 Fed. Reg. 18057 (Mar. 29, 2022), Doc. 137, PA-B Rulemaking 332.

seven airports which the FAA requires advance management of airspace demand.[171] The announcement included the evolution of the Congress' actions to deregulate the industry that *"shows that the DOT/FAA does not have, and has never had, authority to regulate routes."*[172] No carrier licensed Exhaustless' Standard to compete for the reservations.

## 2. Administrative Allocation with the IATA WSG

On May 12, 2022, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[173] On May 19, 2022, carriers submitted their schedule requests for the Winter 2022 scheduling season to the FAA.[174] No later than June 9, 2022, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[175] On June 21, 2022, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference in Seattle, Washington to finalize the regulatory allocation of the season's airspace reservations to the carriers.[176]

---

[171] *See* Exhaustless Comment, Dkt. FAA-2001-9854-0127 (Jan. 7, 2022), Doc. 124, PA-E Auction 103.

[172] *Id.* at 109 (emphasis added).

[173] *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[174] *See id.*

[175] *See id.*

[176] *See id. See also,* Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 100 at 102.

### 3.  Slot Usage Waiver – Reduced Passenger Demand

On August 25, 2022 — two months after allocating the airspace reservations according to the IATA WSG — carrier trade associations requested the FAA grant a waiver from the terms of their private IATA WSG agreement for the Winter 2022 carrier scheduling season beginning October 30, 2022, and ending March 25, 2023.[177]  On October 28, 2022, the FAA declined.[178]

### R.   United/Air Canada Alliance Agreement

On February 10, 2022, rather than compete for airspace reservations or follow the regulatory process to submit an alliance agreement,[179] United and Air Canada privately requested antitrust immunity of an undisclosed alliance agreement.[180]  The contents of the private letter or the agreement are not public.

### S.   Access to South Africa's Airspace

In early 2022, two U.S. carriers had each requested an administrative allocation of reservations for service to South Africa; the sum of the request exceeded the reservation volume agreed to in the bi-lateral air transport agreement.

---

[177]   *See* FAA COVID–19 Related Relief Concerning Operations at [ORD, JFK, LAX, EWR, LGA, DCA, SFO] for the Winter 2022/2023 Scheduling Season, 87 Fed. Reg. 65282 (Oct. 28, 2022), Doc. 180, PA-B Rulemaking 385.

[178]   *See id.*

[179]   *See* 14 C.F.R. § 303.03.

[180]   *See* TRN Letter to United Airlines, Dkt. DOT-OST-2008-0234-0336 (posted Jul. 21, 2022), Doc. 176, PA-D Agreement 424.

On March 30, 2022, Exhaustless announced a competitive market allocation to clear the excess demand for airspace reservations for the rest of the Summer 2022 and the Winter 2022 carrier scheduling season.[181]  No carrier licensed Exhaustless' Standard to compete for the reservations in the market, instead accepting a grant from the DOT.[182]

## T.    Access to Cuba's Airspace

On October 25, 2019, the DOT unilaterally imposed economic sanctions on Cuba by suspending scheduled service by U.S. carriers at airports other than the Havana airport,[183] and a year later by limiting the annual number of round-trip charter flights.[184]  No carrier challenged these unlawful agency actions.

Between March and April 2022, charter air carriers filed applications for more round-trip frequencies to Cuba than the DOT's limit.[185]  On April 19, 2022, Exhaustless announced an auction to clear the excess demand for these airspace

---

[181]  *See* Exhaustless Auction of Airspace Reservations to South Africa, Dkt. DOT-OST-2001-9849-0188 (Mar. 30, 2022), Doc. 141, PA-E Auction 144.

[182]  *See* Order 2022-7-18 (Jul. 26, 2022), Doc. 174, PA-F MarketFail 115.

[183]  *See* Notice Suspending US-Cuba Scheduled Services via Non-Havana Points, Dkt. DOT-OST-2016-0021-1410 (Oct. 25, 2019), Doc. 156, PA-F MarketFail 75.

[184]  *See* Order 2020-11-14 (Nov. 17, 2020), Doc. 157, PA-F MarketFail 78.

[185]  *See* Exhaustless Announces Auction of Frequencies to Cuba, Dkt. DOT-OST-2001-9849-0190 (Apr. 19, 2022), Doc. 158, PA-E Auction 148.

reservations.[186]  No carrier joined the competitive standard to compete for the frequencies in the market, deciding instead to seek a grant from the DOT.[187]

On May 5, 2022, Exhaustless announced an auction to clear excess carrier demand for airspace reservations from any U.S. airport to the Havana, Cuba airport for the Winter 2022 carrier scheduling season.[188]  On June 1, 2022, the DOT removed the administratively imposed flight limits and returned to the limits agreed by the air transport agreement between the U.S. and Cuba.[189]  No carrier joined the competitive standard to compete for the frequencies in the market, and on September 19, 2022, the DOT administratively allocated the reservations.[190]  At the request of carriers, the DOT promptly granted use waivers on the allocated frequencies.[191]

---

[186]  *Id.*

[187]  Order 2022-5-17 (May 19, 2022), Doc. 159, PA-F MarketFail 81 at 83.

[188]  *See* Exhaustless Announces Auction of Frequencies for Scheduled Services to Havana, Dkt. DOT-OST-2016-0021-1427 (May 5, 2022), Doc. 160, PA-E Auction 153.

[189]  *See* Order 2022-6-1 (Jun. 1, 2022), Doc. 161, PA-F MarketFail 89.

[190]  *See* Notice of Action Taken re: American Airlines, Inc. and JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-1436 (Sep. 19, 2022), Doc. 162, PA-F MarketFail 94. *See also*, Notice of Action Taken re: Mesa Airlines, Inc., Dkt. DOT-OST-2016-0021-1435 (Sep. 19, 2022), Doc. 163, PA-F MarketFail 97.

[191]  *See, e.g.*, Notice of Action Taken re: Delta Air Lines, Dkt. DOT-OST-2016-0021-1442 (Oct. 18, 2022), Doc. 164, PA-F MarketFail 100. *See also*, Notice of Action Taken re: JetBlue Airways Corp., Dkt. DOT-OST-2016-0021-1447 (Mar. 17, 2023), Doc. 165, PA-F MarketFail 104.

## U.   The Public's Access to the Public's Airspace at DCA and LGA

### 1.  Access to Airspace at a Washington, D.C. Airport

In 1986, the federal government hired the Metropolitan Washington Airports Authority to manage the operations of the two Washington, D.C. airports owned by the federal government, and which were previously managed by the FAA.  The terms of the operating lease were codified in law[192] and adopted in the federal government's lease agreement with the MWAA.[193]

As part of the transfer of operations, Congress prohibited nonstop air transportation between Reagan National Airport (DCA), a Washington, D.C. port, and certain domestic and foreign terminal points.[194]

In addition, the Congress 'granted' the MWAA the authority to regulate service in air transportation by regulating the hours of operation or aircraft type.[195]

---

[192]  *See* Metropolitan Washington Airports Act of 1986, Pub. L. 99-500, title VI, §6012, 100 Stat. 1783-385 (1986), *codified at* 49 U.S.C. § 49101 *et seq.*

[193]  *See* Lease of the Metropolitan Washington Airports between the U.S.A. acting by and through the Secretary of Transportation and the Metropolitan Washington Airports Authority (Mar. 2, 1987), amend. 1 (1991), amend. 2 (1998), amend. 3 (2003), and amend. 4 (2013), Doc. 308, PA-A InfoCongress 782.

[194]  *See id.*, *codified as amended at* 49 U.S.C. § 49109 ("An air carrier may not operate an aircraft nonstop in air transportation between Ronald Reagan Washington National Airport and another airport that is more than 1,250 statute miles away[.]").

[195]  See *id.*, §6005(c)(4), 100 Stat. 1783-376, *codified at* 49 U.S.C. § 49104(a)(4) ("In acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, the Airports Authority to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures. By a vote of 7 members, the Airports Authority may grant exceptions to the requirements of this paragraph.").

In addition, the Congress 'granted' the Metropolitan Washington Airports Authority (MWAA) an exception to market competition in acquiring certain supplies or services, or in awarding concession contracts, when approved by most of its directors.[196]  The MWAA has relied on terms of its charter and the federal government's 'grant' of an exception to market competition to justify its failure to procure services and supplies by competing in a market, and its failure to allocate its commercial space with a competitive market:

> MWAA stated, however, that [GSA's] assessment of its contracting practices using recognized principles of full and open competition was inappropriate because, in its view, these principles do not adequately reflect the unique environment applicable to contracting at commercial airports. MWAA noted that its charter, as reflected in statutes of the District of Columbia and the Commonwealth of Virginia, recognized the need for flexibility in MWAA's contracting and, consequently, granted it expanded commercial discretion in making and entering into contracts.  In MWAA's view, it has the power to use contracting practices and procedures that are based upon business needs and "not inherently linked to federal concepts" for maximizing competition.[197]

---

[196]   See *id.*, §6005(c)(4), 100 Stat. 1783-376, *codified at* 49 U.S.C. § 49104(a)(4) ("In acquiring by contract supplies or services for an amount estimated to be more than $200,000, or awarding concession contracts, the Airports Authority to the maximum extent practicable shall obtain complete and open competition through the use of published competitive procedures. By a vote of 7 members, the Airports Authority may grant exceptions to the requirements of this paragraph.").

[197]   U.S. General Accounting Office Report to Congress, GAO-02-36 Metropolitan Washington Airports Authority, 34 (March 2002).

## 2. Access to Airspace at a New York Airport

Since the 1950s, the Port Authority of New York and New Jersey (PANYNJ), a bi-state agency of New York and New Jersey, has established and enforced a regulation prohibiting nonstop air transportation between LaGuardia Airport (LGA), a New York port, and certain terminal points in the world (the "LaGuardia Perimeter Rule").[198]  When the Congress passed the Airline Deregulation Act in 1978, it prohibited states from enforcing regulations related to price, route, and service in air transportation.[199]  The Supreme Court upheld the preemption of state regulations in 1992.[200]  The PANYNJ has not repealed its regulation of routes serving LaGuardia.

On May 24, 2022, a bill to favor a New York port at LaGuardia Airport, by codifying the PANYNJ "LaGuardia Perimeter Rule," passed the New York State Senate.[201]

------------------------------

[198]  *See* The Port Authority of New York and New Jersey, Airport Rules and Regulations, Chapter VIII Aircraft Operations (Jul. 27, 2022), Doc. 335, PA-J Other 146, U.16 at 167 ("LaGuardia Airport is to be utilized for nonstop domestic flights and international flights pre-cleared by the Federal Inspection Services only to and from points that are located within 1,500 statute miles of LaGuardia Airport, and to and from Denver, CO. The foregoing limitation does not apply to flight operations conducted on Saturdays or to general aviation operations conducted at the Marine Air Terminal.").

[199]  See 49 U.S.C. § 41713.

[200]  See *Morales v. Trans World Airlines*, 504 U.S. 374 (1992).

[201]  *See* New York Senate Bill S311A.

## V.   JetBlue/Spirit Merger Agreement

On May 12, 2021, Spirit Airlines stated that the "blatant actions of [American Airlines and JetBlue NEA] to reshape competition using *publicly-owned but highly-constrained resources* . . . underscore the immediate need for an investigation[.]"[202]

On July 28, 2022, JetBlue Airways and Spirit Airlines entered into a merger agreement.[203]  Spirit represented that it had a "valid and subsisting ownership interest" in its tangible personal property[204] and a "valid and subsisting leasehold interest in all Company Leased Real Property."[205]  Yet JetBlue required no representation, and Spirit made no representation, of any right to confer the publicly-owned takeoff or landing slots "held by" or "permanently allocated to" Spirit[206] — even though JetBlue's 2022 $3.5 billion Senior Secured Bridge Facility commitment to consummate the merger was secured by takeoff and landing slots.[207] JetBlue claimed that the value of its assets pledged as security increased to $6.2

---

[202]   Spirit Airlines Supplement to Complaint, Dkt. DOT-OST-2021-0001 (May 12, 2021), Doc. 327, PA-D Agreement 1458 at 1461 (emphasis added).

[203]   See Spirit Airlines, Inc. SEC Form 8-K/A, Agreement and Plan of Merger, Exhibit 2.1 (filed Aug. 16, 2022), Doc. 323, PA-D Agreement 1131.

[204]   *Id.*, §3.21 at 1164.

[205]   *Id.*, §3.22 1164.

[206]   *Id.*, §3.25 1166.

[207]   *See* JetBlue Airways Corporation SEC Form 10-K, 10 (Feb. 27, 2023) ("We were able to leverage . . . our . . . unencumbered asset base to secure the funding to support the Spirit acquisition."). *See also, id.* at 79 ("Our indefinite-lived intangible assets consist primarily of acquired Slots at certain High Density Airports[.]").

billion at the end of 2022[208] — for a public company with shareholder equity market capitalization of $3.0 billion as of June 30, 2023.[209]

On March 6, 2023, JetBlue and Spirit agreed to federally preempted State regulations related to price, route, or service of a carrier in air transportation in exchange for the State to not prosecute the JetBlue and Spirit merger agreement for antitrust violations.[210] The carriers agreed not to disclose the agreement with the State to a court.[211]

On March 7, 2023, the DOJ Antitrust Division, joined by several states,[212] filed a complaint in this court against the JetBlue Airways and Spirit Airlines merger agreement for violation of the antitrust laws.[213]

On March 13, 2023, the DOJ notified Exhaustless that the DOJ is required to provide the information Exhaustless provided in both its current investigation and

---

[208] *See id* at 10.

[209] *See* JetBlue Airways Corporation SEC Form 10-Q, 1 (Aug. 1, 2023), showing 333,250,321 outstanding shares at June 30, 2023; and *see also*, finance.yahoo.com showing an $8.86 closing price per share on June 30, 2023.

[210] *See* Settlement Agreement among Spirit Airlines, Inc., JetBlue Airways Corp., and the Attorney General of Florida (Mar. 6, 2023), Doc. 214, PA-I Antitrust 695.

[211] *Id.* at ¶30 at 704.

[212] Massachusetts, New York, and District of Columbia; amended on March 31, 2023, to join California, Maryland, New Jersey, and North Carolina.

[213] *See* U.S. et al v. JetBlue Airways and Spirit Airlines, Inc., D. Mass. Case 1:23-cv-10511, Complaint, ECF 1 (Mar. 7, 2023), Doc. 215, PA-I Antitrust 708.

the NEA case to each defendant's outside counsel, categorized as highly confidential submissions and governed by the Court's default protective order.[214]

On March 22, 2023, the DOJ notified Exhaustless that the information Exhaustless provided is categorized as "highly confidential" and governed by the Court's stipulated protective order.[215]

## W.   Summer 2023 Seasonal Reservations

### 1.  Competitive Market Allocation Boycott

On July 29, 2022, Exhaustless announced an auction of congestion-free access to the National Airspace System for Summer 2023 at Reagan National Airport in Washington, D.C., and the three large hub airports in the New York City metro area airspace; Newark Liberty, JFK, and LaGuardia airports.[216]  On August 24, 2022, Exhaustless notified the public that no carriers licensed Exhaustless' Standard to compete in the market for the airport schedules.[217]

---

[214] *See* DOJ Email, Notice of Production to Defendants in US v JetBlue and Spirit (Mar. 13, 2023), Doc. 380, PA-I Antitrust 1255.

[215] *See* DOJ Email, Notice of Stipulated Protective Order (Mar. 22, 2023), Doc. 381, PA-I Antitrust 1257.

[216] *See, e.g.*, Exhaustless Airport Slot Auction Notice for Summer 2023, Dkt. DOT-OST-2001-9849-0193 (Jul. 29, 2022), Doc. 177, PA-E Auction 158.

[217] *See* Exhaustless Notice of Results of Auction of Airport Schedules for Summer 2023, Dkt. DOT-OST-2001-9849-0194 (Aug. 24, 2022), Doc. 178, PA-E Auction 165.

## 2.  Administrative Allocation with the IATA WSG

On September 29, 2022, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[218]  On October 6, 2022, carriers submitted their schedule requests for the Summer 2023 scheduling season to the FAA.[219]  No later than November 3, 2022, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and refused that reservation to other carriers.[220]  On November 15, 2022, carriers and the DOT/Slot Coordinator attended the IATA Slot Conference in Melbourne, Australia to finalize the regulatory allocation of the season's airspace reservations to the carriers.[221]

## 3.  Slot Usage Waiver – Reduced Airport Runway Capacity

Although the Airline Deregulation Act of 1978 and the Open Skies air transport agreements require carriers to compete in a market for reservations to use the airspace, while there was no reservation market, the Congress required a voluntary schedule reduction meeting to reduce delays caused by the

---

[218]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[219]  *See id.*

[220]  *See id.*

[221]  *See id.*  *See also*, Exhaustless FOIA Request Use of Government Aircraft (Mar. 6, 2023), Doc. 21, PA-B Rulemaking 100 at 102.

overscheduling of flights by carriers.[222]  The IATA WSG requires adherence to the seniority of "historic slots" when there is a reduction of capacity.[223]

At the November 15, 2022, IATA WSG slot conference, the FAA disclosed the 'coordination parameters' of each 'level 2' and 'level 3' airport for the IATA Summer 2023 season, including Reagan National in Washington, D.C. (DCA).[224]

On December 27, 2022, the FAA issued a notice that runway construction at DCA would reduce flight capacity and that, at the unpublished request of a carrier trade association, the FAA 'granted' carriers a waiver of the minimum usage requirement for certain airspace reservations — agreed to by carriers' private IATA WSG agreement — at DCA for most of 2023.[225]  The waiver does not apply to airspace reservations granted pursuant to statute,[226] so it only applies to 'great-grandfathered' airspace reservations initially allocated by the FAA to carriers according to the grandfathering rules of the carrier scheduling committee

---

[222]  *See* Vision 100—Century of Aviation Reauthorization Act, Pub. L. 108–176, §422, 117 Stat. 2490, 2552 (2003), *codified at* 49 U.S.C. § 41722.

[223]  IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, § 6.9.1 at 169.

[224]  *See* IATA, How to get the most out of attending the Slot Conference (March 2022), Doc. 338, PA-J Other 168 at 169 ("Coordinators please . . . upload any of the following documents or website links to Swapcard . . . Declared airport capacities . . .").

[225]  FAA Construction Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 87 Fed. Reg. 79245 (Dec. 27, 2022), Doc. 201, PA-B Rulemaking 402.

[226]  *Id.* at 409.  *See exemptions at, e.g.*, Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR-21 Act), Pub. L. 106-181, §231(e)(1), 114 Stat. 61 (2000), *codified at* 49 U.S.C. § 41718.

agreements from the regulated era. [227]  Rather than compete for congestion-free reservations in the Exhaustless market, or follow the statutory policy for a schedule reduction to reduce delays, or uphold the historical hierarchy of reservations pursuant to the IATA WSG, carriers violated their private IATA WSG agreement to the minimum usage requirement.

Because the air carriers guarantee the allocation of capacity and the price for federal and state government employees pursuant to their unlawful contracts, this reduced flight capacity to Washington D.C. funnels the rest of the public onto fewer available seats than the total available at the time the GSA contract was negotiated, which will apply upward pressure on published prices even further above the negotiated fixed price of the contract.

### 4.  Slot Usage Waiver – Reduced Airspace Capacity

At the November 15, 2022, IATA WSG slot conference, the FAA disclosed the "coordination parameters" of each "level 2" and "level 3" airport for the IATA Summer 2023 season, including JFK, Newark Liberty, and LaGuardia.[228]

---

[227]  *See* 14 C.F.R. Part 93, Subpart S, § 93.215(a), Doc. 202, PA-B Rulemaking 405.  *See also*, FAA High Density Traffic Airports; Slot Allocation and Transfer Methods, 50 Fed. Reg. 52180 (Dec. 20, 1985), Doc. 232, PA-B Rulemaking 455 ("[S]lots at each of the four airports generally have been allocated by . . . scheduling committees composed of the incumbent carriers and interested new entrant carriers in each category at each airport. Each committee meets and operates under a limited grant of antitrust immunity issued under section 414 of the Federal Aviation Act. * * * As a result of this amendment, the role of the scheduling committees in the allocation of slots is eliminated.").

[228]  *See* IATA, How to get the most out of attending the Slot Conference (March 2022), Doc. 338, PA-J Other 168 at 169 ("Coordinators please . . . upload any of the following documents or website links to Swapcard . . . Declared airport capacities . . .").

On March 15, 2023, carriers attended a private "safety summit" held by the FAA.[229] On March 21-22, 2023, rather than compete for reservations in Exhaustless' market, or comply with the statutory schedule reduction meeting, or comply with the IATA WSG and relinquish the less senior reservations from the market, carriers American, Delta, and United requested that the FAA reduce the schedule at the three New York City area large hub airports by 10% during the calendar summer of 2023 to reduce anticipated delays, and grant the carriers a waiver of the minimum usage requirements agreed to by carriers' private IATA WSG agreement.[230] The FAA *de facto* 'granted' carriers a waiver.[231] The FAA committed not to reallocate any reservations for the NYC area airspace that a carrier cancels but will reallocate those cancelled at the D.C. airport — while it is simultaneously reducing the schedule at Reagan Washington, D.C. airport for runway construction.[232] No process for setting the reservation volume to capacity levels was described.

---

[229]   FAA Press Release, FAA Aviation Safety Summit Breakout Panels (Mar. 15, 2023), Doc. 382, PA- J Other 232.

[230]   *See* Delta Air Lines letter to FAA re system constraints (Mar. 21, 2023), Doc. 383, PA-J Other 235.  *See also,* American Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 384, PA-J Other 237.  *See also,* United Airlines letter to FAA re system constraints (Mar. 22, 2023), Doc. 385, PA-J Other 238.

[231]   *See* FAA PR, Fed. Reg. Notice of Limited Waiver of Slot Usage Requirement for Summer 2023 (Mar. 22, 2023), Doc. 386, PA-J Other 241.  *See also,* FAA Notice of Limited Waiver of the Slot Usage Requirement, Doc. 387, PA-J Other 243.  *See also,* FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 88 Fed. Reg. 18032 (Mar. 27, 2023), Doc. 210, PA-B Rulemaking 417.

[232]   See *id.* at 425.

Because the air carriers guarantee the allocation of capacity and the price for federal and state government employees pursuant to their unlawful contracts, this reduced flight capacity to NYC funnels the rest of the public onto even fewer seats at above-market prices, further subsidizing the price and service of federal and state government employees from the rest of the public.

The carriers that returned airspace reservations for the IATA Summer 2023 season — which they had allocated according to the grandfathering rules of the IATA WSG, in which they agreed to minimum usage requirements to retain entitlement — are poised to violate their private IATA WSG agreement and claim entitlement to those airspace reservations for the IATA Summer 2024 season based on a non-party's waiver of the terms of their private IATA WSG agreement.

## X.   JetBlue Complaint Against The Netherlands

On February 14, 2023, JetBlue filed a complaint with the DOT against the Kingdom of the Netherlands alleging that the government must provide JetBlue with slots at Schiphol airport in Amsterdam, a 'level 3' airport, by requiring a domestic carrier to transfer "a sufficient number of slots" to JetBlue, as defined by JetBlue.[233]  On March 7, 2023, the Dutch government responded to the complaint:

---

[233]   *See* JetBlue Airways Complaint, Dkt. DOT-OST-2023-0028 (Feb. 14, 2023), Doc. 344, PA-J Other 182. *See also*, IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, §8.1.1(g) at 174. ("Historic slots may not be withdrawn from an airline to accommodate new entrants or any other category of aircraft operator.").

> Traffic rights and slots are independent of each other. The Agreement assigns traffic rights. In our view, the assignment of traffic rights does not imply a guarantee to receive slots. This is also laid down as one of the "key principles" of a coordinated (level 3) airport in the Worldwide Airport Slot Guidelines (WASG) from IATA under 1.7.2.j and 8.1.1.j: "The allocation of slots is independent from the assignment of traffic rights under bilateral air service agreements." The Agreement provides for traffic rights, not slots. Furthermore, the Agreement does not contain any provisions on slots. For each airline, the slot allocation process in the Netherlands is governed by the EU Slot Regulation.[234]

On March 13, 2023, Exhaustless notified the Dutch government of its competitive market for slots, that the air transport agreement calls for a competitive market allocation of reservations, and that "[t]his conflict is manufactured by Jet Blue to attempt to obtain slots while seeking *protection* by the U.S. Department of Transportation *from* that competition."[235]  Exhaustless further explained the contradictory claims of JetBlue in the U.S.:

> At airports where JetBlue holds 'grandfathered' slot reservations, it claims 'ownership' — of reservations to use the public's airspace — and then collateralizes the slots against borrowed money.  Yet when they have no 'grandfathered rights' at an airport, as in this proceeding, JetBlue *fabricates a dispute between the U.S. and the Netherlands* to demand that one sovereign give it slots by waiving the allocation of historical rights to another carrier — even though the historical rights are only declared by an agreement among carriers that JetBlue

---

[234]  Answer of the Dutch Government, Ministry of Infrastructure and Water Management, Dkt. DOT-OST-2023-0028 (Mar. 7, 2023), Doc. 345, PA-J Other 203.

[235]  Exhaustless Response, Dkt. DOT-OST-2023-0028 (Mar. 13, 2023), Doc. 346, PA-J Other 207 (emphasis in original).

joined, whose agreement is managed by an organization that JetBlue co-controls.[236]

On June 5, 2023, JetBlue notified the DOT that it had been granted slots by the Dutch government for the season but lamented that the Dutch government had not granted JetBlue a "permanent" ability to provide service — with no mention of its requirement to compete in the market for its reservations.[237]  Nonetheless, JetBlue requested that the DOT withdraw its complaint.[238]  On June 27, 2023, the DOT dismissed the complaint and terminated the proceeding.[239]

## Y.   Winter 2023 Seasonal Reservations

### 1.  Competitive Market Allocation Boycott

On Feb. 17, 2023, Exhaustless announced a competitive market allocation for the airspace reservations at certain airports for the Winter 2023 carrier scheduling season.[240]  On Mar. 17, 2023, Exhaustless notified the public that no carrier

_____

[236]  *Id.* (emphasis in original), *referencing* JetBlue Airways Corporation SEC Form 8-K (Oct. 24, 2022) ("Additional Collateral" shall mean . . . Slots of the borrower[.]").

[237]  JetBlue request to withdraw complaint, Dkt.  DOT-OST-2023-0028 (Jun. 5, 2023), Doc. 347, PA-J Other 216.

[238]  *See id.*

[239]  *See* Order 2023-6-21 (Jun. 27, 2023), Doc. 348, PA-J Other 218.

[240]  *See* (a) Exhaustless Airport Slot Auction Notice for Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 203, PA-E Auction 171; (b) Exhaustless Aviation 2.0 Licensing Agreement – Carrier (v8.1) Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 204, PA-E Auction 178; (c) Exhaustless Slot Auction Design Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 205, PA-E Auction 193; (d) Exhaustless Slot Auction Rules and Procedures Winter 2023, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 206, PA-E Auction 201; (e) Exhaustless Winter 2023 Auction Registration doc ver. 1.1, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 207, PA-E

licensed Exhaustless' Standard to be eligible to participate in the competitive market allocation of airspace reservations for access to public airport schedules at four airports in the National Airspace System.[241]

## 2. Administrative Allocation with the IATA WSG

On May 4, 2023, carriers sent the DOT/Slot Coordinator a list of the airspace reservations allocated to them the last equivalent season, and which they claim entitle them to the future season's reservation.[242]  On May 11, 2023, carriers submitted their schedule requests for the Winter 2023 scheduling season to the FAA.[243]  No later than June 1, 2023, the DOT/Slot Coordinator allocated each reservation — for free — to the carrier claiming entitlement and denied the opportunity to hear the market price or bid on that reservation to other carriers.[244]

The majority of air carriers across the globe, many airport operators, and many regulators attended the IATA Slot Conference on June 13, 2023, to allocate the worldwide reservations to use the public's airspace during the Winter 2023

---

Auction 215; and (f) Exhaustless Winter 2023 Airport Slot Auction Prepayment Form, Dkt. DOT-OST-2001-9849-0195 (Feb. 17, 2023), Doc. 208, PA-E Auction 218.

[241]  *See* Exhaustless Notice of Results of Auction of Airport Schedules for Winter 2023, Dkt. DOT-OST-2001-9849-0196 (Mar. 17, 2023), Doc. 209, PA-E Auction 219.

[242]  *See* Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[243]  *See id.*

[244]  *See id.*

carrier scheduling season.[245]  This included the domestic carriers American, JetBlue, Spirit, Delta, United, Southwest, FedEx, and UPS.  Many of these carriers were in this court between September 27 and October 27, 2023, testifying on the American-JetBlue Northeast Alliance agreement, *which was predicated on a right to lease airspace reservations*, yet none of them disclosed the IATA WSG and its seasonal slot conferences.

At the close of the slot conference, IATA member-carriers joined a statement to "*urge governments worldwide to ensure global alignment of slot rules to safeguard the consistent, fair, and transparent allocation of airport slots under the Worldwide Airport Slot Guidelines (WASG).*"[246]

## Z.    JetBlue/Frontier LaGuardia "Divestiture" Agreement

On June 1, 2023, in another price-fixing and market-allocation scheme, JetBlue and Frontier Group Holdings, Inc. both announced an agreement under which JetBlue will "divest" all of the "holdings" of Spirit Airlines at New York's LaGuardia Airport to Frontier, including "six gates . . . and 22 takeoff and landing

---

[245]  *See* IATA 152nd Slot Conference – Organizations attending (Jun. 11, 2023), Doc. 254, PA-D Agreement 449.

[246]  *See* IATA Press Release, Airline Associations Join Together to Call for Global Alignment of Slot Regulations (Jun. 15, 2023), Doc. 313, PA-D Agreement 1091.  *See also,* Airline associations statement on benefit of global alignment of airport slot regulations (Jun. 15, 2023), Doc. 314, PA-D Agreement 1092.

slots," on condition of JetBlue's merger with Spirit.[247]  Note that LaGuardia is a public airport owned by New York City, and leases the use of gates to carriers.[248] Neither carrier published the "divestiture" agreement.

## AA.  ATPCO

The Air Tariff Publishing Company (ATPCO) collects fare and fare-related data from carriers and distributes that information to Global Distribution Systems and travel agencies — but has declined to collect and distribute the Exhaustless market-clearing premium alongside the airfare, stating they must have an order from the Secretary of Transportation or direction from its airline owners to undertake the change.

ATPCO is owned by a consortium of Respondent Carriers and enjoys a 99% share of the air tariff publishing market.[249]

As noted by a recent DOT order:

> [W]e are not proposing any conditions regarding the management of Computer Reservations System (CRS) or Global Distribution System (GDS) interests.  Any coordination between the applicants concerning the

---

[247]  *See* Frontier Press Release, JetBlue and Frontier Announce Divestiture Agreement in Connection with JetBlue's Combination with Spirit (Jun. 1, 2023), Doc. 324, PA-D Agreement 1242.

[248]  *See* Spirit Airlines, Inc. SEC Form 10-K, Item 2 Ground Facilities, 44 (Feb. 6, 2023) ("We lease all of our facilities at each of the airports we serve . . . Our leases for terminal passenger service facilities, which include ticket counter and gate space, operations support areas and baggage service offices, generally have a term ranging from month-to-month to 24 years[.]").

[249]  See Wikipedia – ATPCO (printed Jul. 15, 2023), Doc. 309, PA-J Other 1 (showing the airline owners of ATPCO — Air Canada, Air France, All Nippon Airways, American Airlines, British Airways, Delta, Hawaiian, KLM Royal Dutch, LATAM, Lufthansa, and United Airlines.

> operation of separate businesses, such as CRSs, would not
> be transactions specifically approved or necessarily
> contemplated by our orders in this proceeding. While the
> Joint Applicants, individually or collectively, may
> maintain an interest in a CRS, the grant of immunity in
> this Order thus would not extend to their management of
> those interests.[250]

Testimony during the NEA trial revealed how airlines coordinate pricing through ATPCO software features.[251] This is the same behavior that led to a ten-year consent decree with seven defendants from 1993 to 2003.[252] In 2004, the DOJ settled a contempt-of-court charge against American Airlines for violating the consent decree with a fine.

## BB.  Monetization of Grandfathered Allocation to use the Public's Airspace

### 1.  Carrier Sells Reservations to Consumers

After securing reservations, for $0, to use the public's airspace for the IATA season by the unlawful grandfathering of the IATA WSG, each Respondent Carrier

---

[250]  Order 2020-11-9 (proposed Nov. 16, 2020), Doc. 64, PA-D Agreement 92 at 106.

[251]  *See, e.g.,* Testimony of JetBlue Pricing Manager, D. Mass. Case 1:21-cv-11558, ECF 300 (Sep. 29, 2022), line 16 at 53 ("Q. Okay. And there you report that JetBlue canceled the $149 tactical fare for JFK to LAX, right? A. [Y]es. Q. Okay. And then American also canceled that $149 fare, right? A. That's right[.] Q. And then after that, American refiled the $149 fare the following day? A. [Y]es. Q. And JetBlue matched that fare action by American, right? A. That's what I see there. Q. So both American and JetBlue would have kept the $149 tactical fare in the JFK to LAX market as a result? A. That seems right.").

[252]  See *U.S. v. Airline Tariff Publishing Company, et al,* Civil Action No.: 92 2854, Final Judgment (D.D.C. Nov. 1, 1993). The defendants were Airline Tariff Publishing Company, Alaska Airlines, Inc., American Airlines, Inc., Continental Airlines, Inc., Delta Airlines, Inc., Northwest Airlines, Inc., and Trans World Airlines, Inc.

sold reservations for flights that use the public's airspace to consumers. The carrier accomplished this by bundling the consumer's purchase of a reservation to use the public's airspace with the purchase of a reservation for space on an aircraft for air transportation service provided by the carrier. The consumer had no knowledge that there was a separate price for the congestion-free use of the public airspace. In this way, the carrier collected a portion of the airspace reservation market surplus — to which they were not entitled — and blocked Exhaustless' market from clearing the excess supplier and excess consumer demand.

## 2. Carrier Allocates Future Capacity to Certain Employers

Each Respondent Carrier allocates access to the perpetual future reservations to the airspace, to which the carrier claims entitlement, to its preferred consumers — by unlawfully contracting with an entity to allocate a portion of future cargo aircraft space; or by unlawfully contracting with an employer to allocate a portion of future passenger aircraft space, on a specified future route, to its employees.[253] One such contract for cargo service is the federal government's scheduled air freight contract.[254] One such contract for passenger service is the

_____

[253] *See, e.g.*, GSA Press Release, FY23 City Pair Contracts Awarded for Official Government Travel (Jul. 12, 2022), Doc. 186, PA-H CarrierInfo 273.

[254] *See, e.g.*, the contracts awarded by USTRANSCOM to 22 carriers on Dec. 22, 2022: Alaska Airlines, Doc. 357; American Airlines, Doc. 358; Delta Air Lines, Doc. 361; Hawaiian Airlines, Doc. 364; JetBlue Airways, Doc. 365; United Airlines, Doc. 374; and UPS, Doc. 375, PA-H CarrierInfo 316 to 358.

federal government's City Pair Program of the General Services Administration.[255] These contracts are outside of the Exhaustless public market and thus exclude the market-clearing premium. Because these seats are not available for purchase in the public market, the public has fewer seats for which to compete for a given level of market demand.

### 3. Carrier Coins its Own Currency

To monetize the value of the perpetual future reservations to the airspace to which the carrier claims entitlement, but for which it has not yet scheduled flights, each Respondent Passenger Carrier has coined its own currency, called 'airline points' or 'airline miles,' which it manages through its 'frequent flyer' or 'loyalty' program.[256] Each carrier privately determines, and adjusts, the conversion rate of its currency to U.S. currency.[257]

Each Respondent Passenger Carrier converts its currency to U.S. currency by (a) selling points directly to a consumer with an undisclosed surcharge on the airfare and accruing the points in the consumer's personal loyalty account;[258] (b)

---

[255] *See* GSA FY23 CPP Request for Proposal (Feb. 17, 2022), Doc. 185, PA-H CarrierInfo 153, Section F, Item F.1 at 191 (requiring the term of the contract to be 12 to 15 months, whereas an IATA season is approximately 6 months).

[256] *See, e.g.*, JetBlue Airways Corporation SEC Form 10-K, 7 (Feb. 27, 2023) ("[P]oints can be redeemed for any open seat. . . if the TrueBlue member has enough points to exchange for the value of an open seat.").

[257] *See, e.g., id.* at 80 ("We determine the standalone selling price of TrueBlue points issued using the redemption value approach.").

[258] *See, e.g., id.* at 80 ("Points Earned From a Ticket Purchase. When a TrueBlue member travels, we recognize a portion of the fare as revenue and defer in air traffic liabilities the portion that

charging an undisclosed surcharge on the airfare to the consumer's employer as part of its fixed contract price and accruing the points in the consumers personal loyalty account; [259] or (c) selling points to a credit card company, hotel, car rental, or ride sharing company which will allocate the points to its customers using its own method.[260]

The consumer's personal loyalty account is divorced from the dollar value of the points; the value of the points *purchased by everyone* is instead accrued in one pool.[261] When a consumer redeems points to purchase a seat reservation, each carrier determines the value of those points based on an average conversion rate of the pool — irrespective of what that individual consumer paid for the points, and for

---

represents the value of the points[,]") (*note that* the consumer does not know the dollar amount they paid for the points).

[259]  *See, e.g.*, National Defense Authorization Act for Fiscal Year 2002, Pub. L. 107-107, div. A, title XI, § 1116, 115 Stat. 1012, 1241 (Dec. 28, 2001), *codified at* 5 U.S.C. § 5702 note, Retention of Travel Promotional Items ("[A] Federal employee, . . any family member or dependent of such an employee or member, or other individual who receives a promotional item (including frequent flyer miles, upgrade, or access to carrier clubs or facilities) as a result of using travel or transportation services obtained at Federal Government expense . . . may retain the promotional item for personal use if the promotional item is obtained under the same terms as those offered to the general public and at no additional cost to the Federal Government.").

[260]  *See, e.g.*, Delta Air Lines, Inc. SEC Form 10-K, 72 (Feb. 10, 2023). *See also*, JPMorgan Chase & Co., 2022 SEC Form 10-K (Feb. 21, 2023) ("JPMorgan Chase offers credit cards with various rewards programs which allow cardholders to earn rewards points based on their account activity and the terms and conditions of the rewards program. Generally, there are no limits on the points that an eligible cardholder can earn, nor do the points expire, and the points can be redeemed for a variety of rewards, including cash . . . gift cards and travel.").

[261]  *See, e.g.*, JetBlue Airways Corporation SEC Form 10-K, 80 (Feb. 27, 2023) ("TrueBlue points are combined in one homogeneous pool and are not separately identifiable. As such, the revenue is comprised of the points that were part of the air traffic liability balance at the beginning of the period as well as points that were issued during the period.").

which airspace and time the flight is scheduled regardless of level of overall excess market demand and subsequent congestion delay.[262]

### 4. Allocate Future Service to Consumers with Grandfathering

Each Respondent Passenger Carrier allocates a certain portion of seats on each flight to passenger service reservations paid with points.[263]  Because these seats are not available for purchase in the Exhaustless public market, the public has fewer seats for which to compete with U.S. currency.

Since the carrier has bundled the purchase of the airspace reservation and the airfare, each carrier then accepts its points as payment for both the reserved use of the public's airspace and for the air transportation service the carrier provides.

### 5. Other Claims of Ownership of Public Assets

On August 11, 2002, Respondent American Airlines' predecessor US Airways filed for Chapter 11 federal bankruptcy protection in federal court.[264]  In the case, US Airways claimed ownership of public airspace assets and collateralized those

---

[262]   *See, e.g.*, Delta Air Lines, Inc. SEC Form 10-K, 72 (Feb. 10, 2023) ("We . . . recognize loyalty travel awards in passenger revenue as the miles are redeemed and transportation is provided.") (*note that* no carrier discloses a redemption valuation procedure).

[263]   *See* Testimony of JetBlue Pricing Manager, D. Mass. Case 1:21-cv-11558, ECF 300 (Sep. 29, 2022), line 13 at 35 ("We'll have a certain number of seats available in each of the booking classes[.]")

[264]   *See* US Airways Group, Inc. SEC Form 10-K, 2 (Mar. 27, 2003).

public airspace assets to secure bank loans.[265]  US Airways emerged from Chapter 11 bankruptcy protection on March 31, 2003.[266]

On December 9, 2002, Respondent United Airlines filed for Chapter 11 federal bankruptcy protection in federal court.[267]  In the case, United claimed ownership of public airspace assets, and collateralized those public airspace assets to secure bank loans.[268]  On February 1, 2006, United emerged from Chapter 11 bankruptcy protection.[269]

On September 14, 2005, Respondent Delta Air Lines filed for Chapter 11 federal bankruptcy protection in federal court.[270]  In the case, Delta claimed ownership of public airspace assets, and collateralized those public airspace assets to secure bank loans.[271]  On April 30, 2007, Delta emerged from Chapter 11 bankruptcy protection.[272]

---

[265]  *See id.* at 7, ("Under the RSA DIP [Debtor in Possession] Facility, borrowing availability is determined by a formula based on a percentage of eligible assets. The eligible assets consist of certain previously unencumbered . . . takeoff and landing slots[.]").

[266]  *See* US Airways Group, Inc. SEC Form 10-K, 1 (Mar. 12, 2004).

[267]  *See* UAL Corporation SEC Form 10-K, 2 (Mar. 28, 2003).

[268]  *See id.*, Exhibit 4.7, 79 (showing "Additional DIP [Debtor in Possession] Collateral" includes slots).  *See also, id.*, Note 2(k), 40 ("Slots and gates, like routes, are highly valued assets that do not frequently come into the marketplace. The Company has no intention to sell these assets[.]").

[269]  *See* UAL Corporation SEC Form 10-K, 4 (Mar. 16, 2007).

[270]  *See* Delta Air Lines, Inc. SEC Form 10-K, 1 (Mar. 27, 2006).

[271]  *See id.*, Note 8, F-29 ("Our senior secured debt and our secured debt is collateralized by first liens, and in many cases second and junior liens, on substantially all of our assets, including . . . landing slots[.]").

[272]  *See* Delta Air Lines, Inc. SEC Form 10-K, 1 (Feb. 15, 2008).

On November 29, 2011, Respondent American Airlines' predecessor AMR Corp. filed for Chapter 11 federal bankruptcy protection in federal court.[273]  In the case, AMR claimed ownership of slots, and collateralized those slots to secure bank loans.[274]  On December 9, 2013, AMR emerged from Chapter 11 bankruptcy protection by merging with US Airways.[275]

On March 30, 2020, Spirit Airlines secured financing with public airspace assets.[276]

Respondents American Airlines, United Airlines, Delta Air Lines, JetBlue Airways, and Spirit Airlines continue to collateralize private loans with public airspace assets, preventing Exhaustless from leveraging its proprietary right to operate its public airspace reservation market-clearing service to obtain working capital.

---

[273]  *See* AMR Corporation SEC Form 10-K, 1 (Feb. 15, 2012).

[274]  *See id.*, Note 7, 71 ("[T]he Senior Secured Notes are secured by certain . . .  airport landing and takeoff slots[.]").

[275]  *See* American Airlines Group, Inc. SEC Form 10-K, 5 (Feb. 28, 2014).

[276]  *See* Spirit Airlines, Inc. SEC Form 10-K, 144 (Feb. 6, 2023).

## ARGUMENT

**A.    Respondent Carriers Violated Antitrust Laws.**

Respondent Carriers have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, every day since June 7, 2018, by boycotting Exhaustless' competitive market for reservations to use the public's airspace.  The Congress has attempted to unseat this global cartel for decades:

> The reason we abolished economic regulation of the airlines, as it was practiced from 1938 to 1978, was that it systematically suppressed competition.  The goal of deregulation was a competitive airline industry; the goal of antitrust is to keep it that way.[277]

The IATA Worldwide Slot Guidelines is an agreement to allocate the market of airspace reservations at each airport with unlawful grandfathering as part of a global conspiracy by the carrier members of the IATA to restrain trade in airspace reservations.  This market allocation agreement is a *per se* violation of § 1 of the Sherman Act:

> One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition. . . This Court has reiterated time and time again that horizontal territorial limitation . . .

---

[277]    Alfred Kahn, "Federal Trade Commission Act Amendments of 1987" *Congressional Record –* Senate, 8169 (Apr. 7, 1987), Doc. 317, PA-A InfoCongress 854 at 856.

> are naked restraints of trade, with no purpose except
> stifling of competition.[278]

The IATA WSG is also an agreement to set the supplier purchase price of airspace reservations to \$0 by banning competitive bidding in the market as part of a global conspiracy by the carrier members of the IATA to restrain trade in airspace reservations. This price fixing agreement is a *per se* violation of § 1 of the Sherman Act:

> Price is the central nervous system of the economy, and an agreement that interferes with the setting of price by free market forces is illegal on its face. . . [This agreement] operates as an absolute ban on competitive bidding . . .[that] impedes the ordinary give and take of the market place . . . On its face, this agreement restrains trade within the meaning of § 1 of the Sherman Act.[279]

The resolution by the carrier-members of the IATA to continue to allocate airspace reservations according to the IATA WSG, dated June 2, 2019, was a group boycott of the Exhaustless market of airspace reservations and a *per se* violation of § 1 of the Sherman Act:[280]

> The per se rules in antitrust law serve purposes analogous to per se restrictions upon, for example, stunt flying in congested areas or speeding. Laws prohibiting stunt flying or setting speed limits are justified by the State's interest in protecting human life and property. . .

---

[278] *U.S. v. Topco Assocs., Inc.,* 405 U.S. 596, 608 (1972) (internal quotation marks and citations omitted).

[279] *National Soc'y of Prof. Engineers v. U.S.,* 435 U.S. 679, 692, 695 (1978) (internal quotation marks and citations omitted).

[280] *See* IATA Resolution on Slot Policy, 75th Annual General Meeting (Jun. 2, 2019), Doc. 304, PA-D Agreement 1082.

> [T]he justification for these per se rules is supported . . .
> by the observation that every speeder and every stunt
> pilot poses some threat to the community. . . So it is with
> boycotts and price fixing. Every such horizontal
> arrangement among competitors poses some threat to the
> free market.[281]

The Respondent Carriers call for governments worldwide to abide by the

IATA WSG — issued from the 152nd Slot Conference on June 15, 2023 — was a

continuation of the group boycott of the Exhaustless market.[282]

Respondent Carriers that contracted with entities to allocate a portion of the

scheduled air transportation market at discriminatory prices between different

purchasers have violated Section 2 of the Clayton Act, 15 U.S.C. § 13(a).

The collective ownership of Air Tariff Publishing Company (ATPCO) by

horizontal competitors is a version of a business trust, and a tool used to coordinate

prices as a service to the conspiracy to not compete and a *per se* violation of § 1 of

the Sherman Act.

The collective ownership of San Francisco Terminal Equipment Company,

L.L.C. (SFOTEC) by horizontal competitors is a version of a business trust, and a

tool used to coordinate schedules as a service to the conspiracy to not compete and a

*per se* violation of § 1 of the Sherman Act.

---

[281] *FTC v. Superior Court Trial Lawyers Ass'n,* 493 U.S. 411, 433 (1990).

[282] *See* IATA Press Release, Airline Associations Join Together to Call for Global Alignment of Slot Regulations (Jun. 15, 2023), Doc. 313, PA-D Agreement 1091.

The Respondents conspiracy not to compete for reservations to use the airspace injured Exhaustless by preventing it from allocating the reservations in its competitive market and earning the market-clearing premium as revenue. Pursuant to 15 U.S.C. § 15(a), Exhaustless is entitled to recover threefold the damages.  Pursuant to section eleven of the Clayton Act, as amended, 15 U.S.C. § 21(e), "no order of the . . . Secretary or judgment of the court to enforce the same shall in anywise relieve or absolve any person from any liability under the antitrust laws."

The statute of limitations for antitrust claims require filing "within four years after the cause of action accrued," 15 U.S.C. § 15b.  As explained by the court:

> Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date — often the same, but sometimes later — on which the plaintiff discovers that he has been injured. The rule that postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured is the "discovery rule" of federal common law, which is read into statutes of limitations in federal-question cases . . .  in the absence of a contrary directive from Congress.[283]

Prior to March 25, 2020, Exhaustless believed that the FAA controlled the reservations, but on March 25, 2020, when the FAA said carriers requested a 7-month "global waiver from standard slot usage rules," and that a "foreign carrier seeking a waiver may wish to ensure that the responsible authority of the foreign

---

[283]  *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990).

carrier's home jurisdiction submits a statement by email to . . . dot.gov confirming reciprocal treatment of the slot holdings of U.S. carriers," it became clear that member carriers of the IATA were controlling the reservations globally.[284]  The accrual date is therefore March 25, 2020.

**B.      Respondents American Airlines and JetBlue Airways Committed Fraud**

Respondents American Airlines and JetBlue Airways committed fraud, in violation of 18 U.S.C. § 1001, by omitting the IATA WSG agreement from the Northeast Alliance Agreement, while claiming that there is no other agreement; and from omitting the Exhaustless market-clearing service during discovery and trial, while claiming there is no less anticompetitive way to "optimiz[e] American's and JetBlue's route networks and scheduling of flight times and frequencies at the NEA Airports" to attract the passengers they prefer to serve — the employees of large corporations.[285]

The carriers and their outside antitrust attorneys negotiated a "naked agreement to not compete" and "a straightforward example of market allocation" with the Assistant Attorney General of the DOJ Antitrust Division and the General Counsel of the DOT, who was also the Acting Deputy Secretary of the DOT, and was

---

[284]   FAA Notice of limited waiver of the minimum slot usage requirement, 85 Fed. Reg. 16989 (proposed Mar. 25, 2020), Doc. 41, PA-B Rulemaking 146.

[285]   *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PA-I Antitrust 749 at 769.

a former assistant attorney general of the DOJ for the Office of Legal Counsel, and was American Airlines former antitrust attorney.[286]  All parties — the pinnacle of the antitrust legal profession — omitted the binding case precedent of *Causby*, omitted the underlying agreement the IATA WSG, and omitted the *Exhaustless* binding case precedent declaring the lawful market allocation that replaces the IATA WSG.

American Airlines and JetBlue claimed they acted in "good faith" by bringing their private joint venture agreement to the DOT and DOJ regulators, prior to implementation, to negotiate the terms of the agreement.[287]

Black's Law Dictionary defines Good Faith:

> Sometimes legally binding due diligence around the effort made, information given, or transaction done, honestly, objectively, with no deliberate intent to defraud the other party. *Yet, this does not cover a sin of omission, something done or not done in negligence.* Known also as bona fides, implied by law into commercial contracts.[288]

---

[286]  *Id.* at 755, 824. *See also*, Testimony of Spirit Airlines VP Network Planning, D. Mass. Case 1:21-cv-11558, ECF 300 (Sep. 29, 2022), Doc. 291, PA-I Antitrust 1132, line 2 at 1163 ("Q. . . And what's the purpose of sending this letter to Steven Bradbury [General Counsel/Acting Deputy Secretary] at DOT and Makan Delrahim [Assistant Attorney General] at Department of Justice, antitrust? A. At a very high level, what we're doing is we're expressing our concerns about what we know at that point, because we didn't do a lot, and asking them that they carefully review the anticompetitive potential of this combination.").

[287]  U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, American Airlines and JetBlue Response to Plaintiff's Motion for Entry of Final Judgment and Permanent Injunction, Exhibit A, ECF 359-1 (Jun. 14, 2023), Doc. 315, PA-I Antitrust 1243 at 1244 ("Defendants engaged with both agencies in good faith, providing documents, data, and depositions in response to government requests, and made multiple amendments to the NEA in connection with DOT's review.").

[288]  Black's Law Dictionary, Free 2nd ed. (emphasis added).

American Airlines has tried to block competition before.  In the 1940s, when price, route, and service in air transportation were regulated by Congress, American Airlines explicitly lobbied the economic regulator to block a new type of air transportation service – all-cargo service.  The regulator declined, and the Court upheld that decision:

> The statements of the Board which petitioners take as the text for their first and principal quarrel are these: "[I]t is essential in disposing of the present case that we keep in mind the nature of the basic issue involved. That issue is primarily promotional in character and relates to developmental rather than purely regulatory purposes."

> * * *

> In the first place, Congress expressly directed that the Board consider, as being in the public interest and in accordance with the public convenience and necessity, the development, encouragement and promotion of air transportation, air commerce, and civil aeronautics. Whatever belittling significance may be attached to the fact that those provisions were under a title "Declaration of Policy", they are in the statute, are peremptory, and are as much an enactment by the Congress as is any other section of the statute.

> * * *

> The public convenience and necessity for which regulatory agencies issue certificates are the convenience and necessity of the future. The needs of yesterday require no fulfillment if they be not the needs of tomorrow. They may require recompense, but they need no regulation. . . If past or present events are indicative of such probabilities, they are useful as indices. But surely the future is not limited to or by the past. . . There is nothing peculiar about regulatory functions in that respect. It is a common

> practice of business. In business the principal usefulness
> of the past to the present is in foretelling the future.[289]

In 2020, when price, route, and service in air transportation were required by Congress to be regulated by competitive market forces, American Airlines and JetBlue privately lobbied the economic regulator, to join the boycott of Exhaustless' new service in air transportation that would provide that very competition.  But in this case, the economic regulator made no attempt to deliberate the public's interest as required by statutory policy[290] — because the economic regulator was the part of the sovereign that has accepted the Title of "Slot Coordinator" from a foreign corporation, pursuant to the carriers' private IATA WSG agreement, and that attends the carrier cartels' slot conference twice a year;  the part of the sovereign that obstructed Exhaustless' market in two court cases by misrepresenting its authority; that expressed Exhaustless must have its permission to conduct commerce, and must find a government entity with the "desire" to enforce its

---

[289]   *American Airlines v. Civil Aeronautics Board*, 192 F.2d 417, 420 (D.C. Cir. 1951).

[290]   *See* 49 U.S.C. § 40101.

private contract rights;[291] and that expressed it has no requirement to consider market competition in its regulations.[292]

Exhaustless' rights, however, are preserved by the U.S. Constitution, not granted by a federal agency or another corporation.  In 1891, the Supreme Court declared:

> To carry on interstate commerce is not a franchise or a privilege granted by the State; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States[.][293]

The powers of the federal government, the state governments, and the people are separate — and therefore, there can be no collusion or confusion between them:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.[294]

No carrier is entitled to a private agreement with the Executive branch related to price, route, or service in air transportation.  The right to make private contracts was reserved to the people:

---

[291] *See* Exhaustless Inc. v. FAA, D.C. Cir. Case 19-1158, Brief for Respondent, ECF 1821592 (Dec. 26, 2019), Doc. 251, PA-G Court 2245 at 2279 ("For petitioner's slot allocations to be enforceable (and thus for petitioner to have a potential market), there must be some entity with the desire, power, and ability to require airlines to comply with the slots allocated using petitioner's product. Yet to the extent petitioner wants FAA to be that enforcement entity, this Court found that it is not the orders that stand in petitioner's way, but rather the absence of an FAA rule authorizing petitioner's proposal.").

[292] See *Spirit Airlines, Inc. v. DOT*, No. 19-1248 (D.C. Cir. 2021), Doc. 82, PA-G Court 218 at 2235 ("It argues [49 U.S.C.] § 40103(b) permits, but does not require, the agency to consider competition.").

[293] *Crutcher v. Kentucky*, 141 U.S. 47, 57 (1891).

[294] U.S. Const. amend. X.

It has been well said that "the property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper."[295]

Under its constitutional power to regulate commerce and to protect the people's first amendment rights to free speech, the Congress required competition in the market to set price, route, and service in air transportation and thus preempted both federal and state regulation from making those decisions. Therefore, that market power is delegated to "the people" as the only remaining entity, of which Exhaustless is a member.

## C.   Racketeering Activity

### 1.   Respondent Air Carriers and Foreign Air Carriers

Each Respondent Carrier engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B) by: (i) violating section 1352(a) of the Money Laundering Control Act of 1986, 18

---

[295]  *Butchers' Union Co. v. Crescent City Co.*, 111 U.S. 746, 757 (1884) (quoting Adam Smith, Wealth of Nations, Bk. I, c. 10.).

U.S.C. § 1957, by selling reservations for flights to use the public's airspace — reservations which the carrier had procured unlawfully — to consumers; (ii) violating section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1952, by using the transportation, mail, wired or wireless communication system in domestic or foreign commerce to attend the IATA Annual General Meetings to manage and carry on the IATA WSG agreement and thereafter maintained and continued the IATA WSG agreement; and (iii) violating section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1952, by using the transportation, mail, wired or wireless communication system in domestic or foreign commerce to attend the semi-annual IATA Slot Conferences to distribute the seasonal airspace reservations for scheduled service at airports across the globe, procured by its members from unlawful grandfathering.

## 2. Respondent Passenger Air Carriers and Foreign Air Carriers

Each Respondent Passenger Carrier violated the U.S. Constitution, art. I, § 8, cl. 5, by coining its own currency and regulating the value thereof. Only the U.S. Congress has the enumerated power to coin money.

> The power to coin money and regulate the value thereof, and of foreign coin, is a prerogative of sovereignty and a power exclusively vested in the Congress of the United States.[296]

---

[296] *Ling Su Fan v. United States*, 218 U.S. 302, 310 (1910).

Each Respondent Passenger Carrier violated section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a), by selling the carrier's currency to a credit card company, which paid in U.S. currency, to secure an allocation of the air carrier capacity outside of the lawful market.

Respondent American Airlines, by its predecessor US Airways, engaged in racketeering activity between August 11, 2002, to March 31, 2003, pursuant to section 314(b) of Pub. L. 95-575 (Nov. 6, 1978), 18 U.S.C. § 1961(1)(D) by fraudulently claiming ownership of current and future reservations to use the public's airspace in a case under title 11 of the U.S. code.

Respondent United Airlines engaged in racketeering activity between Dec. 9, 2002, to February 1, 2006, pursuant to section 314(b) of Pub. L. 95-575 (Nov. 6, 1978), 18 U.S.C. § 1961(1)(D) by fraudulently claiming ownership of current and future reservations to use the public's airspace in a case under title 11 of the U.S. code.

Respondent Delta Air Lines engaged in racketeering activity between September 14. 2005, to April 30, 2007, pursuant to section 314(b) of Pub. L. 95-575 (Nov. 6, 1978), 18 U.S.C. § 1961(1)(D) by fraudulently claiming ownership of current and future reservations to use the public's airspace in a case under title 11 of the U.S. code.

Respondent American Airlines engaged in racketeering activity between November 29, 2011, to December 9, 2013, pursuant to section 314(b) of Pub. L. 95-575 (Nov. 6, 1978), 18 U.S.C. § 1961(1)(D) by fraudulently claiming ownership of

current and future reservations to use the public's airspace in a case under title 11 of the U.S. code.

Respondents American Airlines and JetBlue Airways engaged in racketeering activity, pursuant to section 901(a) of the Organized Crime Control Act 1970, 18 U.S.C. § 1961(1)(B), by obstructing the due administration of justice by not disclosing the IATA WSG as part of their Northeast Alliance Agreement, in violation of law passed June 25, 1948, ch. 645, 62 Stat. 683, 769, 18 U.S.C. § 1503.

### 3. Respondent Airport Operators

Each Respondent Airport Operator engaged in racketeering activity pursuant to section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B) by violating section 1365(b) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1952, by using the transportation, mail, wired or wireless communication system in domestic or foreign commerce to attend the semi-annual IATA Slot Conferences to distribute rights to use airport infrastructure according to the unlawful allocation by grandfathering of seasonal airspace reservations for scheduled service at its airport.

## D.   Pattern of Racketeering Activity

Per 18 U.S.C. § 1961(5), a "pattern of racketeering activity" requires at least two acts of racketeering activity. Each Respondent Carrier has completed at least three acts of racketeering activity *per year* for decades by attending the Annual General Meeting and the two slot conferences held each year for the past 76 years.

In addition, the pattern of racketeering has continued in contempt of consent decrees with the courts, terms of protection from creditors in federal bankruptcy courts, terms of grants or loans subsidized from the Public's treasury during national crises, and in full knowledge of the DOJ investigating the operations pursuant to two extant antitrust cases in this Court.

By engaging in this pattern of racketeering, each Respondent Carrier has unlawfully derived income or loans which they have used to acquire interest in, and operation of, enterprises engaged in commerce, in violation of 18 U.S.C. § 1962. These enterprises include Air Tariff Publishing Company.[297]  As of the date these investments were made, the title to the Respondent Carrier's interest in the enterprise vested in the United States, per 18 U.S.C. § 1963(c).  The Court must order each Respondent Carrier to forfeit such property to the United States, pursuant to 18 U.S.C. § 1963(a).

---

[297] Other enterprises and activities include, but are not limited to: many commercial services provided by IATA and A4A, including financial services and coordination of services with the International Union of Railways; Airlines Reporting Corporation; Airlines Clearing House, Inc.; UATP; jet fuel consortiums at many airports; SFOTEC, and other airport operating entities; Aviation Climate Taskforce, Inc., and its investment fund; Aviation Spectrum Resources, Inc.; JetBlue's investments in JetBlue Ventures, TWA Flight Center Hotel at John F. Kennedy International Airport, JFK Millennium Partner L.L.C., and shares in public companies.; United Airlines Ventures, including its Sustainable Flight Fund and other sustainable aviation fuel consortiums; Delta Air Lines investments in refinery operations under Monroe Energy, L.L.C., China Eastern Airlines, Delta TechOps, Delta Vacations, Affirm Holdings Inc., Clear Secure Inc., Joby Aviation, Sarcos Techn & Robotics Co., and Wheels Up Experience, Inc.; American Airlines investments in ZeroAvia, Universal Hydrogen, Breakthrough Energy Catalyst, GOL (Brazilian carrier), JetSmart Airlines (Chile), and China Southern Airlines; UPS's Supply Chain Solutions division; rights to products acquired, directly or indirectly, from NASA and MITRE; and acquisitions of other air carrier and other operations in merger and acquisition transactions.

To ensure that "the price stated is the entire price to be paid by the customer to the carrier, or agent, for such air transportation," 14 C.F.R. § 399.84(a), Petitioner believes it is in the public's interest that the United States be ordered to divest Air Tariff Publishing Company, at the market price, to Exhaustless Inc. to publish the full airfare, including both the price of reserving the public airspace and the price of the private air transportation service. Prices for future services that emerge in the air transportation system could then access the market without being blocked by regulators, airlines, or airport operators.

E.     **Respondent the United States Violated the Constitution**

The 'grant' of special rights to the Metropolitan Washington Airports Authority (MWAA) over other airport operators[298] violates the constitutional prohibition that the U.S. shall grant no title of nobility, U.S. Const. art. I, § 9, cl. 8.

The perimeter rule, 49 U.S.C. § 49109, protects a Washington D.C. airport from competition, violating the U.S. Constitution art. I, § 9, cl. 6, which prohibits the Congress from preferencing a port by any regulation of commerce.

The 'grant' of authority to the MWAA to regulate service in air transportation, 49 U.S.C. § 49106(e), by regulating the hours of operation or aircraft type, violates the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, which exclusively

---

[298]   *See* 49 U.S.C. § 49111 ("[T]he Metropolitan Washington Airports Authority has the same proprietary powers and is subject to the same restrictions under United States law as any other airport *except as otherwise provided in this chapter*[.]" (emphasis added).  *See also*, Lease of the Metropolitan Washington Airports (Mar. 2, 1987), and amendments, Doc. 308, PA-A InfoCongress 782, 3.B at 792.

empowers the Congress to regulate commerce among the states and with foreign

nations. The Court has declared that the Congress cannot delegate its authority to

another branch of government:

> The Constitution established a national government with powers deemed to be adequate, as they have proved to be both in war and peace, but these powers of the national government are limited by the constitutional grants. Those who act under these grants are not at liberty to transcend the imposed limits because they believe that more or different power is necessary. Such assertions of extraconstitutional authority were anticipated and precluded by the explicit terms of the Tenth Amendment - -"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[299]

The MWAA contracts clause, 49 U.S.C. § 49104(a)(4), which 'grants' the

Metropolitan Washington Airports Authority (MWAA) an exception to market

competition in awarding concession contracts, violates the constitutional freedom to

access the market.  The Court has declared that:

> Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such was the vision of the Founders;

---

[299]  *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 528 (1935).

such has been the doctrine of this Court which has given it reality.[300]

In addition, the MWAA contracts clause, 49 U.S.C. § 49104(a)(4), which 'grants' the Metropolitan Washington Airports Authority (MWAA) an exception to market competition in procuring supplies and services, violates the people's first amendment right to compete for those goods and services in a competitive market – whether as a consumer or a supplier. The Court has held that:

> The heart of our national economic policy long has been faith in the value of competition. The assumption that competition is the best method of allocating resources in *a free market* recognizes that *all elements of a bargain* -- quality, service, safety, and durability -- and not just the immediate cost, *are favorably affected by the free opportunity to select among alternative offers*. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.[301]

## F.  Respondent Airport Operators Violated Exhaustless' First Amendment Rights and Other Laws

Each Respondent Airport Operator's joinder to the carrier conspiracy to restrain trade in airspace reservations violated Exhaustless' First Amendment rights, U.S. Const. amend. I, to receive bids from passengers and shippers to

------------------------------------------------------------

[300]  *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949).

[301]  *National Soc'y of Prof. Engineers v. U.S.*, 435 U.S. 679, 695 (1978) (internal quotations and references omitted) (emphasis added).

discover the price they are willing to pay to obtain congestion-free service; to receive bids from carriers to discover the price they are willing to pay to obtain term-limited exclusivity; and to advertise those prices.

> "[I]n the commercial advertisement, we may assume that the advertiser's interest is a purely economic one. That hardly disqualifies him from protection under the First Amendment. . . As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate. . . . So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable."[302]

Each Respondent Airport Operator's joinder to the carrier conspiracy to restrain trade in airspace reservations violated Section 1 of the Sherman Act, 15 U.S.C. § 1, every day since June 7, 2018, by allowing the operations of carriers whose reservations were illegally obtained through grandfathering.[303]

Respondent the Metropolitan Washington Airports Authority's (MWAA) lease agreement with the federal government violates laws regulating domestic and foreign commerce.[304] The MWAA's powers do not come from a grant from the

---

[302] *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 762 (1976).

[303] *See* IATA press release, Industry Collaboration Brings New Era for Airport Slot Allocation (June 3, 2019), Doc. 32, PA-D Agreement 12.

[304] *See* Lease of the Metropolitan Washington Airports (Mar. 2, 1987), and amendments, Doc. 308, PA-A InfoCongress 782 at 792 ("[T]he Airports Authority shall have . . . the same proprietary powers

Congress or from its charter — they come from the powers that the people reserved to the States pursuant to the tenth amendment to the U.S. Constitution.  Congress has no power to 'grant' the MWAA a Title of Nobility,[305] and the MWAA has no power to accept a Title of Nobility.  The MWAA's lease agreement with the U.S. at §11.F(2)[306] — to regulate service in air transportation by regulating the hours of operation or aircraft type — violates the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and violates the preemption of state regulations related to price, route, and service in air transportation, 49 U.S.C. § 41713.  The MWAA's lease agreement with the U.S. at §11.D Contracts,[307] violates Section 1 of the Sherman Act, 15 U.S.C. § 1 as it is an agreement to retrain trade in both procurement of supplies and services and in the allocation of its commercial space.

Respondent the Port Authority of New York and New Jersey's joinder to the WSG also violated its bi-state compact with the Congress by violating laws regulating domestic and foreign commerce.[308]  In addition, the LaGuardia Perimeter Rule of Respondent the Port Authority of New York and New Jersey violates 49 U.S.C. § 41713 by enforcing regulations related to routes and service in

---

and be subject to the same restrictions with respect to federal law as any other airport, *except as otherwise provided herein*." (emphasis added)).

[305]   See U.S. Const. art. I, § 9, cl. 8.

[306]   See *id.* at 799.

[307]   See *id.* at 798.

[308]   Port of New York Authority, Pub. Res., No. 17 (Aug. 3, 1921), Doc. 310, PA-A InfoCongress 847 at 853 ("[N]othing therein contained shall be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the region which forms the subject of said agreement.").

air transportation.  In so violating this statute, the PANYNJ violated the constitutional (a) power of the Congress to regulate commerce;[309] and (b) power of the Congress to regulate the use of the public's property.[310]

## G.     Respondent Attorneys General Violated the U.S. Constitution

Each Respondent State Attorney General violated section 4 of the Airline Deregulation Act of 1978, 49 U.S.C. § 41713, by regulating service in air transportation.   The Supreme Court upheld the Congress' preemption of state regulations:

> Congress, determining that maximum reliance on competitive market forces would best further efficiency, innovation, and low prices as well as variety and quality of air transportation services, enacted the Airline Deregulation Act (ADA).  To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law relating to rates, routes, or services of any air carrier.[311]

In so violating this statute, the State violated the constitutional (a) power of the Congress to regulate commerce;[312] (b) power of the Congress to regulate the use

------------------------

[309]   *See* U.S. Const. art. I, § 8, cl. 3.

[310]   *See* U.S. Const. art. IV, § 3, cl. 2.

[311]   *Morales v. Trans World Airlines*, 504 U.S. 374, 378 (1992) (internal quotation marks and citations omitted).

[312]   *See* U.S. Const. art. I, § 8, cl. 3.

of the public's property;[313] and (c) prohibition of a State from "impairing the Obligation of Contracts."[314]

## H.   Four-factor Test to Establish Standing for a Permanent Injunction

The Court has established that a "prevailing plaintiff . . . seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

### 1.  Petitioner suffered an irreparable injury.

The Exhaustless market-clearing service is readily available, and no other competitive market allocation has emerged in the public record.  Exhaustless would have allocated the market but for Respondent Carriers anticompetitive allocation of airspace reservations.

Exhaustless has lost global business opportunities and suffered damage to its reputation because of this illegal allocation.  This was especially grievous during the COVID-19 pandemic of 2020-2023 when the market-clearing service could have entered the market, with minimized disruption, to competitively allocate airspace resources to the carriers and consumers eager to use them — both cargo service and passenger service users — after abrupt changes to, and sustained volatility of, demand and supply throughout the air transportation system.

---

[313]  *See* U.S. Const. art. IV, § 3, cl. 2.
[314]  U.S. Const. art. I, § 10, cl. 1.

## 2. Remedies available at law are inadequate.

The allocation of airspace reservations to use the public's airspace in the future is not a one-time event; the seasonal schedule for scheduled service must be allocated before the start of each season. Compensation for past injury would not redress future injury to Exhaustless' proprietary right to allocate the market and collect future market-clearing premiums.

In addition, compensation for past injury would not remedy the ongoing violation of Exhaustless' constitutional right to displace the current anticompetitive allocation with its demand-calibrated market-clearing service to provide for a consistent system of domestic and foreign commerce in air transportation. The Supreme Court has held that:

> Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. . . And the freedom guaranteed each and every business, no matter how small, is the freedom to compete — to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster.[315]

## 3. The balance of hardships warrants an injunction.

No person — neither supplier nor consumer — has a right to scarce public economic resources allocated through prohibited grandfathering schemes. The Congress decided that allocating scarce air transportation resources by market

---

[315] *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).

competition best protects the public interest – the people's rights — and that is the law, 49 U.S.C. § 40101(a)(12).

Moreover, the current grandfathering rules rigidly fix the schedules and routes.  Obtaining airspace reservations from a competitive primary market will provide the exclusive seasonal access to the airspace that carriers seek — and the proprietary right to trade any of that season's reservations in a secondary or tertiary competitive market.  This competitive market allows carriers to expand or contract service and to change routes to meet market demand — as statutorily required.[316]

Competition will also prevent the risk to shareholders of their carrier business forfeiting its economic certificate or permit by violating its statutory terms.[317]

### 4.  Permanent injunction serves the public interest.

The statutory economic policy of air transportation states that the public interest is served by (i) relying on market competition to "provide efficiency, innovation, and low prices; and to decide on the variety and quality of, and determine prices for, air transportation services," 49 U.S.C. § 40101(a)(12); (ii) allowing market competition "to provide the needed air transportation system," 49

---

[316]  *See* 49 U.S.C. § 41109(a)(2)(B).  (The Secretary "may not prescribe a term preventing an air carrier from adding or changing schedules. . . to satisfy business development and public demand.")
[317]  *See* 49 U.S.C. § 41110(a) and 49 U.S.C. § 41304(a).

U.S.C. § 40101(a)(6)(A); (iii) coordinating transportation by air carriers, 49 U.S.C. § 40101(a)(5); (iv) "developing civil aeronautics and a viable, privately-owned United States air transport industry," 49 U.S.C. § 40101(a)(14); and (v) coordinating the air transportation system with the national intermodal transportation system, 49 U.S.C. § 47101(b).  Permanent injunction of the IATA WSG coupled with the patent for the Exhaustless market-clearing service serves the public interest by ensuring that all consumers and suppliers across the nation have access to a fair, reasonable, and non-discriminatory market for scarce airspace reservations as required by the Congress in the regulation of domestic and foreign air commerce.

I.    **Future Injury Is Certainly Impending**

Petitioner must also show that "threatened injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013).

In the last three years, in addition to the claims of ownership cited *supra*, several Respondent Air Carriers have asserted the right to permanent, exclusive, and priority access to airspace at various airports.[318]

---

[318]   *See* **United Airlines** Comment, Dkt. DOT-OST-2021-0103 (Sep. 27, 2021) Doc. 330, PA-J Other 15 ("[Government action must] ensure that [other carrier operations do] not depriv[e] United of the movements necessary to serve its customers through its full service global hub at EWR"). *See also,* comments at Docket FAA-2020-0862, *e.g.,* **United Airlines** Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 331, PA-J Other 122 ("Through an administrative structure that has already been designed, built, and implemented, [the current process] preserves the overall *status quo ante* of the industry in order to enable airlines to survive the effects of the pandemic."). *See also,* **Southwest Airlines** Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 332, PA-J Other 129 (". . . a number of airlines, including Southwest, have made clear their willingness to operate additional flights . . . *now* if permanent slots were made available. . . takeoff and landing slots . . . are valuable *public assets.* . . Allowing the large incumbent carriers . . . to protect the entirety of their existing slot portfolios while

American Airlines and JetBlue claimed "title" to slots in their Northeast Alliance Agreement and claimed there was no other agreement. The DOT joined this naked agreement to not compete — with full knowledge of the IATA WSG, and of the D.C. Circuits' declaration of Exhaustless' competitive market.  The carriers fraudulently omitted their foundational market allocation agreement, the IATA WSG, from this Court in an antitrust case.  While they were in this Court, claiming that they had acted in good faith when negotiating a private agreement with regulators, the carriers attended the IATA WSG's 151st Slot Conference, the IATA WSG's 152nd slot conference, and the IATA Annual General Meeting.

On June 15, 2023, the trade association governed by, *inter alia*, American Airlines and JetBlue's CEOs, *"urge[d] governments worldwide to ensure global alignment of slot rules to safeguard the consistent, fair, and transparent allocation of airport slots under the Worldwide Airport Slot Guidelines (WASG)"* — a "transparent" process that they hid from the Court.[319]

In July 2023, the GSA announced the City Pair Program awards for fiscal year 2024, highlighting that the federal government will buy air transportation from BOS (Boston) – DCA (Reagan Washington D.C.) at a 63% lower price than

---

simultaneously barring other carriers from using the slots to add new service and competition is contrary to the public interest. . .") (italic emphasis in original, underline emphasis added).  *See also*, **Spirit Airlines** Comment, Dkt. FAA-2020-0862 (Dec. 29, 2020), Doc. 333, PA-J Other 134 ("With usage well below the caps, now is the ideal time to permit pro-competitive access at least to slots and authorizations used for domestic flying."); **JetBlue** Comment, Dkt. FAA-2020-0862 (Sep. 23, 2020), Doc. 334, PA-J Other 144 ("We welcome the ability to continue to grow our low-fare presence at EWR while also receiving FAA recognition for future priority status." (emphasis added)).

[319]  IATA Press Release, Airline Associations Join Together to Call for Global Alignment of Slot Regulations (Jun. 15, 2023), Doc. 313, PA-D Agreement 1091.

other corporate contracts, which would be even more of a discount over the price paid by the rest of the people.[320]

On July 21, 2023, American Airlines notified the DOT that it was reducing certain service to Cuba to deploy its aircraft on other routes in response to market conditions, but wanted to retain the reservations in case American Airlines decides to offer the Cuba service again, and so requested a waiver from its obligation to use the reservation,[321] which the DOT granted on August 11, 2023, for the entire IATA Winter season of 153 days.[322]  The people are thus denied the use of this airspace to connect Cuba and the U.S., negotiated in a bilateral agreement by the two governments for the benefit of their people.

On August 7, 2023, Airlines for America requested the FAA to grant a waiver of the slot usage term of its carrier-member's private IATA WSG agreement for airspace reservations to New York City's large hub airports through the IATA summer season ending October 28, 2023.[323]  The trade association claimed it is "actively working on additional ideas for the upcoming year and will be in contact with you in the near future," and did not mention the Exhaustless competitive

--------------------

[320]   *See* GSA City Pair Program (CPP) FY24 Contract Awards (Jul. 2023), Doc. 354, PA-H CarrierInfo 315.

[321]   See American Airlines, Request for Cuba Waiver, Dkt. DOT-OST-2022-0073 (Jul. 21, 2023), Doc. 388, PA-B Rulemaking 806.

[322]   *See* DOT Notice of Action Taken, Dkt. DOT-OST-2022-0073 (Aug. 14, 2023), Doc. 389, PA-B Rulemaking 811

[323]   Airlines for America Letter to FAA re Slot Usage Waiver (Aug. 7, 2023), Doc. 342, PA-J Other 172.

market.[324]  On August 9, 2023, by press release, the FAA granted the requested
waiver of the terms of the carriers' private IATA WSG agreement and noted that
American Airlines request for a slot usage waiver for the following IATA winter
season would be addressed separately.[325]  On September 20, 2023, the FAA
'granted' waivers from the slot usage requirements through the end of the Summer
2024 carrier scheduling season on October 26, 2024.[326]

The ignorance and/or contempt of the U.S. Constitution, the public's property
rights to navigable airspace, and Title 49 laws has distorted the separation of
powers between the branches of the federal government; the separation of powers
between the federal government, the state governments, and the people; the equal
rights of every citizen; and federalism itself.  The Attorney General of Florida joined
the DOJ to enforce the antitrust laws against JetBlue in its NEA agreement that
relied on airspace reservations used to access New York and Massachusetts, but
then waived antitrust enforcement in a merger between JetBlue and Spirit that
relied on airspace reservations that serve Florida — to negotiate expanded air
transport service for Florida's ports.  Yet the People prohibited States from
regulating "Commerce with foreign Nations, and among the several States, and

_____

[324]  *Id.*

[325]  *See* FAA Press Release, FAA Extends Flexibility for Airlines (Aug. 9, 2023), Doc. 352, PA-J
Other 223. *See also,* FAA NYC_Waiver_Extension_FAA_8-8-23, Doc. 353, PA-J Other 224. *See also,*
FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], September 16, 2023,
Through October 28, 2023, 88 Fed. Reg. 54873 (Aug. 14, 2023), Doc.

[326]  See FAA Staffing Related Relief Concerning Operations at [DCA, JFK, LGA, EWR], 88 Fed.
Reg. 64793 (Sep. 20, 2023).

with the Indian Tribes" for this very reason; to provide for a nationally consistent regulatory framework.[327]

These facts show that the Respondents restraint of trade in reservations to use the public's National Airspace System is certainly impending — and as a market-clearing entity, an injury to competition to use the airspace capacity is an injury to Exhaustless.

## J.    The Public's Right to the Patent

To protect competition itself, the Court must issue the patent for Exhaustless' market-clearing service.  The patent will ensure a consistent national market, protected by the private-sector enforcement of antitrust laws and free of regulatory interference from all levels of government, as called for by the U.S. Constitution and specifically by the Federal Aviation Act, as amended.

> The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.  The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.[328]

---

[327]   U.S. Const. art. I, § 8, cl. 3.  *See also*, U.S. Const. art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land[.]").  *See also*, U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Therefore, the powers delegated to the United States by the Constitution are reserved to the United States.)

[328]   *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

The People retain the right to compete for economic resources.  In 1891, the Supreme Court declared:

> To carry on interstate commerce is not a franchise or a privilege granted by the State; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States[.][329]

Air transportation is a multi-sided market.[330]  One side is the public, which holds the title to the navigable airspace used by aircraft for air commerce.[331]  A second side is the public's fiduciary, the Congress, that sets the rules for using and protecting the public's airspace.[332]  A third side is the consumer (passenger and shipper) that demands air transportation for convenience and necessity.[333]  A fourth side is the supplier (carrier) that provides its choice of air transportation service to meet the demand of passengers and shippers, where and when it chooses.[334]  A fifth

---

[329]   *Crutcher v. Kentucky*, 141 U.S. 47, 57 (1891).

[330]   *See* 49 U.S.C. § 40102 ("air transportation means the transportation of passengers or property by aircraft as a common carrier for compensation, or the transportation of mail by aircraft" (cleaned up)).

[331]   See *U.S. v. Causby*, 328 U.S. 256 (1946).

[332]   *See* U.S. Const. art. IV, § 3, cl. 2.

[333]   *See* 49 U.S.C. § 101(a) ("The national objectives of general welfare, economic growth and stability, and security of the United States require the development of transportation policies and programs that contribute to providing fast, safe, efficient, and convenient transportation at the lowest cost consistent with those and other national objectives, including the efficient use and conservation of the resources of the United States.").

[334]   *See* 49 U.S.C. § 41109(a)(2) ("The Secretary . . . may not prescribe a term preventing an air carrier from adding or changing schedules, equipment, accommodations, and facilities for providing the authorized transportation to satisfy business development and public demand."). *See also*, Civil Aeronautics Board Fiscal Year 1981/1982 Reports to Congress, page 1 (1983) ("With the expiration of the control over domestic routes on December 31, 1981, which was mandated by the Airline Deregulation Act, the Board's domestic route program came to a conclusion.  On that date, carriers

side is the sovereign, again the Congress, that regulates the rules of the market for air commerce.[335] To clear the excess demand for the use of the airspace, Exhaustless developed and disclosed a sixth side — an independent private-sector market-clearing service that discovers and broadcasts the (a) congestion-free capacity of reservations for an instrument flight rule takeoff or landing for each airspace before each carrier scheduling season, (b) the market-clearing price of carrier demand for the carrier scheduling season of airspace reservations for an aircraft to provide scheduled service, which is broadcast in a seasonal auction; and (c) a demand-calibrated market-clearing price of consumer demand of an airspace reservation on a scheduled flight, which is broadcast by the air tariff publishing system along with the price of the carrier's service.

Suppliers and consumers are equally protected under the U.S. Constitution,[336] as enumerated by Supreme Court precedent:

> [T]he Citizenship Clause of the Fourteenth Amendment does not provide for, and does not allow for, degrees of citizenship based on length of residence. And the Equal Protection Clause would not tolerate such distinctions. In

---

holding domestic certificates received authority to serve any domestic or territorial point." (internal reference omitted)).

[335] *See* U.S. Const. art. I, § 8, cl. 3.

[336] *See* U.S. Const. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States.") *See also*, Google Dictionary ("the group of people belonging to the noble class in a country, especially those with a hereditary or honorary title."). *See also*, https://legal-dictionary.thefreedictionary.com/Nobility ("An order of men in several countries to whom privileges are granted at the expense of the rest of the people.").

short, as much as the right to travel, equality of
citizenship is of the essence in our Republic.[337]

And more recently, in an alleged antitrust case:

Focusing on one dimension of competition tends to distort
the competition that actually exists among two-sided
platforms.  Any other analysis would lead to mistaken
inferences of the kind that could chill the very conduct the
antitrust laws are designed to protect.[338]

Because the market-clearing service has no power to charge above-market

prices, the clearing of excess demand and excess supply in a fair, open, and non-

discriminatory market, as We the People agreed to, protects the constitutional right

of each human to use the airspace — each pilot, crew member, passenger, and

shipper, on an equal basis — regardless of age or any current or former occupation.

The Court should also issue the patent to protect the Public's constitutional

right to progress in the science and the arts:

This Court has recognized, and the parties do not dispute,
that the decision to grant a patent is a matter involving
public rights—specifically, the grant of a public franchise.
. .  As this Court has long recognized, the grant of a
patent is a matter between the public, who are the
grantors, and the patentee.[339]

---

[337]  *Zobel v. Williams*, 457 U.S. 55, 70 n.3 (1982) (Brennan, J., concurring).

[338]  *See, e.g.*, *Ohio v. AMEX*, 585 U.S. ___ (2018) (slip op. at 14) (internal quotations and references
omitted).

[339]  *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. ___ (2018) (slip op. at
7) (internal quotation marks and references omitted).

The Court should also issue the patent to protect the Public's constitutional right to progress in the science and the arts of preventing chronic congestion delays in transportation through a multi-sided market clearing process.  As the Supreme Court ruled over 150 years ago:

> We are all citizens of the United States, and as members of the same community must have the right to pass and repass through every part of it without interruption, as freely as in our own states.[340]

And as the D.C. Circuit Court ruled over 70 years ago, in another case where American Airlines was trying to block a new type of air transportation service:

> [The Civil Aeronautics Board (CAB)] was indicating the substantial amount of such traffic which it believed could and, if adequately sought and promoted, would be developed. The substance of this undeveloped industry is an element of public convenience and necessity in any economy of progress.[341]

---

[340]   *Crandall v. Nevada*, 73 U.S. 35, 49 (1867).

[341]   *American Airlines v. Civil Aeronautics Board*, 192 F.2d 417, 422 (D.C. Cir. 1951).

## REQUEST FOR RELIEF

**A.    Request for Relief**

Petitioner requests that:

1.   The Worldwide Slot Guidelines of the International Air Transport Association[342] be adjudged to be a *per se* market allocation and price fixing agreement to restrain trade in reservations to use the public's airspace, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1;

2.   The allocation of airspace reservations with grandfathering by Respondents, except Respondent the United States, since June 7, 2018, be adjudged to be a group boycott of the Exhaustless airspace reservation market, a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.   Respondents be permanently enjoined from continuing and restrained from further implementing the IATA Worldwide Slot Guidelines (also called Worldwide Scheduling Guidelines and Worldwide Airport Slot Guidelines);

4.   The patent for Exhaustless Inc.'s patent application 15/789,585 for its demand-calibrated market clearing process be issued in order to protect competition among suppliers and competition among consumers in airspace reservations in air commerce as required by section 3 of the

---

[342]   *See* Doc. 69, PA-D Agreement 136

Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a)(6)(A), (9), and (12), and to protect the Public's constitutional right, U.S. Const. art. I, § 8, cl. 8, to progress in the art of preventing chronic congestion delays in transportation through a multi-sided market-clearing process;[343]

5.  Patent Number 9,156,564 (2015) for Exhaustless Inc.'s assisted takeoff system and Patent Number 9,920,695 (2018) for Exhaustless Inc.'s controlled descent system be extended to 18 years after the issuance of the patent in the previous paragraph;

6.  Compensation from Respondent Air Carriers and Foreign Air Carriers for threefold the revenue, pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15(a), that Exhaustless Inc. was entitled to earn from its proprietary right to allocate the public airspace reservation market to suppliers with its market-clearing service since June 7, 2018.  The value of the property is difficult to estimate because there has never been a competitive market for reservations.  The most recent study of delay costs valued the annual cost of domestic passenger service delays to suppliers — based on a DOT value of time — at $8,300,000,000 in 2007;[344] the study also proposed

---

[343]  *See* J. The Public's Right to the Patent, *supra.*

[344]  *See* Michael Ball, et al., Total Delay Impact Study, National Center of Excellence for Aviation Operations Research ("NEXTOR") (Nov. 3, 2010), Doc. 2, PA-A InfoCongress 38 at 49 and 62 ("We focus on domestic data, since airline on-time performance records are only for domestic flights. In our study, the selected airlines are all passenger service focused, with only a small portion of their traffic undertaking cargo, mail, and other types of business.").

that the market price to avoid delays was likely higher.[345]   This cost
equates to $61,070,000,000 over five years at a June 2023 dollar value,
and treble damages brings the value to $183,210,000,000.  Exhaustless
does not have access to a reliable study of the cost of domestic and foreign
cargo and mail service delays or foreign passenger service delays, so the
estimate of damages excludes a valuation of that portion of the market;

7.  **That each Respondent Carrier be adjudged to have engaged in
racketeering activity pursuant to section 1365(b) of the Money
Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B):**

    a.  **every day since June 7, 2018, by selling reservations in
domestic and foreign air commerce which it had acquired
unlawfully, 18 U.S.C. § 1957;[346]**

    b.  **by attending the IATA Annual General Meetings to
manage and carry on the IATA WSG agreement[347] and
thereafter maintaining and continuing the IATA WSG
agreement, 18 U.S.C. § 1952;**

---

[345]  *Id.* at 57 ("In general, passengers are willing to pay a higher price for less delayed flights[.]").

[346]  *See* BB.1 Carrier Sells Reservations to Consumers, *supra.*

[347]  *See, e.g.,* IATA Resolution on Slot Policy, 75th Annual General Meeting (Jun. 2, 2019), Doc. 304,
PA-D Agreement 1082.

     c.  by attending the twice-a-year IATA Slot Conferences to distribute the seasonal airspace reservations procured by unlawful grandfathering,[348] 18 U.S.C. § 1952;

8.  Consequent to paragraph 7, that each Respondent Carrier be adjudged to be engaged in a pattern of racketeering pursuant to 18 U.S.C. § 1961(5);

9.  Compensation from Respondent Air Carriers and Foreign Air Carriers for threefold the revenue, pursuant to section 901(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(c), that Exhaustless Inc. was entitled to earn from its proprietary right to allocate the public airspace reservation market with its market-clearing service since June 7, 2018. The value of the property is difficult to estimate because there has never been a competitive market for reservations.  The most recent study of delay costs valued the annual cost of domestic passenger service delays to the public — based on a TRN value of time — at $31,200,000,000 in 2007;[349] the study also proposed that the market price to avoid delays was likely higher.[350]  This cost equates to $229,000,000,000 over five years at a June 2023 dollar value, and treble damages brings the value to

---

[348]  See, e.g., Exhaustless Documentation of IATA WSG Calendar of Coordination History, Doc. 14, PA-D Agreement 1.

[349]  See Michael Ball, et al., Total Delay Impact Study, National Center of Excellence for Aviation Operations Research ("NEXTOR") (November 3, 2010), Doc. 2, PA-A InfoCongress 38 at 49 and 62 ("We focus on domestic data, since airline on-time performance records are only for domestic flights. In our study, the selected airlines are all passenger service focused, with only a small portion of their traffic undertaking cargo, mail, and other types of business.").

[350]  Id. at 57 ("In general, passengers are willing to pay a higher price for less delayed flights[.]").

$687,000,000,000.  Exhaustless does not have access to a reliable study of the cost of domestic and foreign cargo and mail service delays or foreign passenger service delays, so the estimate of damages excludes a valuation of that portion of the market.  Combined with the antitrust claim of $183,210,000,000,[351] the total claim is $870,210,000,000;

10. Air Tariff Publishing Company[352]  be adjudged to be a corporate trust in service to the conspiracy to not compete, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1;

11. Respondent Air Carriers and Foreign Air Carriers that are co-owners be ordered to forfeit ownership of Air Tariff Publishing Company to the United States, pursuant to 18 U.S.C. § 1962;

12. Respondent United States be ordered to divest Air Tariff Publishing Company, at the market price, to Exhaustless Inc. to publish the full airfare per 14 C.F.R. § 399.84(a);

13. Each Respondent Passenger Carrier be adjudged to have violated the U.S. Const. art. I, § 8, cl. 5, by coining its own currency and regulating the value thereof;[353]

14. Each Respondent Passenger Carrier be adjudged to have engaged in racketeering activity pursuant to section 1365(b) of the Money

---

[351] *See* A. Request for Relief, ¶5, *supra*.

[352] *See* AA. ATPCO, *supra*.

[353] *See* BB.3. Carrier Coins its Own Currency, *supra*.

Laundering Control Act of 1986, 18 U.S.C. § 1961(1)(B), by selling the carrier's currency to passengers, credit card companies, hotels, and others, which paid in U.S. currency,[354] in violation of section 1352(a) of the Money Laundering Control Act of 1986, 18 U.S.C. § 1956(a);

15. That the following carriers be adjudged to have engaged in racketeering activity pursuant to section 314(b) of Pub. L. 95-575 (Nov. 6, 1978), 18 U.S.C. § 1961(1)(D) by fraudulently claiming ownership of current and future reservations to use the public's airspace in a case under title 11 of the U.S. code:[355]

   a. Respondent American Airlines, by its predecessor US Airways, between August 11, 2002, to March 31, 2003;

   b. Respondent United Airlines between Dec. 9, 2002, to February 1, 2006;

   c. Respondent Delta Air Lines between September 14. 2005, to April 30, 2007; and

   d. Respondent American Airlines between November 29, 2011, to December 9, 2013;

16. Respondents American Airlines and JetBlue Airways be adjudged to have engaged in racketeering activity, pursuant to section 901(a) of the

---

[354] *See id.*

[355] *See* BB.5. Other Claims of Ownership of Public Assets, *supra*.

Organized Crime Control Act 1970, 18 U.S.C. § 1961(1)(B), by obstructing the due administration of justice by not disclosing to this Court the IATA WSG as part of their Northeast Alliance Agreement,[356] in violation of law passed June 25, 1948, ch. 645, 62 Stat. 683, 769, 18 U.S.C. § 1503;

17. San Francisco Terminal Equipment Company, L.L.C. (SFOTEC)[357] be adjudged to be a corporate trust in service to the conspiracy to restrain trade in airspace reservations, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1;

18. Respondent Air Carriers and Foreign Air Carriers that are co-owners be ordered to dissolve SFOTEC, pursuant to 18 U.S.C. § 1964(a);

19. The agreement of merger between Respondents JetBlue Airways and Spirit Airlines[358] be adjudged to violate 18 U.S.C. § 1001 by making a false claim to a proprietary right to airspace reservations allocated by unlawful grandfathering;

20. Respondents JetBlue Airways and Spirit Airlines be permanently enjoined from continuing and restrained from further implementing the agreement of merger;

---

[356]   *See* Doc. 322, PA-D Agreement at 1093.

[357]   *See* San Francisco Board of Supervisors, Notification of Contract Approval (Aug. 3, 2012), Doc. 392, PA-J Other 261.

[358]   *See* Doc. 323, PA-D Agreement 1131.

21. The agreement between Respondents JetBlue Airways and Frontier Group Holdings regarding "divestiture" of public assets at LaGuardia, New York City airport[359] be adjudged to be a *per se* market allocation and price fixing agreement to restrain trade in reservations to use the public's airspace, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

22. Respondents JetBlue Airways and Frontier Group Holdings be permanently enjoined from continuing and restrained from further implementing their "divestiture" agreement;

23. The Agreement between the USDOT and Respondents American Airlines and JetBlue Airways dated January 10, 2021,[360] be adjudged to violate Exhaustless' first amendment right to free speech, U.S. Const. amend. I, to discover and broadcast the market-clearing price of airspace reservations, Exhaustless' first amendment right to free speech to engage in commerce, and section 3 of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a), which requires market competition to decide matters related to price, route, and service in air transportation;

24. The Agreement between the USDOT and Respondents American Airlines and JetBlue Airways dated January 10, 2021,[361] be adjudged to violate 18

---

[359] *See* Doc. 324, PA-D Agreement 1242.

[360] *See* Doc. 75, PA-D Agreement 204.

[361] *See id.*

U.S.C. § 1001 by making a false claim to a proprietary right to airspace reservations allocated by unlawful grandfathering;

25. Respondents American Airlines, JetBlue Airways, and the United States be permanently enjoined from continuing and restrained from further implementing the Agreement with the USDOT dated January 10, 2021;

26. The Agreement between the USDOT and Respondent American Airlines (the merged company) dated November 12, 2013,[362] be adjudged to violate section 3 of the Airline Deregulation Act of 1978, 49 U.S.C. § 40101(a), which requires market competition to decide matters related to price, route, and service in air transportation;

27. The Agreement between the USDOT and Respondent American Airlines (the merged company) dated November 12, 2013,[363] be adjudged to violate 18 U.S.C. § 1001 by making a false claim to a proprietary right to airspace reservations allocated by unlawful grandfathering;

28. The Settlement Agreement between Respondents JetBlue Airways, Spirit Airlines, and the Attorney General of the State of Florida dated March 6, 2023,[364] be declared to violate the U.S. Const. art. I, § 8, cl. 3, art. IV, § 3, cl. 2, and art. I, § 10, cl. 1;

---

[362] *See* TRN Agreement regarding Merger Between US Airways Group, Inc. and AMR Corp. (Nov. 12, 2013), Doc. 191, PA-I Antitrust 463.

[363] *See id.*

[364] *See* , Doc. 214, PA-I Antitrust 698.

29. Respondents JetBlue Airways, Spirit Airlines, and the Attorney General of the State of Florida be permanently enjoined from continuing and restrained from further implementing the Settlement Agreement dated March 6, 2023;

30. The Settlement Agreement between Respondents American Airlines (the merged company) and the Attorney General of the State of Texas dated September 30, 2013,[365] be declared to violate the U.S. Const. art. I, § 8, cl. 3, art. IV, § 3, cl. 2, and art. I, § 10, cl. 1;

31. Respondent Air Carriers and Foreign Air Carriers be permanently enjoined from continuing and restrained from further implementing the air carrier alliance agreements that fraudulently stated there were no other agreements, whereas they were predicated on the IATA WSG, including:

    a. The undisclosed West Coast International Alliance Agreement between Respondents American Airlines and Alaskan Airlines;[366]

    b. The "oneworld" Alliance between Respondents Alaska Airlines, American Airlines, and International

---

[365] *See* US Airways and AMR Settlement Agreement Texas (Sep. 30, 2013), Doc. 192, PA-I Antitrust 484.

[366] See *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PA-I Antitrust 749 at 764.

Consolidated Airlines Group's subsidiaries Aer Lingus,
British Airways, and Iberia Airlines;[367]

c.  The "SkyTeam" Alliance between Respondents Air
France-KLM, and Delta Air Lines;[368]

d.  The alliance between Respondents Delta Air Lines and
LATAM Airlines Group;[369]

e.  The "Star" Alliance between Respondents Air Canada,
United Airlines, and Deutsche Lufthansa and its
subsidiaries Austrian Airlines and SWISS.[370]

32. Contracts made by Respondent Carriers for scheduled air transportation
market at discriminatory prices and service between different purchasers
be adjudged to have violated Section 2 of the Clayton Act, 15 U.S.C. §
13(a);[371]

33. Respondent Carriers be permanently enjoined from continuing and
restrained from further implementing any such discriminatory contracts
for scheduled air transportation;

---

[367] *See* DOT List of Active Antitrust Immunized Alliances (Oct. 19, 2022), Doc. 287, PA-D
Agreement 806.

[368] *See id.*

[369] *See id.*

[370] *See id.*

[371] *See* e.g., GSA City Pair Program (CPP) FY24 Contract Awards (Jul. 2023), Doc. 354, PA-H
CarrierInfo 315. *See also*, the USTRANSCOM list of contracts at footnote 254.

34. United States statute 49 U.S.C. § 49111 be declared to violate the U.S. Const. art. I, § 9, cl. 8, and Respondent U.S. be enjoined from enforcing it;

35. United States statute 49 U.S.C. § 49109 be declared to violate the U.S. Const. art. I, § 9, cl. 6, and Respondent U.S. be enjoined from enforcing it;

36. United States statute 49 U.S.C. § 49106(e) be declared to violate U.S. Const. art. I, § 8, cl. 3, and Respondent U.S. be enjoined from enforcing it;

37. United States statute 49 U.S.C. § 49104(a)(4) be declared to violate U.S. Const. art. I, § 8, cl. 3, and Respondent U.S. be enjoined from enforcing it;

38. The Lease Agreement between the U.S. and Metropolitan Airports Authority, as amended,[372] be declared to violate U.S. Const. art. I, § 8, cl. 3, 49 U.S.C. § 41713, and Section 1 of the Sherman Act, 15 U.S.C. § 1 and Respondent U.S. and MWAA be permanently enjoined from continuing and restrained from further implementing the lease agreement;

39. The Port Authority of New York and New Jersey (PANYNJ) regulation regarding a perimeter rule at LaGuardia airport[373] be declared to violate the U.S. Const. art. I, § 8, cl. 3, and U.S. Const. art. IV, § 3, cl. 2, and Respondent PANYNJ be enjoined from enforcing it;

---

[372] *See* Lease of the Metropolitan Washington Airports (Mar. 2, 1987), and amendments, Doc. 308, PA-A InfoCongress 782.

[373] *See* The Port Authority of New York and New Jersey, Airport Rules and Regulations, Chapter VIII Aircraft Operations (Jul. 27, 2022), Doc. 335, PA-J Other 146, U.16 at 167.

40. Plaintiffs be awarded such other relief as the Court may deem necessary and proper.

## OATH

I declare under penalty of perjury that the foregoing is true and correct.

Signed September 27, 2023.

*/s/ Steven P. Endres*
Steven P. Endres — PRO SE

4338 Hillside Dr
Ann Arbor, Michigan 48105
steve@exhaustless.com
1-(734) 945-9231

126