## UNITED STATES DISTRICT COURT for the DISTRICT OF MASSACHUSSETS

**STEVEN P. ENDRES**

        **Plaintiff,**

v.

**ASHLEY MOODY** *et al*

        **Defendants.**

Case No. 1:23-cv-12051-FDS

## PLAINTIFF'S OPPOSITION TO CERTAIN DEFENDANTS' MOTION TO STRIKE AMENDED COMPLAINT AND DISMISS

Pursuant to Federal Rules of Civil Procedure (FRCP) Rule 7(b) and Local Rule 7.1(b)(2), Plaintiff Endres opposes Defendants' Motion to Strike the Amended Complaint and Dismiss, ECF 120 (the "Motion to Dismiss") filed jointly by certain Defendants' attorneys' ("Counsel") and responds to their supporting Memorandum of Law, ECF 121, Dec. 8, 2023. Counsel for this motion comprises eight signatures for the twenty-two licensed attorneys listed from ten law firms (eight private, one state, and one federal law firm) representing twenty-one defendants out of the total of twenty-three defendants in the case.

**1. Plaintiff's response to Defendants' limited answers.**

    a. **IATA WSG Agreement**

Despite their issue with the format of the complaint, *infra*, Counsel identified the *per se* claims regarding the IATA WSG to be a key issue and provided a partial response.  Endres intends to file a motion for summary judgment based on Counsel's admission that the International Air Transport Association's (IATA), the "relevant trade association[]", Worldwide Slot Guidelines (WSG) is a market allocating agreement by and among IATA-member air carriers for reservations to take off and land, ECF 121 at 2, as stated in his Amended Complaint, ECF 17 at 19.  A market allocation agreement among horizontal competitors is a *per se* violation of § 1 of the Sherman Act, see Amended Complaint, ECF 17 at 82 (referencing *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)).

Trade associations do not regulate commerce — The Congress does.  U.S. Const. art. I, §8, cl. 3.  The Congress cannot delegate this legislative authority — as has been recognized since the Supreme Court declared the National Industrial Recovery Act unconstitutional in 1935.  *A. L. A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935) ("But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises?

And, could an effort of that sort be made valid by such a preface of generalities as to permissible aims as we find in section 1 of title I? The answer is obvious. Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress.").

Counsel denies Endres' claim that the IATA WSG agreement fixes the price of the airspace reservation to $0, Amended Complaint ECF 17, §C.1(c) at 20, stating that "the WSG . . . do [sic] not establish prices for any good or service," ECF 121 at 2. Counsel did not respond to the public evidence Endres provided that the IATA WSG sets the price that carriers pay *to procure* the seasonal airspace reservation to $0.[1] Counsel's denial is therefore not factual, in violation of Rule 11(b)(3).

Counsel claims that "airport owners and operators can allocate reservations for flight take offs and landings", ECF 121 at 2. But only the federal government has sovereignty over the airspace, 49 U.S.C. § 40103(a).[2] And the Congress

---

[1] *See* IATA Worldwide Airport Slots Fact Sheet (Apr. 2023), Doc. 306, PA-D Agreement 1086 at 1087 ("Why Not Auction Slots to the Highest Bidder? Auctioning adds costs and uncertainty to the slots process with potentially disastrous outcomes for consumers.").

[2] See *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 303 (1944) (Justice Jackson, concurring) ("Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive, and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxies onto a runway, it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone, and not to any state government."). <u>See also</u>, City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633 (1973) (quoting an excerpt of this passage).

delegated the authority to decide price, routes, and service in air transportation to market competition, 49 U.S.C. § 40101(a)(6) and (12), as adjudicated by the Supreme Court in 1992.[3, 4]  The U.S. Court of Appeals for the D.C. Circuit said that the suggestion that "the FAA would delegate authority over flight schedules at LaGuardia and JFK Airports to the Port Authority defies history and blinks reality."[5]  This statement by Counsel regarding the airport's role is therefore not factual, in violation of Rule 11(b)(3).

Counsel claims that the IATA WSG is "voluntary," ECF 121 at 2. Yes, IATA member-carriers voluntarily and illegally claim entitlement to obtain free airspace reservations – runway slots – by boycotting any open competitive market for those reservations, thus negating the exclusive authority of the Congresses that have continually decided that public transportation capacity should be allocated in open market competition.  Federal regulators also voluntarily and illegally negate the

---

[3]  See *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ("In 1978, however, Congress, determining that 'maximum reliance on competitive market forces' would best further 'efficiency, innovation, and low prices' as well as 'variety [and] quality ... of air transportation services,' enacted the Airline Deregulation Act (ADA). . . To ensure that the States would not undo federal deregulation with regulation of their own, the ADA included a pre-emption provision, prohibiting the States from enforcing any law 'relating to rates, routes, or services' of any air carrier." (omitting references)).

[4]  During the era of the failure of the market to allocate reservations, the Secretary of Transportation stepped in to administratively allocate reservations for flight take offs and landings, 50 Fed. Reg. 52180 (Dec. 20, 1985).  *Note that* the failure of the Secretary of Transportation from stepping out of the allocation of reservations when the market appeared is the basis of Endres' takings claim in the companion case, Endres v. United States, 1:23-cv-01536 in the U.S. Court of Federal Claims.

[5]  *Exhaustless Inc. v. F.A.A.*, 931 F.3d 1209, 1213 (D.C. Cir. 2019).

4

Congress' authority by enforcing the IATA WSG. But the IATA WSG is *involuntary* for non-IATA-member carriers since the federal government enforces the private agreement, and waivers to the private agreement, on behalf of the IATA member-carriers. See *Spirit Airlines, Inc. v. DOT*.[6] And the IATA WSG is *involuntary* for consumers, which are given no choice.[7] This statement by Counsel is therefore not factual, in violation of Rule 11(b)(3).

Counsel claims that the IATA WSG is "free," ECF 121 at 2.[8] The cost of the guidelines or the software used to allocate the reservation to use the public's

---

[6] See *Spirit Airlines, Inc. v. DOT*, No. 19-1248, 10 (D.C. Cir. 2021), Doc. 82, PA-G Court 218 ("We question just how 'voluntary' this [overall scheduling] regime is. . . . A request for help backed by a threat hardly seems a call for voluntary action; at best, the airlines appear to have been 'voluntold.' U.S. Army, "Soldier-Speak: A Brief Guide to Modern Military Jargon" (Mar. 9, 2015)[.]. . There, as here, 'the voluntary form of the rule is but a veil for the threat it obscures.'" (references omitted)).

[7] See IATA Worldwide Slot Guidelines, 9th Edition (Effective Jan. 1, 2019), Dkt. FAA-2020-0862 (Dec. 17, 2020), Doc. 69, PA-D Agreement 136, §1.3 at 152 (which lists the "stakeholders in airport coordination" that excludes the public and consumers). *See also*, Notice of withdrawal of request for information, 85 Fed. Reg. 86983 (Dec. 31, 2020); Doc. 73, PA-B Rulemaking at 235 ("The issue of airline restrictions on the distribution or display of airline flight information on third-party travel websites is a complex issue with far-reaching implications for consumers, airlines, ticket agents, and the various participants in the distribution chain. The Department recognizes that transparency is not only good for consumers but also good for competition in the airline industry. However, the Department also believes that airlines should be able to choose how and where they sell their products so long as they do not engage in unfair or deceptive practices. These two goals are not mutually exclusive.").

[8] Endres does not know how, or by whom, the IATA WSG enterprise software system is funded.

airspace is not relevant in this case; it is the value of the underlying airspace reservation itself — the "treasure" — that is at issue.[9]

Counsel misrepresented Endres as a disgruntled shareholder that tried to sell his company's "product for allocating reservation slots at airports." ECF 121 at 2. Endres' company never offered to sell a product; rather, Endres' company offered a market to competitively allocate airspace reservations — the instrumentalities of domestic and foreign scheduled air transportation — to suppliers and to consumers, which replaces the IATA WSG agreement to allocate slots to suppliers with grandfathering. Amended Complaint, ECF 17 at 10-11.

> b. **Patent relief**

Counsel answers that "[Plaintiff] also requests relief that this Court cannot provide, including the issuance of two patents." ECF 121 at 3. Counsel's answer lacks any legal support, in violation of Rule 11(b)(2).

Endres requested the Court issue *one* patent to protect the *public's right* to compete for airspace reservations. Amended Complaint, ECF 17, ¶A4 at 114, ¶J at 109. As Defendants JetBlue Airways and Spirit Airlines recently asserted, "When crafting equitable remedies under the Clayton Act, district courts 'are clothed with large discretion to model their judgments to fit the exigencies of the particular case.'

---

[9] U.S. et al v. JetBlue and Spirit, Case 1:23-cv-10511 (D.Mass.), Defendants' Proposed Findings of Fact, ECF 444 at 137 (Dec. 13, 2023) ("The divestitures [of slots] present a generational opportunity to get into some of these airports. It's extremely hard to get into. So these really are the treasure." (quoting JetBlue's CEO)).

6

*United States v. E. I. Du Pont De Nemours & Co.*, 353 U.S. 586, 607-08 (1957) (internal quotation marks and citation omitted)."[10]

The Congress has provided to the Court The All Writs Act, Amended Complaint ECF 17 at 5, and the President of the United States has declared a policy to engage the Whole of Government to protect market competition, Executive Order 14036 of July 9, 2021.  The Court will decide if mandamus to the Undersecretary of Commerce for Intellectual Property is appropriate in this case to uphold Congress' authority to regulate commerce and to protect bankruptcy proceedings from false claims of ownership of public assets.

**2. The derivative action cannot be prosecuted pro se.**

The main argument Counsel makes in its Motion to Dismiss is that "Mr. Endres cannot prosecute his corporation's claims *pro se*."  ECF 121 at 5.  Endres agrees.

On October 20, 2023, certain Defendants filed a Motion for Extension of Time to Respond, requesting an expansion of time for all defendants to respond to January 25, 2024, regardless of when each defendant was served.  ECF 49.  Defendants claimed that they planned to file the instant motion to strike if Endres did not retain an attorney, but referenced no law, only 'supporting' case law that was not relevant to the case at bar.  *Id.*  On October 23, 2023, the court granted the motion, adding between 59 to 91 days to each defendant's time to respond.  ECF 58.

---

[10] U.S. et al v. JetBlue et al, 1:23-cv-10511 (D.Mass.), ECF 446, ¶180 at 58 (Dec. 13, 2023).

7

At the time of the Nov. 28, 2023, status conference, Endres did not plan to amend his complaint. The Court granted Defendants request to file an early motion to strike by December 8, 2023, and their request to vacate the January 25, 2024 deadline to respond to the Amended Complaint to give Defendants time to file a motion to dismiss in case the motion to strike failed.[11] ECF 108. Then on Nov. 30, 2023, the U.S. Court of Federal Claims (CFC) in Plaintiff's companion case explained the law, as established through relevant case law, that a derivative action belongs to the company; the CFC ordered Endres to either hire an attorney to prosecute the company's claims or amend the complaint to only prosecute his personal claims.[12] Endres v. U.S., 1:23-cv-01536, ECF 14. After reviewing the case law and his choices, Endres requested this Court's leave to amend his complaint to only represent his personal claims, pursuant to Rule 15(a)(2), ECF 113, Dec. 5, 2023 — which the rule states that "[t]he court should freely give leave when justice so requires."[13]

---

[11] *See* Tr. of Nov. 28, 2023 Status Conference at 12:01-6.

[12] Defendants' memorandum of law incorrectly stated that the Court of Federal Claims (CFC) granted the DOJ's "motion to dismiss," ECF 121 at 1. Rather, the CFC granted the DOJ's motion to dismiss or stay the case, and the case is stayed pending Endres filing an amended complaint.

[13] Counsel separately responded to Endres's motion for leave to amend his complaint on December 15, 2023, at ECF 122, asserting that the operative complaint does not "plausibly suggest that Mr. Endres has, or could assert, any injury personally." *Id*. at 3. However, the operative complaint referenced two patents and a patent application that Exhaustless owns; Endres is the sole inventor for each of those inventions and assigned those patents to his company. Endres inventions were specifically designed to meet the Congressional intent for a competitive market to determine price, route, and service in air transportation.

8

Counsel's rearranged timeline of events misconstrue Endres' actions as a plot to waste their time. Endres' only goal in this court is to legally protect his interests without delay.

Counsel's Memorandum of Law, ECF 121 at 5, quotes a U.S. Supreme Court ruling that "[i]t has been the law for the better part of two centuries . . . that a corporation may appear in federal courts only through licensed counsel." *Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993). But rather than cite the 200-year-old law the court was adjudicating,[14] Counsel cites only this Court's Local Rule 83.5.5(c), adopted in 2015, as the legal standard, stating "[t]he Amended Complaint should be stricken as a matter of law." ECF 121 at 5. Since Local Rule 83.5.5(c) is not a law, the Motion to Dismiss is not sufficiently supported, in violation of Rule 11(b)(2).

Endres asks the Court to deny the certain Defendants' motion to dismiss because it is based on a non-judicial local rule of this Court.

## 3. The Amended Complaint does not follow FRCP Rules 8 and 10 formatting requirements.

Counsel's second reason to dismiss cited in its Memorandum of Law is that Endres failed to comply with the Federal Rules of Civil Procedure (FRCP) because

---

[14] *See* 506 U.S. 194, 202 ("As the courts have recognized, the rationale for that rule applies equally to all artificial entities. Thus, save in a few aberrant cases, the lower courts have uniformly held that 28 U. S. C. § 1654, providing that 'parties may plead and conduct their own cases personally or by counsel,' does not allow corporations, partnerships, or associations to appear in federal court otherwise than through a licensed attorney.").

the format of the complaint does not follow requirements of Rules 8 and 10. ECF 121 at 10. This brings the Motion to Dismiss under Rule 41(b). Endres will next explain the reason for this perceived deficiency.

The U.S. had brought its antitrust case against Defendants American Airlines and JetBlue's Northeast Alliance agreement to this Court on Sep. 21, 2021.[15] Endres began providing relevant information to the attorneys for the Department of Justice's (DOJ) antitrust division, representing the U.S.

As of November 30, 2021, Endres had intended to file his complaint in the Supreme Court of the U.S. because "[e]xceptional circumstances warrant the exercise of the [Supreme] Court's discretionary powers because the rights claimed by carriers and conferred in the administrative allocation of reservations to use scarce national airspace directly undermine the Constitutional and statutory framework, affecting passengers in over 1.1 billion annual enplanements across the U.S. on domestic and foreign carriers."[16] Then, on January 14, 2022, the DOJ notified Endres that the DOJ is required to provide the information that Endres had provided to them "to each carrier-defendant's outside counsel, categorized as highly confidential submissions and governed by the court's default protective order."[17]

---

[15] *See* U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Complaint, ECF 1 (Sep. 21, 2021), Doc. 105, PA-I Antitrust 1.

[16] SCOTUS Permanent Injunction Draft v34.3 (Nov. 30, 2021), Doc. 117, PA-A InfoCongress 314 at 332. *See also*, Endres v. U.S., ECF 1, ¶58 at 81.

[17] Endres v. U.S., ECF 1, ¶61 at 83.

Since the DOJ appeared to be acting on his information, Endres believed that the attorney for the U.S. would protect the public's interest in the navigable airspace, as the Supreme Court of the U.S. upheld in *Causby* in 1946,[18] and as the U.S. Court of Appeals for the Federal Circuit had reiterated in *Air Pegasus*.[19] Endres' interest was aligned with the public's interest because he had built his airspace reservation market-clearing process based on the public's ownership of the National Air Space; therefore, Endres believed his interest would be represented by the attorney for the U.S. before this Court. But then on Dec. 2, 2022, the attorneys representing the U.S. and several U.S. States filed a memorandum of facts in this Court stating that defendant American Airlines "owned" reservations to enter the National Air Space from a domestic airport.[20]

On March 7, 2023, the U.S. filed another complaint against air carriers in this Court, this time against the JetBlue Airways and Spirit Airlines merger agreement for violation of the antitrust laws.[21] On March 13, 2023, the DOJ antitrust division again notified Endres that the information that Endres had

---

[18] *See* U.S. v. Causby, 328 U.S. 256, 261 (1946) ("To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim.").

[19] *See* Air Pegasus of D.C., Inc. v. U.S., 424 F.3d 1206, 1217 (Fed. Cir. 2005) ("[I]t is well established under federal law that the navigable airspace is public property not subject to private ownership.").

[20] U.S. et al v. American Airlines and JetBlue Airways, D. Mass. Case 1:21-cv-11558, Plaintiff's Proposed Findings of Fact, ECF 332 (Dec. 2, 2022), Doc. 200, PA-I Antitrust 517, ¶436 at 645.

[21] *See* U.S. et al v. JetBlue Airways and Spirit Airlines, Inc., D. Mass. Case 1:23-cv-10511, Complaint, ECF 1 (Mar. 7, 2023), Doc. 215, PA-I Antitrust 708.

11

provided would be disclosed to each carrier-defendant's outside counsel, categorized as highly confidential submissions and governed by the court's protective order.[22]

On May 19, 2023, this Court enjoined the Northeast Alliance agreement but did not address the fundamental property rights of the reservations to use the public's airspace;[23] Endres realized that he would need to protect his own interest in the fair, open and competitive allocation of airspace reservations declared lawful by the D.C. Circuit. Endres knew that the IATA WSG was pertinent to this Court in the cases involving Defendants — the American-JetBlue Northeast Alliance agreement and the JetBlue-Spirit merger agreement — and to cases in other courts across the country involving Defendants, such as In Re: Domestic Airline Travel Antitrust Litigation, Case 1:15-mc-01404 in the U.S. District Court for D.C.

Endres decided that it was more important to get the parties to the conspiracy and the evidence before the Courts as quickly as possible to limit the damage caused by Defendants agreement than to start from scratch to format the complaint according to FRCP 8(a) and 10(a). In making this decision, Endres relied on rules (i) FRCP 1, "These rules . . . should be construed, administered, and employed *by the court and the parties* to secure the just, speedy, and inexpensive determination of every action and proceeding" (emphasis added); (ii) FRCP 5(d)(4), "The clerk must not refuse to file a paper solely because it is not in the form

---

[22] *See* Endres v. U.S., ECF 1, ¶100 at 115.
[23] *U.S. et al v. American Airlines and JetBlue Airways*, D. Mass. 1:21-cv-11558, Findings of Fact and Conclusions of Law, ECF 344 (May 19, 2023), Doc. 224, PA-I Antitrust 749.

12

prescribed by these rules or by a local rule or practice; (iii) FRCP 8(b)(2), "A denial must fairly respond to the substance of the allegation;" (iv) FRCP 8(e) "Pleadings must be construed so as to do justice;" and (v) FRCP 82, "These rules do not extend or limit the jurisdiction of the district courts or the venue of actions in those courts."

Due to the magnitude of the injury sustained by each IATA seasonal allocation of airspace reservations over Endres' competitive market allocation, Endres provided the court with the fastest path for an injunction, knowing that he could amend the complaint if needed.

Counsel cites *Newman v. Massachusetts*, 115 F.R.D. 341, 343 (D. Mass. 1987) to argue that "a complaint that violates the principles of Rule 8 may be struck 'within the sound discretion of the court,'" ECF 121 at 5.  However, that quote is not from the court, but is rather a quote from a textbook that the plaintiff had cited.  Likewise, Counsel cites *Alvarado-Morales v. Digital Equipment Corp.*, 843 F.2d 613 (1st Cir. 1988) in support of their motion to strike the complaint pursuant to Rule 8; but that ruling was reiterating the law at Rule 12(f) that the "court has considerable discretion in striking 'any redundant, immaterial, impertinent or scandalous matter;'" the ruling did not adjudicate Rule 8 or Rule 10.  Counsel's Motion to Dismiss based on failure to comply with Rules 8 and 10 is therefore not sufficiently supported, in violation of Rule 11(b)(2).

Defendants' and their many attorneys from many law firms have withheld the Industry's life-long agreement for self-proclaimed grandfather rights from the U.S. district courts in every case brought against an agreement, bankruptcy, or

anticompetitive practices of the Industry going back at least twenty years, while claiming in the court that they "owned" the airspace reservation.  Amended Complaint, ECF 17 at 37.  Endres' combined pleadings between this case and the companion case in the Court of Federal Claims describes each party's role in entrenching this restriction of trade, and how Endres has attempted to correct this market corruption for the past seven years.  But Defendants' want this Court to believe that the more egregious, and fatal, violation here is the format of Endres' pleading.  Counsel's Memorandum of Law, ECF 121 at 11 ("Permitting the survival of Plaintiff's unclear and unsupported pleading, which fails to satisfy basic requirements under the federal and local rules, risks wasting the Court's and Parties' valuable time and resources.").  *See also, e.g.*, "These procedural defects forcefully underscore the importance of Local Rule 83.5.5(c), which is designed, in part, to avoid inarticulate, awkward, and meritless litigation that neither courts, nor defendants, should waste time and resources on," *id.* (internal quotation marks and references omitted); "All too frequently non-lawyers, as here, bring less than considered claims and present arguments in an inarticulate, if not totally incomprehensible, manner," *id.* (internal quotation marks and references omitted); "the confusion that has resulted in this case from pleadings awkwardly drafted and motions inarticulately presented demonstrates the wisdom of such a [no-lawyer] policy," *id.* (internal quotation marks and references omitted).  Counsel further wastes this Court's and Endres' time citing *Pierce v. Collins*, Case 1:18-cv-10843-FDS, ECF 20 (D. Mass. June 4, 2018), ECF 121 at 10, which was a one-sentence

complaint about a state government official appointing a governor, followed with 300 pages of documents.  These statements, at best, were made to harass or cause unnecessary delay, in violation of Rule 11(b)(1).

Counsel claims that the Amended Complaint "is over 125 pages of . . . repetitive allegations," ECF 121 at 2.  Yet it is the actions of the defendants that are repetitive; the allegations that support Endres' claims regarding Racketeering Influenced Corrupt Organizations (RICO) merely mimic that pattern.  This statement was made to harass or cause unnecessary delay, in violation of Rule 11(b)(1).

Endres believes that Counsel's complaint in regard to the format of the Amended Complaint is for dramatic effect and moot because they already admitted to the market allocating agreement, ECF 121 at 2. However, if the Court believes that it is in the public's interest or in the interest of justice for the entrepreneur to spend his time amending the formatting of the complaint to comply with Rules 8 and 10, he welcomes an order of the Court.  However, Endres' time is not free: Since Sep. 5, 2023, when he filed his petition for a permanent injunction of the IATA WSG, Defendants have allocated the 30-week Summer 2024 carrier scheduling season's airspace reservations at the 153rd IATA Slot Conference in Dubai, United Arab Emirates from November 14 to 17, 2023 — adding tens of billions more dollars to Endres' injury.  Defendant Carriers plan to allocate the 22-

week Winter 2024 carrier scheduling season's airspace reservations at the IATA Slot Conference on June 11, 2024, in Bogota, Columbia.[24]

Endres asks the Court to deny the certain Defendants' Motion to Dismiss based on formatting. Defendants could have moved for a court order for a more definite statement of a pleading, but now that they have made pleadings, they have waived this right. Rule 12(e). Alternatively, Endres asks the Court to order him to reformat the complaint according to Rules 8 and 10. Time is of the essence since carriers are pledging the same slots to secure loans from banks,[25] loans from airport operators,[26] and loans from state agencies[27].

**4. Certain defendants' contradictory actions.**

Defendants American Airlines Group, Inc., Delta Air Lines, Inc., Southwest Airlines Co., and United Airlines Holdings, Inc., are also defendants in a case in the U.S. District Court for D.C, In Re: Domestic Airline Travel Antitrust Litigation,

---

[24] *See* https://www.iata.org/en/events/all/sc154/.

[25] *See* American Airlines Group Inc. SEC Form 8-K (Nov. 17, 2023).

[26] *See, e.g.,* New York Transportation Development Corporation, Meeting of the Directors (Aug. 18, 2020) ("WHEREAS, the Series 2020 Note and the Guaranty will secure the Borrower's [JFK International Air Terminal LLC] payment obligations under the Loan Agreement, the Borrower will grant to the Corporation and the Trustee (for the benefit of the bondholders) a leasehold mortgage in the Borrower's leasehold interest under the Lease Agreement pursuant to a Leasehold Mortgage[.]" (In other words, the PANYNJ is granting a mortgage to the terminal operator that is secured by the PANYNJ's own airport terminal, which is leased to the terminal operator, which is owned by airlines.)) at https://esd.ny.gov/sites/default/files/news-articles/Board%20Materials_5.pdf.

[27] *See, e.g.*, *id.* at 40 *et seq* (Issuance of Special Facilities Revenue Bonds, Series 2020 bonds by New York Transportation Development Corporation for the benefit of Delta Air Lines, Inc.).

Case 1:15-mc-01404. There, Delta Air Lines helped write,[28] and paid the court filing fee for,[29] a joint amicus brief filed *pro se* by New York Stock Exchange LLC and Nasdaq, Inc. Neither American, Southwest, nor United have filed a motion to compel the stock listing corporations to retain outside attorneys.

### 5. Counsel's memorandum of law in general.

This case is a big deal — for Endres and for society. Endres has signed every filing as true and correct under oath, on penalty of perjury. Counsel presents the "wide-ranging relief" requested — including an injunction of the IATA WSG and monetary damages of $870,210,000,000 —as a reason the Court should dismiss the case. ECF 121 at 2. Rather, the scope of the relief requested is a direct result of the scope of the injury caused by Defendants and the correction needed to convert air transportation to a lawful market system as intended by Congress and upheld as constitutional by the Supreme Court of the United States *Morales*, 1992.

That Counsel does not understand the effort by the Congresses, from 1978, to fully deregulate transportation, and Endres' eleven-year effort to fulfill that need, further demonstrates the failure of the market and ongoing usurpation of the supreme law of the land.

---

[28] *See* In Re: Domestic Airline Travel Antitrust Litigation, Case 1:15-mc-01404, ECF 621-1 (Nov. 20, 2023) ("[Unnamed] counsel for Defendant Delta Air Lines, Inc. helped author this Brief in collaboration with Amici.").
[29] *See id.* at ECF 623.

## 6. Defendants have waived their right to file another motion to dismiss.

Counsel claims to "preserv[e] without exception—all rights and defenses that could be raised in responsive pleadings and a motion to dismiss." ECF 120. But now that Defendants have made pleadings in the Memorandum of Law, they have waived their right to file a motion to assert Rule 12(b) defenses. Rule 12(b) ("[a] motion asserting any of these defenses must be made before pleading[.]").

Defendants have also filed their motion to dismiss for failure to comply with the Federal Rules of Civil Procedure pursuant to Rule 41(b): *see*, *e.g.*, ECF 120 at 1 ("Amended Complaint should be stricken and the action dismissed[.]"); ECF 121 at 5 ("This limited motion to strike addresses a key procedural defect with the complaint—and the case itself—that mandates dismissal."); and ECF 121 at 12 (". . . Defendants respectfully request that the Court grant the motion, strike Plaintiff's Amended Complaint, and dismiss the action.").

## 7. The U.S.'s Interest

Endres does not understand the U.S.'s interest in joining this Motion to Dismiss since 1) it admits that the IATA WSG agreement is a market allocation, which is a violation of the antitrust laws, and 2) the executive branch has adopted a "Whole of Government Competition Policy" to enforce the antitrust laws, specifically calling out "'slots' administration,"[30] and relying on the supreme law: "As the

---

[30] Executive Order 14036 of July 9, 2021, 86 Fed. Reg. 36987, 36989, 36996 (Jul. 14, 2021), Doc. 93, PA-B Rulemaking 239 ("[C]onsider measures to support airport development and increased capacity and improve airport congestion management,

18

Supreme Court has stated, for instance, the Sherman Act 'rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.' *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958)."[31] The whole of government must enforce property rights to prevent the recurring "transfer into private ownership that to which only the public has a just claim." (*See Causby, supra at footnote 18*).

### 8. Conclusion

For the reasons set forth herein, Endres asks the Court to deny the certain Defendants' Motion to Strike Amended Complaint and to Dismiss, ECF 120 (Dec. 8, 2023). Given that the Defendants have already admitted to Plaintiff's claim of an agreement to allocate the market, the formatting issue appears moot. Alternatively, if the Court finds that reformatting is in the interest of justice, Endres welcomes a Court order to reformat the complaint according to Rules 8 and 10.

---

gate access, implementation of airport competition plans pursuant to 49 U.S.C. 47106(f), and "slot" administration[.]").

[31] *Id*. at 36989.

### 9. Oath

I declare under penalty of perjury that the foregoing is true and correct.

Signed December 22, 2023.


*/s/ Steven P. Endres*
Steven P. Endres — PRO SE

4338 Hillside Dr
Ann Arbor, Michigan 48105
steve@exhaustless.com
1-(734) 945-9231